**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.   ) | No.   1:22-cr-15-1 (APM) |
| ) | |
| ELMER STEWART RHODES III, ) | |
| ) | |
| Defendant.   ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION
FOR RECONSIDERATION OF DETENTION**

The United States respectfully opposes Defendant Elmer Stewart Rhodes's motion for reconsideration of detention (ECF No. 33). Rhodes stands charged with seditious conspiracy and related offenses for orchestrating a plot to oppose by force the execution of the laws governing the transfer of presidential power following the 2020 United States Presidential Election, including an attack on the United States Capitol on January 6, 2021. Rhodes is also charged with obstructing justice for destroying evidence of that plot. Based on the compelling evidence of Rhodes's leadership of this conspiracy, there are no conditions of release that can reasonably assure the safety of the community or the defendant's appearance in court. And based on Rhodes's evidence destruction aimed at hiding his crimes and the identities of his co-conspirators, he poses a risk of obstructing justice should he be released. Pretrial detention is warranted and necessary.

**I.     Procedural Background**

On January 12, 2022, a grand jury of this Court returned an indictment charging Rhodes with seditious conspiracy, in violation of 18 U.S.C. § 2384; conspiracy to obstruct an official proceeding, in violation of 18 U.S.C. § 1512(k); obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2); conspiracy to prevent an officer from discharging any duties, in violation of 18 U.S.C. § 372; and tampering with documents or proceedings, in violation of 18

U.S.C. § 1512(c)(1). Upon return of the indictment, the Honorable G. Michael Harvey issued a warrant for Rhodes's arrest. Rhodes was arrested on January 13, 2022, in Little Elm, Texas, and he had his initial appearance before the Eastern District of Texas on Friday, January 14.

The United States moved for Rhodes's pretrial detention pursuant to 18 U.S.C. §§ 3142(f)(1)(E) (case that involves the possession or use of a firearm, destructive device, or any other dangerous weapon), 3142(f)(2)(A) (case that involves a serious risk of flight), and 3142(f)(2)(B) (case that involves a serious risk that the defendant will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror). The Honorable Kimberly C. Priest Johnson presided over a detention hearing in the Eastern District of Texas on January 24, in that Court's Case No. 4:22-mj-00011-KPJ. During the hearing, Judge Johnson took testimony from a special agent with the Federal Bureau of Investigation ("FBI") who has investigated this case, as well as two possible third-party custodians proffered by the defense. Later in the day, Judge Johnson also took testimony from the defendant's estranged wife, who contacted Judge Johnson to convey her concerns for the safety of herself and her children should the defendant be released. A transcript of the hearing is attached to this motion as Exhibit 1.

On January 26, Judge Johnson issued an Order detaining the defendant pending trial. A copy of Judge Johnson's Memorandum Opinion and Order of Detention Pending Trial is attached as Exhibit 2. Judge Johnson found that "Defendant's authoritative role in the conspiracy, access to substantial weaponry, and ability to finance any future insurrection, combined with his continued advocacy for violence against the federal government, gives rise to a credible threat that Defendant's release might endanger others by fostering the planning and execution of additional

violent events." For all the reasons cited in Judge Johnson's Detention Order and those laid out in greater detail below, the defendant must be detained pending trial.

## II. Legal Standard

"If a person is ordered detained by a magistrate judge, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court[,] the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." 18 U.S.C. § 3145(b). "Neither § 3142 nor § 3145 specifies the standard of review to be applied by a district court reviewing a magistrate judge's release or detention order, and the 'D.C. Circuit has not yet addressed the issue.'" *United States v. Chrestman*, No. 21-MJ-218 (ZMF), 2021 WL 765662, at *5 (D.D.C. Feb. 26, 2021) (quoting *United States v. Hunt*, 240 F. Supp. 3d 128, 132–33 (D.D.C. 2017)). "Nonetheless, both the [Bail Reform Act] and the Federal Magistrates Act, 28 U.S.C. § 636, support the conclusion, reached by every circuit to have considered the question, that a district court reviews a magistrate judge's release or detention order *de novo*." *Id* (citing cases); *see also Cua*, 2021 WL 918225, at *3.

## III. Factual Background

Rhodes spearheaded a conspiracy to oppose by force the execution of the laws governing the transfer of presidential power in the United States. In November 2020, days after the presidential election, Rhodes began recruiting co-conspirators to join him in traveling to Washington, D.C., for operations aimed at stopping the transfer of power with the support of an armed "quick reaction force," or "QRF," stationed just across the river in Arlington, Virginia. Rhodes's co-conspirators joined and implemented his plan by, among other means, using social media and encrypted messaging to communicate with and recruit more co-conspirators; organizing and participating in tactical military-style training; and amassing weaponry and tactical gear and

3

organizing into regional teams to transport these items to the D.C. area for operations in support of the conspiracy.

In December 2020, after the Electoral College cast ballots confirming Joseph Biden as the President-Elect, Rhodes's criminal plan focused on delaying or stopping Congress's Certification of the Electoral College vote ("Certification proceeding"). Rhodes's plan materialized on January 6, 2021, the day of the Certification proceeding, when he oversaw two military-style stacks of co-conspirators who, along with other rioters, forcibly breached the Capitol while armed QRF teams stood by, awaiting deployment. The breach succeeded in delaying the Certification proceeding for several hours. Rhodes and co-conspirators then fled from the Washington area when they heard that the FBI had begun arresting individuals involved in the attack. In the weeks that followed, Rhodes and his co-conspirators continued to make plans to stop the presidential power transfer, amass additional weaponry and tactical gear, and prepare themselves to deploy their arms, if necessary, to stop the inauguration of a new president.

As detailed more below, Rhodes stood at the center of the seditious conspiracy—orchestrating plans to use force, recruiting and financing co-conspirators, purchasing weaponry and tactical gear, inciting support and action, and endeavoring to conceal his and other co-conspirators' crimes.

### A. Rhodes Recruited Co-Conspirators for His Plan to Forcibly Oppose the Lawful Transfer of Presidential Power

Rhodes is the founder and leader of the "Oath Keepers," which describes itself on its website as "a non-partisan association of current and formerly serving military, police, and first responders (as well as 'Associate Members') who pledge to fulfill the oath all military and police take to 'defend the Constitution against all enemies, foreign and domestic.'" In November 2020, days after the election, Rhodes began disseminating messages to Oath Keepers members and

4

affiliates delegitimizing the results of the election and encouraging members and affiliates of his organization to forcibly oppose the lawful transfer of presidential power. *See* Indictment at ¶¶ 18(a) (telling those on the "Leadership intel sharing secured" chat (hereafter "Leadership Intel chat"), on November 5, 2020, that they "MUST refuse to accept Biden as a legitimate winner" and warning, "We aren't getting through this without a civil war. Too late for that. Prepare your mind, body, spirit."); 18(b) (posting to the Oath Keepers' website a plan that included "[m]illions gather[ing] in our capital," breaking through barricades, and storming the legislature); *see also* Ex. 1 at 11-17. At Rhodes's direction, regional leaders of the Oath Keepers then began recruiting others to the conspiracy, Indictment at ¶ 20, and preparing for operations inside Washington, D.C., Indictment at ¶ 21. Those plans included organizing armed QRF teams to support those on the ground. Indictment at ¶¶ 42-45; *see also* Ex. 1 at 26-27.

In December 2020, Rhodes focused his co-conspirators on the Certification proceeding of January 6, 2021. During a December 22 interview with a regional Oath Keepers leader, Rhodes described January 6 as "a hard constitutional deadline" for stopping the transfer of presidential power and warned that if President-Elect Biden were to assume the presidency, "We will have to do a bloody, massively bloody revolution against them." Indictment at ¶ 30; *see also* Ex. 1 at 18-19. On December 23, Rhodes published an open letter on the Oath Keepers website in which he noted that, on January 6, 2021, "tens of thousands of patriot Americans, both veterans and non-veterans, will already be in Washington D.C., and many of us will have our mission-critical gear stowed nearby just outside D.C." Indictment at ¶ 31. Rhodes warned in the open letter that he and others may have to "take to arms in defense of our God given liberty." *Id.*

Rhodes and his co-conspirators created and administered Signal chats with titles like "DC OP: Jan 6 21" and "OK FL DC OP Jan 6" for coordinating their plans for January 6. Indictment

at ¶¶ 38-40; *see also* Ex. 1 at 23-24. On these chats, they discussed, among other topics, what weapons they would bring and plans for the QRF. Indictment at ¶ 41-56, 58-60. They utilized encrypted messaging applications for these planning chats and stressed the need for operational security. *See, e.g.*, *id.* at ¶ 27. Rhodes offered to reimburse co-conspirators for expenses incurred in support of the operation for things like hotels, radios, and making/copying maps. Ex. 1 at 25-26. On these chats and others, Rhodes repeatedly primed his co-conspirators to prepare themselves to use violence to stop the "usurpers" (as he regularly referred to the incoming president and vice president) from taking control. On December 31, a week before the Capitol attack, Rhodes wrote to the Leadership Intel Chat, "There is no standard political or legal way out of this." Ex. 1 at 22-23.

On December 25, co-conspirator Kelly Meggs messaged an encrypted Signal group chat titled, "OKFL Hangout," in reference to the January 6 Joint Session, "We need to make those senators very uncomfortable with all of us being a few hundred feet away." Indictment at ¶ 34; *see also* Ex. 1 at 19-22. Rhodes wrote in the same chat, "I think Congress will screw him [President Trump] over. The only chance we/he has is if we scare the shit out of them and convince them it will be torches and pitchforks time is they don't do the right thing. But I don't think they will listen." *Id.* Rhodes went on to say, "And he (President Trump) needs to know that if he fails to act, then we will. He needs to understand that we will have no choice."

### B. Rhodes and His Co-Conspirators Prepared an Armed QRF To Support Their Plot to Stop the Transfer of Power

As described in greater detail in the indictment, Rhodes and his co-conspirators coordinated at least three regional QRF teams to provide support on January 6, and these teams were stationed at a Comfort Inn in Arlington, Virginia. Indictment at ¶¶ 45-49. The QRF teams guarded an arsenal of firearms and related equipment and were prepared to speed those weapons into the hands

of co-conspirators on the ground in Washington when directed by Rhodes or other conspiracy leaders. *Id.*

On January 3, Rhodes informed a co-conspirator on Signal, "We WILL have a QRF. this situation calls for it." Indictment at ¶ 50. In the following days, co-conspirators communicated and implemented plans to bring weapons to the Comfort Inn. *Id.* at ¶¶ 58-59, 63-65, 68-69. The day before the Capitol attack, on January 5, Meggs and his Florida team dropped off at least three luggage carts' worth of gun boxes, rifle cases, and suitcases filled with ammunition with their QRF team. Members of the Arizona QRF team wheeled in bags and large bins of weapons, ammunition, and essential supplies to last 30 days. A third QRF team from North Carolina consisted of four men who kept their rifles ready to go in a vehicle parked in the hotel lot. Throughout, the QRF team leaders updated Rhodes of the extent of their weapons stock and apprised him of their readiness to support the Washington-based operation on January 6. On January 5, for example, Meggs messaged Rhodes from near the Comfort Inn, "[W]e are just outside of town unloading at QRF on our way in." Indictment at ¶ 65.

On January 6, the day of the attack, before departing from his hotel for Washington, Rhodes messaged his co-conspirators, "We will have several well equipped QRFs outside DC. And there are many, many others, from other groups, who will be watching and waiting on the outside in case of worst case scenarios." Indictment at ¶ 70. During the attack, the QRF remained in communication with Rhodes. For example: at 2:24 p.m., co-conspirator Edward Vallejo messaged the "DC OP: Jan 6 21" chat, "Vallejo back at hotel and outfitted. Have 2 trucks available. Let me know how I can assist." *Id.* at ¶¶ 86. At 2:38 p.m., Vallejo messaged the chat, "QRF standing by at hotel. Just say the word…" *Id.* at ¶ 96.

Moreover, in the days leading up to January 6, Rhodes himself purchased firearms-related equipment to contribute to the operation. On January 1 and 2, while still in Texas, where Rhodes was residing at the time, he spent approximately $5,000 on firearms and related equipment, including a shotgun, scope, magazines, sights, optics, a bipod, a mount, a case of ammunition, and gun-cleaning supplies. Indictment at ¶ 47. On January 3, Rhodes departed Texas and began traveling to the Washington, D.C., metropolitan area. While traveling, Rhodes spent approximately $6,000 in Texas on an AR-platform rifle and firearms equipment, including sights, mounts, triggers, slings, and additional firearms attachments. *Id.* at ¶ 57. On January 4, while still traveling toward the Washington, D.C., metropolitan area, Rhodes spent approximately $4,500 in Mississippi on firearms equipment, including sights, mounts, an optic plate, a magazine, and various firearms parts. *Id.* at ¶¶ 61.

### C. Rhodes and his Co-Conspirators Attacked the Capitol as Part of their Plot to Stop the Lawful Transfer of Power

On January 6, as a large crowd gathered on the Capitol grounds and converged on the building, an Oath Keeper affiliate on the Leadership Intel Chat claimed that Antifa had breached the Capitol. Indictment at ¶ 77. Rhodes replied: "Nope. I'm right here. These are Patriots." *Id.* He elaborated on a different chat: "Pence is doing nothing. As I predicted. . . . All I see Trump doing is complaining. I see no intent by him to do anything. So the patriots are taking it into their own hands. They've had enough." *Id.* Meanwhile, on yet another encrypted, invitation-only group chat titled "Jan 5/6 DC Op Intel team," which included Rhodes, co-conspirator Joshua James, and others, a participant posted a link to a video titled "live stream of patriots storming capital," and another participant asked, "Are they actually Patriots - not those who were going to go in disguise as Patriots and cause trouble[?]" Indictment at 79; *see also* Ex. 1 at 29-32. Rhodes responded, "Actual Patriots. Pissed off patriots[.] Like the Sons of Liberty were pissed off

8

patriots[.]" *Id.* James followed with, "Were coming to Capitol ETA 30 MIN[.]" James and his group (including co-conspirators Roberto Minuta and Brian Ulrich) then headed toward the Capitol. *Id.*

Around 2:30 p.m., Rhodes explicitly directed his co-conspirators to go to the Capitol. Indictment at ¶¶ 88-89. Rhodes then spoke with Meggs. Indictment at ¶ 92; *see also* Ex. 1 at 32-35. Moments later, Stack One marched up the east steps of the Capitol, joined the mob that was trying to force the doors open, and breached the building. Indictment at ¶¶ 93-95, 97-99; *see also* Ex. 1 at 35-38. Inside, half of Stack One tried to force past riot police to the Senate Chamber, but were rebuffed, and the other half went in search of Speaker of the House Nancy Pelosi, but did not find her. *Id.* at ¶¶ 100-106. Meanwhile, Stack Two, led by James and Minuta, arrived at the Capitol grounds shortly after 2:30 p.m. Indictment at ¶ 111; *see also* Ex. 1 at 39. Stack Two then penetrated the Capitol grounds, marched to the east side doors through which Stack One had entered, and breached the Capitol at approximately 3:15 p.m. *Id.* at ¶¶ 113-118. Members of Stack Two tried to force their way into the Rotunda but were expelled by riot police officers who had begun clearing the building. *Id.* at ¶¶ 119-121. After they exited the Capitol, members of both Stack One and Stack Two met up with Rhodes and other Oath Keeper members and affiliates just outside the Capitol. Indictment at ¶ 124; *see also* Ex. 1 at 39-40.

Because of the breach of the Capitol, members of the House and Senate were evacuated from their respective chambers at approximately 2:20 p.m. The Joint Session and the entire official proceeding of the Congress was halted while Capitol Police and other law-enforcement officers worked to restore order and clear the Capitol of the unlawful occupants—including Rhodes's co-conspirators. The Joint Session was not able to reconvene until approximately 8:00 p.m. In the course of the attack, over 100 members of law enforcement were assaulted, and one Capitol Police

officer died shortly after being hospitalized in connection with injuries sustained in the attack. Additionally, four citizens died; many media members were assaulted and had cameras and other news-gathering equipment destroyed; and the Capitol suffered millions of dollars in damage—including broken windows and doors, graffiti, and residue of various pepper sprays, tear gas, and fire extinguishers deployed both by crowd members who stormed the Capitol and by law enforcement officers trying to restore order.

### D. After January 6, Rhodes and his Co-Conspirators Continued Efforts to Forcibly Oppose the Lawful Transfer of Presidential Power

On the evening of January 6, Rhodes gathered some of his co-conspirators at a restaurant in Vienna, Virginia, to celebrate their attack on the Capitol and discuss next steps. Indictment at ¶ 125. Rhodes also sent messages to the "DC OP: Jan 6 21" Signal chat, including: "Thousands of ticked off patriots spontaneously marched on the Capitol .. . . You ain't seen nothing yet," and, "Patriots entering their own Capitol to send a message to the traitors is NOTHING compared to what's coming." *Id.* at 126. When Rhodes and co-conspirators received information that the FBI had begun arresting those who participated in the attack on the Capitol, Rhodes fled the area. Ex. 1 at 42.

In the weeks after January 6, Rhodes purchased a large volume of firearms pieces and related equipment.

- On January 10, he spent approximately $6,000 on sights, bipods, a scope, mounts, backpacks, a gun grip, a magazine pouch, and other related items.

- On January 11, he spent over $1,500 on scopes, magazines, and other items.

- On January 12, he spent nearly $7,000 on hundreds of rounds of ammunition, duffel bags, magazines, rifle scopes, a scope mount, a gun light, and other items.

- On January 13, he spent approximately $1,000 on firearms parts.

- From January 14 through January 19, he spent more than $2,000 on firearms parts, mounts, magazines, a scope leveler, targets, ammunition, a gun case, holsters, and gun-maintenance equipment, among other items.

Indictment at ¶ 129. In total, during the two-week period from the January 6 attack to the Inauguration, Rhodes spent more than $17,000 on firearms-related equipment.

Rhodes directed his followers to prepare for violence. On or about January 11, 2021, Rhodes told co-conspirators, "Get ready to rock and roll, shit's about to go down," and that those who were fit enough to move, shoot, and communicate should be organized and prepared to do so. Ex. 1 at 43. Rhodes also summoned co-conspirators like James to his side in Texas. *Id.* at 43-44; Indictment at ¶ 130. James collected what he referred to as "all available firearms," and traveled to Texas where he stayed with Rhodes and others. *Id.* On January 10, James sent Meggs a message asking if Meggs and other Florida Oath Keepers were coming to Texas to join him and Rhodes, and Meggs responded, "Fl stays home until shots fired !" Indictment at ¶ 131.

On January 20, Inauguration Day, James messaged another individual, "After this…if nothing happens…its war…Civil War 2.0." Indictment at ¶ 133. Around this time, Rhodes told to his co-conspirators to organize local militias to oppose President Biden's Administration. *Id.* at ¶ 134.

### E. Rhodes Concealed Evidence of the Conspiracy

Rhodes also took steps to destroy evidence of his involvement in this conspiracy. When Rhodes's cellular telephone was seized and searched pursuant to a warrant in May 2021, it revealed evidence that statements by Rhodes at key times on planning/coordination Signal chats had been deleted. Ex. 1 at 46-47. Messages sent by Rhodes in late January, shortly after the first co-conspirators in this matter were arrested, show Rhodes was aware that messages from the Signal chat could be used against the co-conspirators. *Id.* at 47-48. For example, on January 24, Rhodes messaged Vallejo on Signal, "Ed, keep in mind that is NOT a secure chat. Contains at least one

turn-coat snitch. Keep that in mind. Please confirm you got this." *Id.* Later that day, Rhodes messaged Vallejo again, "FBI has Jessica's [Watkins] phone.[1] So they are no doubt now monitoring any chat she was in. Which included that DC op chat." *Id.*

Additionally, in the weeks after January 6, an associate of Rhodes's, with whom Rhodes may have been living at the time, encouraged co-conspirators to delete incriminating messages from their phones. The investigation has revealed that numerous co-conspirators deleted evidence from their phones in the weeks after January 6.

### IV. Argument

Pursuant to 18 U.S.C. § 3142(a), when a defendant is arrested, the Court, in relevant part, "shall issue an order that, pending trial, the person be (1) released on personal recognizance . . . ; (2) released on a condition or a combination of conditions . . . ; or (4) detained under subsection (e)." Detaining a defendant under Section 3142(e) requires a hearing "pursuant to the provisions of subsection (f)." *Id.* at § 3142(e). The evidence outlined above makes plain that Rhodes should be detained pending trial.

#### A. Bases for Detention Request

According to Section 3142(f), there are limited circumstances in which the Court "shall hold a hearing to determine whether any condition or combination of conditions . . . will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f); *see also United States v. Twine*, 344 F.3d 987, 987 (9th Cir. 2003). Here, three of those circumstances apply: Subsection (f)(1)(E) (case that involves the possession or use of a firearm, destructive device, or any other dangerous weapon), Subsection (f)(2)(A) (case that involves a serious risk of flight), and Subsection (f)(2)(B) (case that involves

---

[1] Law enforcement arrested co-conspirator Jessica Watkins that week on January 18, 2021.

12

a serious risk that the defendant will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror). All three bases for a detention hearing are supported by the evidence outlined above.

First, this case involves the possession and use of firearms. Section 3142(f)(1)(E) mandates a detention hearing in connection with "any felony" if the Government proves by a preponderance of the evidence that the charged felony "involves the possession or use of a firearm or destructive device[.]" In determining whether the charged felony "involves the possession or use of a firearm," "we may consider the actual conduct at issue in the specific case," and not just whether the elements of the charged offenses required the possession or use of a firearm. *United States v. Watkins*, 940 F.3d 152, 166 (2d Cir. 2019).[2] Here, the conspiracy involved the planning and coordination of QRF teams armed with an arsenal of firearms that would be brought to co-conspirators on the ground at the direction of Rhodes or other leaders of the conspiracy.

---

[2] In an analogous context interpreting Section 3142(f)(1)(A), the Fifth Circuit held that "it is not necessary that the *charged offense* be a crime of violence; only that the *case involve* a crime of violence or any one or more of the § 3142(f) factors." *United States v. Byrd*, 969 F.2d 106, 110 (5th Cir. 1992) (emphasis in original). In *Byrd*, the court held that government could have (but did not) meet its burden under Section 3142(f) by showing that the nonviolent charged offense—receiving a videotape depicting minors engaged in sexually explicit activity—was accompanied by actual violent criminal activity such as child molestation.

In *United States v. Singleton*, 182 F.3d 7 (D.C. Cir. 1999), this Circuit took a different, categorial approach to the question of whether an offense is a "crime of violence" under Section 3142(f)(1)(A), holding that it is "a question of law to which the underlying facts of a particular case are irrelevant." 182 F.3d at 12. But the *Singleton* court reached this conclusion by focusing on the definition of "crime of violence" in 3156(4), in which that term means in the first instance "an offense." *Id. Singleton* was statutorily overruled by the Adam Walsh Child Protection and Safety Act of 2006, PL 109-248, 120 Stat 587, at sec. 216 (July 27, 2006), which added subsection (E) to 3142(f)(1). In adding subsection (E), Congress opted to not use the term "offense," which is the triggering mechanism in subsections 3142(f)(1)(A) through (D), but rather opted for the more expansive term "involves." The Second Circuit relied on this legislative history in *Watkins* in finding that "Congress clearly intended for courts to pierce the veil of the charged offense and consider the conduct underlying the offense, including who was harmed and whether any firearms were used in the course of committing the offense," to establish a basis for detention. 940 F.3d 166.

Accordingly, this case involves the possession and use of firearms, and Section 3142(f)(1)(E) is an appropriate basis for a detention hearing.

Second, this case also involves a serious risk of flight as defined in 18 U.S.C. § 3142(f)(2)(A). The defendant is facing potential conviction on numerous felony offenses that each carry statutory maximum penalties of up to twenty years of incarceration. He is alleged to have organized a conspiracy to oppose the lawful transfer of presidential power by force, and thus his willingness to comply with conditions of release set by this government is in doubt. Additionally, the defendant lacks a permanent address. Ex. 1 at 45. He is estranged from his legal wife and moved out of his permanent residence in Montana at some point in mid-2020. *Id.* While he has resided primarily with the associate discussed above since the attack on the Capitol, there have been many periods where he has left that residence for several days or several weeks at a time to stay with other associates. *Id.* The defendant has his bank statements and similar mail sent to P.O. boxes. *Id.* Finally, the defendant has associates located throughout the United States, and he is known to possess many firearms and related equipment. *Id.* at 45-46. These factors all combine to give Rhodes the incentive and means to flee and attempt to evade prosecution.

Finally, this case also involves a risk of tampering with witnesses and evidence. As described above, Rhodes stands charged with one count of tampering with documents or proceedings, in violation of 18 U.S.C. § 1512(c)(1), for deleting Signal messages on key chats at key times from his cellular telephone. Additionally, shortly after the attack on the Capitol, Rhodes's associate discussed above, with whom Rhodes is very close and with whom Rhodes may have been living at the time, messaged co-conspirators on the Leadership Intel Chat and told them to delete incriminating messages from their phones. There is a significant risk that Rhodes would

seek to tamper with key witnesses or evidence as these are identified for him through the discovery process.

Under any of those three bases—firearms, flight, and tampering—a detention hearing is warranted. And together, those three features illustrate the need to detain Rhodes pending trial to protect the community, ensure his return to court, and safeguard the integrity of evidence and the proceedings.

**B. Analysis**

The Court must consider four factors to determine whether pretrial detention is warranted and necessary: (1) the nature and circumstances of the offense charged, including whether, for example, the offense is a crime of violence; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g). The persuasion burden rests with the government. *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010). A judicial officer's finding of dangerousness must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f); *Stone*, 608 F.3d at 945. When "risk of flight" is the basis for detention, however, the government must only satisfy a preponderance of the evidence standard. *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996); *United States v. Chimurenga*, 760 F.2d 400, 405-06 (2d Cir. 1985); *United States v. Fortna*, 769 F.2d 243, 250 (5th Cir. 1985); *United States v. Orta*, 760 F.2d 887, 891 (8th Cir. 1985); *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). An analysis of these four factors weighs heavily in favor of Rhodes's detention given the clear and convincing evidence that his release presents a particular danger to the community as well as the preponderance of evidence that he poses a serious risk of flight and of obstructing justice.

### i. Rhodes's Criminal Involvement was Extreme and Serious

A grand jury has found probable cause to charge Rhodes with initiating and leading a conspiracy to forcibly oppose the lawful transfer of presidential power in the United States. It is difficult to imagine conduct that poses a graver risk to our society than one targeted at undermining the laws and procedures at the heart of our democratic process—and doing so with force. *See United States v. Munchel*, 991 F.3d 1273, 1283 (D.C. Cir. 2021) ("[T]o order a defendant preventatively detained, a court must identify an articulable threat posed by the defendant to an individual or the community. The threat need not be of physical violence, and may extend to 'non-physical harms such as corrupting a union.'") (citing *United States v. King*, 849 F.2d 485, 487 n.2 (11th Cir. 1988)). As described in greater detail above and in the indictment, Rhodes put forth the plan for this conspiracy; he recruited co-conspirators; he organized and administered planning meetings and chats on encrypted messaging applications; he offered to reimburse co-conspirators for expenses they incurred in participating in operations in furtherance of the conspiracy; and he contributed thousands of dollars of his own firearms and related equipment to the cause. Because Rhodes was the central leader and coordinator of this conspiracy, this factor points in favor of detention.

### ii. The Weight of Evidence Against Rhodes is Strong[3]

The weight of the evidence of Rhodes's dangerousness is immense. His dangerousness is chronicled in his written and recorded communications; corroborated by his conduct before, during, and after January 6; buttressed by his obstruction efforts; and reinforced by the indisputable success of his planning, most alarmingly the gathering of dozens of Oath Keepers in the

---

[3] "This factor goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." *Stone*, 608 F.3d at 948 (citation omitted).

Washington area on January 6 to participate in an attack on the Capitol featuring two military-style stacks and a QRF, which forced a delay of the Certification proceeding.

Rhodes's electronic communications show a leader who persistently and methodically readied his co-conspirators to use force and violence to stop the lawful transfer of presidential power. Casting the struggle for control of the White House in existential terms—from November 2020 through January 2021, Rhodes regularly used the terms "civil war" and "revolution" to describe the necessary path forward—Rhodes repeatedly emphasized to his co-conspirators that there was no choice but to take up arms to stop the transfer of presidential power.

During this time period, Rhodes engaged in recruitment, planning, and coordination to ensure the largest possible presence of Oath Keeper members and affiliates in Washington, D.C., for the critical moments when he believed his group would be in a position to implement their plan to forcibly oppose the presidential transfer, and he ensured that these ground forces would be supported by well-armed QRF teams who could supply them with firepower when needed. Rhodes offered to reimburse co-conspirators for travel and other expenses related to participating in these operations. And Rhodes personally spent over $22,000 on purchases of firearms and firearms-related equipment in the week leading up to January 6, with many of these purchases being made on his drive from Texas to the Washington, D.C., area.

Rhodes's plotting culminated in his co-conspirators' attack on the Capitol on January 6—but he and his co-conspirators did not stop there. They continued to plan for and amass weapons to forcibly oppose the lawful transfer of presidential power. Rhodes made an additional $17,000 in firearms and firearms-related purchases in the weeks after the attack on the Capitol. He called fellow leaders of this conspiracy, like James, to his side in Texas. As January 20 approached, Rhodes messaged others to organize local militias to prepare to use force again.

There is overwhelming evidence that Rhodes organized a plot to oppose by force the execution of the laws of the United States and that he possesses the willingness and capacity to continue to engage in criminal conduct. Under these circumstances, only pretrial detention can protect the community from the danger Rhodes poses.

### iii. History and Characteristics of Rhodes

Rhodes's history and characteristics animate the conclusions drawn from the facts above. He is a graduate of Yale Law School and has previously served in the military. Those experiences highlight that Rhodes should have and did know better; they support that his words were deliberate, that his deeds were calculated, and that his intent was criminal. Rhodes used his legal and military training to lead an attack on our core democratic traditions, and purposefully recruited others with similar military and law enforcement experience to join the fight. His post-January 6 statements and conduct suggest he would continue to encourage and coordinate violence. As Judge Johnson observed in her Memorandum Opinion and Order of Detention, the defendant's "technical savvy, military training, and familiarity with encrypted communication," coupled with the fact that "it is nearly impossible to effectively monitor communications made through encrypted messaging and video conferencing applications" which the defendant is known to use, Ex. 2 at 16, make it exceedingly difficult to envision any conditions of release that could prevent the defendant from planning and executing additional violent events. Additionally, Rhodes was disbarred by the State of Montana in 2015 for refusing to participate in the disciplinary process surrounding two grievances filed against him,[4] and he has admitted that he has not "filed federal income tax" since

---

[4] According to the State of Montana Supreme Court Order adopting the recommendation of the state's Commission on Practice to disbar Rhodes, the proceeding involved two grievances filed against Rhodes, one by a United States District Court Judge of the District of Arizona, which alleged that Rhodes improperly filed an appearance in that court without license or an application to appear *pro hac vice*, and one filed by a client of Rhodes's who alleged that Rhodes had provided incompetent representation and abandoned the client's cases in Arizona federal court. *See In the*

2007, Ex. 2 at 4, 13. These two facts further call into question Rhodes's willingness to comply with release conditions fashioned by this Court.

### iv. Danger to the Community and Risk of Flight

Finally, Rhodes is a danger to the community. He organized a conspiracy to oppose by force the lawful transfer of presidential power and an attack on the United States Capitol in furtherance of this plot. Moreover, Rhodes set in motion his co-conspirators' attack on the Capitol knowing that an armed QRF stood ready at a moment's notice to ferry an arsenal of firearms into the hands of their co-conspirators on the ground. While the co-conspirators did not need to activate the QRF that day, the danger posed by this plot shows an extreme disregard for the safety of the community and the laws of the United States.

## V. Conclusion

A grand jury has found probable cause to believe that Rhodes hatched and led a plot to oppose by force the execution of the laws governing the transfer of presidential power in the United States—including an attack on the Congress while it reviewed the election results. He then destroyed evidence of his role in these crimes. In so doing, Rhodes showed a contempt for the laws and Constitution of this country that make it impossible to trust that he would comply with any conditions fashioned by this Court for his release. Rhodes must be detained pending trial to protect the safety of the community, ensure his return to court, and safeguard the integrity of evidence and the proceedings.

---

*Matter of: Elmer S. Rhodes*, No. PR 14-0698 (Mont., Dec. 8, 2015), available on the Supreme Court of Montana website, https://supremecourtdocket.mt.gov/. Rhodes then reportedly failed to cooperate at all with the Commission's investigation of these grievances, prompting the Commission to conclude that Rhodes's "refusal to cooperate in the disciplinary process constituted a knowing and intentional disregard of his obligations as an attorney, both to the profession and the public and, therefore, he should forfeit the privilege of practicing law in Montana and be disbarred."

          Respectfully submitted,

          MATTHEW M. GRAVES
          UNITED STATES ATTORNEY
          D.C. Bar No. 481052

By:    Kathryn L. Rakoczy
          Assistant United States Attorney
          D.C. Bar No. 994559
          Ahmed M. Baset
          Troy A. Edwards, Jr.
          Jeffrey S. Nestler
          Assistant United States Attorneys
          Louis Manzo
          Special Assistant United States Attorney
          U.S. Attorney's Office for the District of Columbia
          555 4th Street, N.W.
          Washington, D.C. 20530

          Justin Sher
          Alexandra Hughes
          Trial Attorneys
          National Security Division
          United States Department of Justice
          950 Pennsylvania Avenue
          NW Washington, D.C. 20004

Dated:    February 3, 2022