**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** <br><br> **v.** <br><br> **EDWARD VALLEJO,** <br> *Defendant*. | **No. 22-cr-15 (APM)** |

**MOTION FOR PRETRIAL RELEASE**

Pursuant to the Bail Reform Act, 18 U.S.C. §§ 3142 *et seq.*, Defendant Edward Vallejo respectfully requests that he be released into the custody of his wife, Debra Vallejo, with reasonable conditions, pending trial in this matter.

**FACTUAL BACKGROUND**

Defendant Edward Vallejo, 63, is a partially disabled veteran, a husband of 35 years, a father, and a stepfather. He has suffered since childhood from asthma—a condition that becomes unbearable outside of the dry Arizona air—and had to be home-schooled in a hospital through first grade. Ed completed one year of community college. He was accepted into the Army on his third try, having been rejected twice due to his asthma. He served less than two years at Ft. Polk, LA, before being honorably discharged after an asthma attack. After leaving the service, Ed worked for years in the aerospace industry moving heavy equipment, which has resulted in a back injury that still plagues him. Ed joined Alcoholics Anonymous (AA) in 1984 and has been sober ever since, sponsoring many people in his 39 years in the program. He has lived in the Phoenix area for 50 years and has been involved in local and national politics, serving as an alternate delegate for Ron Paul at the 2012 Republican Convention.

Although he served only briefly in the Army, Ed has a lifelong passion for assisting veterans. Before his arrest in this matter, Ed was the Program Director and Vice-Chairman of the Board of Directors for Homefront Battle Buddies (HBB), a non-profit organization dedicated to helping veterans with PTSD. Through HBB, Ed has taken courses in suicide prevention and was certified in mental health first aid. The Chairman of HBB, Adam Kokesh, has known Ed for 14 years. Ex. 1 at 1. He describes Ed as a "kind and generous" man who is "highly motivated by his principles." *Id*. Ed is "the engine of our organization," and "is critical to our organization and passionate about our mission." *Id*. Kokesh states that without Ed, his "organization has mostly fallen apart." *Id*.  In his view, "[t]he world, our country, and the veterans community needs more men like Ed, not less." *Id*.



Vallejo (left) helping develop the Homefront Battle Buddies campus with Adam Kokesh



Vallejo (right) with Adam Kokesh (left) at a veterans suicide prevention course



Vallejo (fifth from left) representing HBB in a meeting with veterans organizations

3

Joie Leigh, a resident on the HBB property, describes Ed as "an incredibly motivated individual" whose "motivation…is primarily to help others." *Id*. at 2. "He wakes up every morning and gleefully begins doing light work around the property. He cares for the animals on the property as if they were his own children which mirrors his interactions with the people he comes in contact with on a daily basis. This is just one of the many gallant character traits that Ed possesses which makes him a perfect fit for Program Director of HBB in working directly with veterans who feel lost and are looking for a compassionate ear." *Id*.

Leigh describes Ed as "passionate about his political views that are sometimes different from mine," but notes that "his passions have always been expressed with undertones of charity and good will." *Id*. "In all my many interactions with Ed over the past year," Ms. Leigh writes, "I've never seen him get angry, act violent or speak ill to me or of others…. [F]or him to be considered a threat to the public or any living creature for that matter is simply outrageous from what I know of him." *Id*.

Ed's passionate yet gentle nature, as well as his love of animals, also comes through in the letter of Trevor Osgood, another friend who has known Ed for decades. *Id*. at 3. Osgood describes what it is like to be Ed's friend through an anecdote from their last visit. Osgood was driving Ed to lunch when Ed started shouting to pull over before leaping out of the still-moving car. Knowing Ed, Osgood expected him to come back with "a kitten or an injured bird," *id*., but instead Ed had spotted someone's lost wallet by the side of the road. Osgood immediately knew his lunch plans were over: Ed was going to make him "spend the rest of the afternoon tracking down the owner of this wallet to hand deliver it personally. No matter what it took." *Id*. And that is exactly what happened: "At Ed's insistence, we asked passersby and stopped into every store and shop. Finally, we found somebody with vague directions up a dirt road. We canvassed the neighbors and eventually found an old guy whose face lit up with pure joy when we handed him back his wallet."

4

*Id*. Despite spending his entire afternoon just to return a stranger's wallet, "Ed was so happy you'd think he'd won the lottery." *Id*.

Osgood summarizes Ed as a "true man of passion" whose "tools are an abundance of love, sunshine and gratitude to God for giving him a chance to prove it by helping people." *Id*. He is "ferociously" generous, and neither Osgood nor anyone he knows had any recollection of Ed ever using violence against anyone. *Id*. Rather, for Ed, "People come first. Animals come first. Any living and sentient being comes first." *Id*.

According to Osgood, it was Ed's "decades long dream of completing new care facilities for veterans of our armed forces." *Id*. Ed always frames his everyday speech in "military terms. A morning walk is 'recon,' breakfast is 'the chow line,' the day's activity is the 'detail.'" *Id*. at 3. Osgood explains that for Ed, this "lingo" helps maintain "bonds of brotherhood" with the veterans he was working with.  *Id*. Just prior to his arrest, Ed was counseling a suicidal veteran, encouraging him to enter treatment for opioid addiction. Osgood is certain that Ed "will continue this activity until he passes from this Earth." *Id*. at 4.

Ed's wife, Debra Vallejo, expresses gratitude for the kind, generous spirit Ed brought to her life. "One of Ed's gifts is he helped me understand my ex-husband and helped me to take the blame off of myself for his actions. I am a much better and happier person because of my husband. I have always stated God gave him to me because I sure couldn't have found him by myself. I love him and miss him terribly." *Id*. at 5.

### Vallejo's Journey to Washington, D.C.

This "kind and generous" man's journey to Washington occurred in a unique and tragic moment in our country's history. In the fall of 2020, the sitting President of the United States repeatedly declared that a massive hijacking of the American electoral system had taken place. He assembled a legal team to contest the election and called for ordinary Americans to travel to

Washington, D.C. on January 6, 2021, to support him. At the time, Vallejo trusted words of the sitting President of the United States and wanted to join ordinary Americans in responding to this call. He thus made plans to drive from Arizona to Washington, D.C. with two friends. A third friend, a doctor, planned to come but couldn't make it.

Ed and his friends made these plans on their own without knowing whether Stewart Rhodes would be going to Washington, D.C. *See* Ex. 2 at 1 (Text from Vallejo's friend to Rhodes stating: "Hey Stewart are you going to D.C. on the 6th? Myself and some other patriots are going to be there and would like to touch base."). Vallejo knew Rhodes from his prior activism for Ron Paul but was not an active member of the Oath Keepers at the time. Ed's friend also knew Rhodes and communicated with him prior to departing for Washington, D.C. *Id*. After learning that Rhodes would be in D.C., Ed's friend made plans to camp with the Oath Keepers. Ed's friend told Rhodes that the group was coming "[j]ust as volunteers….[w]e are rifles, man power, warm bodies there to support the process and the President." Ex. 2 at 4.

Ed was not privy to any communications between his friend and Rhodes and was not part of any Oath Keeper group chats until the day before he arrived in the D.C. area. Vallejo had seen the open letter to President Trump by Rhodes discussing the legal consequences if the President were to invoke the Insurrection Act, Ex. 5, as well as various other websites outlining the President's options for lawfully challenging the election results even after January 6. Anticipating that protests of up to "ten million" people might continue through January 20, 2021, Ex. 6 at 31, Ed brought large amounts of food and supplies and expected to stay and cook for protestors camping on a farm, as many had been done at a previous rally held in November 2020.  Dkt. 534, *United States v. Harrelson*, 21-cr-28 (APM) ("Person 10 was present for the November 2020 MAGA March in D.C. This is where everybody stayed at a farm outside of D.C. in Virginia.")); Ex. 6 at 24 (Vallejo asking Meggs for "campground address" on January 5th).

A "kind and generous" man who is "highly motivated by his principles," Ex. 1 at 1, Vallejo placed enormous trust in both Rhodes and President Trump at this momentous time. Indeed, Ed was so trusting that he set out without even knowing where he was supposed to be going. He did not know where to go until January 5, 2021, when Rhodes put Ed and his friend in touch with Kelly Meggs. *Id*. Meggs in turn told them that the Oath Keepers had reserved a room at the Comfort Inn in Arlington, VA. This location was a surprise to Ed, who brought "200 pounds of food" in expectation of setting up a camp kitchen on a farm. Ex. 7 at 9.

Around the same time, on January 5, 2021, Ed was added to the "DC OP Jan 6 21" Signal chat group. Ex. 8. With the exception of Rhodes, Vallejo had never met or spoken to any other members of the chat group before. Even after obtaining lodging through the Oath Keepers, Ed still considered other groups to "sign up with," especially groups "that have a permit to be at the Ellipse." Ex. 9. He also independently sought "official" information directly from the President's Twitter feed. Ex. 6 at 23. ("There's no better direct link from him than Twitter.").

When he headed to D.C., Vallejo did not view himself as part of any "Quick Reaction Force" (QRF). Vallejo's friend testified that he never heard the term "Quick Reaction Force" until January 6, 2021, despite traveling cross-country with Vallejo. Ex. 7 at 14. When he asked Ed about it, Vallejo incorrectly referred to the QRF as people staying at a campsite outside the D.C. area, and it seemed that he "had no idea what he was talking about." *Id*. at 15–16. He did not think that he was personally "serving as a Quick Reaction Force." *Id*. at 16. Generally, Ed's texts reflect that he independently "[h]eaded to D.C. to hold their feet to the fire" as part of a massive "rally," not as part of an organized Oath Keeper plan. Ex. 6 at 21, 24.

**The Oath Keepers' General Plans and Goals**

Although Vallejo was not a party to them, there had been numerous meetings, Signal chats, and open letters by Stewart Rhodes and others discussing plans by the Oath Keepers to gather in

Washington on January 6, including plans for a QRF. These discussions included a GoToMeeting virtual event on November 9, 2020, featuring Stewart Rhodes and Kelly Meggs (Ex. 10) and the "DC OP Jan 6 21" Signal group. (Ex. 8).

In these forums, members of the Oath Keepers generally discussed their belief that the 2020 election was fraudulent and their hope that Congress would sustain individual senators' objections to the certification of electoral votes. To support for that outcome, they planned to travel to D.C. to attend rallies and support public protests to apply pressure on Congress to do the right thing (in the Oath Keepers' minds). The Oath Keepers also discussed providing personal security details for speakers and crowd control at these rallies and events, as they had done in the past. In so doing, they specifically discussed the need to obey all local laws, especially weapons laws, during the provision of these services. They also discussed their belief that violence from counter-protesters such as Antifa was likely and that it was necessary to set up a QRF to use in self-defense, as they had done for past events. Finally, they discussed Stewart Rhodes' belief that if Congress overruled objections and certified the electoral result on January 6th, President Trump should invoke the Insurrection Act, which (the Oath Keepers believed) would authorize the President to call up all military veterans up to age 65 (including Oath Keepers) and use force to resist a fraudulent election.

These themes are reflected extensively both in pre-gathering discussions and messages sent in real-time during and immediately after the Capitol breach. *See generally* Ex. 5, 8, 10, 11. As reflected in these internal discussions and open letters, the evidence indicates that Oath Keepers members and affiliates generally traveled to Washington, D.C. intending to see what would happen with the January 6th certification process—not interrupt it—and set up QRFs as means of self-defense should the "SHTF [shit hit the fan]" with Antifa, Ex. 8 at 48, and/or in case President Trump called upon military veterans under the Insurrection Act, Ex. 5.

**Vallejo's Conduct in Washington, D.C.**

After arriving in the D.C. area on January 5, 2021, Ed checked into his hotel and unloaded "200 pounds of food," various supplies, and a personal firearm equipment bag. Ex. 7 at 9.[1] He then drove downtown with his friend and walked around various rallies and events around Freedom Plaza. Ed's friend described their first afternoon in D.C.:

> [W]e arrived around noon. We hooked up with the Oath Keepers and we bivouacked with them in Arlington. Then we unloaded what we could. We got into D.C. as quickly as possible. We went to a gathering at the Supreme Court building, completely peaceful, very calm, lots of police but they were all calm and everything was fine. Then we decided to go to another venue which was supposed to be bigger which it was at Freedom Pavilion…. We went down there and there were a lot more people and you know they had set up a complete you know media set up. We had speakers. It was completely peaceful. We worked as security to get some high-profile people, couple of generals, some other speakers, that came in and addressed the crowd. And everybody was uplifted and excited, but no violence whatsoever...very calm, no police interference. They were all good, everything was fine.

Ex. 3 at 1. After walking around some more and taking selfies, Ed forgot where he parked his 1996 Nissan pickup and had to take an Uber back to the hotel.

The next morning, January 6, Ed hitched a ride back into D.C. with his friend. He appeared with his friend on a podcast hosted by a mutual friend from Arizona. *Id*. On the podcast, Ed's friend discussed the scene from the previous day and how peaceful the pro-Trump rally gatherers had been. Asked why they went to D.C., Ed's friend explained that he took an oath as a Marine to support and defend the Constitution. He stated that he wanted to Congress to know that people were watching them, and hoped this pressure would ensure a constitutional process in Congress to stop a fraudulent outcome that he feared might lead to violence:

---

[1] According to Ed's friend, an uncharged eyewitness, Vallejo "never, ever touched any of the firearms." Ex. 7 at 21. Nor did he touch (or know about) any firearms in anyone else's rooms.

> I think the primary things are to really create a plausible show of evidence that there was significant voter fraud and then to take the next constitutional action…[I]t's very clear constitutionally what the next steps are. Fraud exists and that this vote will be done by one vote one state…. [T]here are many, many citizens here in the D.C. and surrounding area, more coming in by the minute. That's got to apply pressure…that the powers that be are under scrutiny. And that this would be very difficult under these circumstances to pull a fast one…[B]asically the idea is, look, we're here. We're applying as much pressure as we can. The only and obvious next step is to go into armed conflict but hoping very much that that doesn't happen.

*Id*. at 9. Asked if violence was really a possibility after a final certification of the election, Ed's friend described the danger as he saw it:

> [T]he fact is that there are people here who are prepared have the will, have the facilities, to do more than taunt. The question is, you know, is there a shot heard 'round the world moment? The possibility...definitely exists…. [I]t's a tinderbox and this right now, what we've seen, I mean, we have a little bit of inside information with the powers that would oppose the powers that be. But this is a tinderbox it just is a question of what is the precipitating event.

*Id*. at 10. Hoping to avoid setting off a "tinderbox," Ed's friend expressed his view of the importance of people like him and Ed gathering in Washington:

> I think we cannot fail. We have to stand and pass that test. That's why people are here…. [T]hey are normally very even tempered professionals and individuals, educated people. You know we're not a bunch of yahoo white supremacist skinheads. We are, we are doctors, lawyers mothers, fathers, you know, people who are the core backbone of the United States.

*Id*. With somewhat less eloquence, Vallejo passionately expressed his similar hope that presidential leadership would result in a favorable outcome of the certification process. He stated, "I'm just praying to God that Trump has his head on fucking straight and he knows what he's doing. He's got the machinations behind him, he's got all the proof in the world and he's gonna bring the fucking hammer down." *Id*. at 17. And he also expressed his fear that the alternative would lead to violence: "[M]y gut feeling…is…the American people are going to be told today that we have liberty and

justice for all or they're gonna be told fuck you…and if they're told fuck you, that's going to be the declaration of a guerrilla war." *Id*. at 15.[2]

After finishing the podcast, Ed spent the next two hours on January 6th looking for his truck. He did not find his truck until 1:19 p.m.—just a few minutes after President Trump concluded a rally at the Ellipse with a call for protestors to march toward the Capitol. While the crowd marched east, Ed drove in the opposite direction through D.C. traffic toward Ballston, giddy to have found his wheels. Ex. 8 at 76 ("Eureka! Truck found :) ").

In the hour it took for Vallejo to get back to his hotel, chaos had engulfed the U.S. Capitol building. On the Oath Keeper group chat (to which Ed had just been added the day before), there were reports of "blood in the Capitol steps," "Officer down," "flash grenades/explosions going off," "tear gas at the Capitol," and "several officers hurt," along with predictions that "the Police are going to be overwhelmed." Ex. 8 at 76–77. It also appeared that Oath Keepers near the Capitol were trying to find each other, with Rhodes asking various Oath Keeper members, "[W]hat's your location? I'm trying to get to you" and "where are you?" *Id*. at 77. Seeing these messages, Vallejo texted the group at 2:24 pm: "Vallejo back at hotel and outfitted. Have 2 trucks available. Let me know how I can assist." *Id*. Hearing no response, he messaged the group fourteen minutes later, "QRF standing by at hotel. Just say the word..." *Id*. at 78.

In the Indictment and prior memoranda, the government has attempted to paint a nefarious picture of these messages, portraying Vallejo as offering to deliver a cache of weapons to Oath

---

[2] In rhetoric he regrets (but which is common on talk radio), Vallejo attempted to describe the public mood by stating, "I'm the guy that everybody said no, Ed, you can't shoot 'em yet, it's too soon. No, Ed, you can't shoot the bastard yet, it's too soon. Well, …about five six months ago…they quit telling me." Ex. 3 at 16. Ed's podcaster friend knew not to take these words literally, describing Ed as a man who is "well known by a lot of people" to be someone who "if somebody needs yellin' he'll take care of it for em." *Id*. at 4. He contrasted this demeanor with Ed's friend, whom he described as an "IT guy more logic and reason." *Id*.

Keepers in an effort to violently take over the U.S. Capitol and halt the certification process. But that narrative is utterly false. Ed's other friend, an uncharged eyewitness who was in Ed's room the whole time, testified that Ed "never, ever touched any of the firearms." Ex. 7 at 21. This is corroborated by hotel video, which shows no sign of Ed carrying weapons back to his truck, which had been left in D.C. without weapons overnight. And most importantly, later messages by Ed clearly show that his intent was to help evacuate Oath Keepers out of a dangerous situation, not arm them so they could stay there. At 4:49 p.m., for example, Vallejo sent an almost identical message explicitly offering to "exfil" (evacuate) people: "I have 2 pickups and 1 hour 11 minutes to exfil whomever needs it." Ex. 8 at 87. And at 5:51 p.m., with a 6:00 p.m. curfew nearing and Oath Keepers expressing concerns about people being "stuck inside" D.C., Vallejo again offered to transfer people, stating that his Arizona team "won't let anyone walk. I was RTO [radio telephone operator] for 36 Dust off [a medical *evacuation* unit] and we will monitor all night and transport anyone that meets us on the perimeter curfew be damned." *Id.* at 88. In sum, the messages in context clearly reflect Ed offering to help "exfil" Oath Keepers from a dangerous situation, using his unarmed, beat-up 1996 pickup truck.[3]

Notably, there was widespread confusion among Oath Keepers who were not at the Capitol over whether Antifa was attacking the Capitol, and Vallejo initially believed that to be the case. Ex. 6 at 26 ("We believe this is Antifa but not confirmed. Note the lumber. There was a cache of lumber

---

[3] Other credible statements by uncharged Oath Keepers strongly corroborate that the primary purpose of QRFs—both on January 6 and at prior rallies—was to assist in evacuations from dangerous situations. *See, e.g.*, Ex. 12 (Nate Thayer, *Guns, Bad Attitudes, & Cheap Whiskey: Inside the Oath Keepers Armed 'Quick Reaction Force' on January 6* (April 11, 2022), at 3, *available at* https://natethayer.substack.com/p/guns-bad-attitudes-and-cheap-whiskey?s=w) (describing statement by uncharged North Carolina Oath Keeper leader that "Our QRF was to protect our civilians on our bus—to extract them if they got in trouble. Our QRF…was to get our civilians out of D.C. into Virginia if violence broke out. There were no plans to bring guns or our QRF into D.C."); *id.* at 6 ("A QRF is meant to extract people if they get in trouble.").

and propane tanks discovered in downtown D.C. yesterday just like the Soros brick stashes."). He later understood that many of the rioters were ordinary citizens and Trump supporters, describing them as "We The People" and jokingly asking his conservative podcaster friend, "So, have you secured the Arizona Capital yet, slacker?" *Id*. at 27. Either way, from seven miles away, he was under the belief that the Oath Keepers were providing a helpful presence in the chaos, stating, "there was a squad of scared…MPD that thought they would be torn apart were escorted by Oathkeepers & The People to safety," *id*., at 33, and "they broke in and our guys are now getting pics of antifa posters inside," *id*. at 28. There is no evidence that Ed believed that the Oath Keepers in or near the Capitol—whom he offered to "exfil"—were there to attempt to stop the certification, or that he intended for that to occur.[4]

In the aftermath of these events, discussions began on the Oath Keepers Signal group as to what to make of the event and how to respond. Ex. 8. Without question, the days' events inspired Vallejo to continue the purpose for which he came to Washington, D.C.: to protest what he believed (and had been told by the sitting President of the United States) was a fraudulent process, and to be present and ready to follow the orders of President Trump. Ed had anticipated that this might be a multi-week protest and process, and declared that he "ain't goin nowhere." *Id*. at 87. When Stewart Rhodes stated that "thousands of ticked off patriots spontaneously marched on the Capitol," *id*. at 91, Vallejo responded, "We'll be back to 6am to do it again…. We got food for 30 days…. We have only b[egun] to fight!" *Id*. at 91, 93.

Importantly, this statement about returning at 6:00 a.m. "to do it again" referred to protesting and "march[ing]," not interrupting the electoral certification. *Id*. Vallejo expressly predicted that

---

[4] Significantly, as explained by Vallejo and his friend on the January 6th podcast and reiterated in a January 7th podcast, Vallejo and his friend were eagerly awaiting the outcome of the constitutional certification process to see what happened, making the notion that he would use weapons to take over the Capitol and interrupt that process non-sensical.

Congress would certify the election results overnight, *id*. at 91, so he could not have viewed a renewed "march[] on the Capitol" at 6:00 a.m. the next day as a means to thwart the certification process. Likewise, several other indications show that even in his passion, Vallejo viewed himself as subservient to the lawful President and had no intention of obstructing an incoming Biden administration. For example, when another group member shared some "thoughts for after action review," Ed urged that "After Action Reports will be dated 1/21/21." *Id*. at 93. That date was significant, reflecting his intention to stay and work toward a successful vindication of the President by the lawful end of his first term—*and no later*. Similarly, even while describing the situation as being "at WAR," *id*. at 100—an eternal American political hyperbole that became a rallying cry in the Trump era[5]—Vallejo stated that he would "depart when cleared by my Commander Sir. Be well, and peace be with you," *id*. In other words, Ed viewed himself as under the lawful command of the President, who was still the legitimate head of the U.S. government until January 20, 2021, and whose lawful orders he felt oath-bound to follow.[6]

---

[5] *See* Paul M. Renfro, "War Has Been the Governing Metaphor for Decades of American Life," TIME (April 15, 2020), available at https://time.com/5821430/history-war-language/ (describing "the long American history of declaring 'war' on any conceivable enemy — whether physical, abstract, domestic or foreign"); Larry O'Connor, "Andrew Breitbart's iconic 'War' declaration finds context in Trump era," THE WASHINGTON TIMES (July 5, 2018), available at https://www.washingtontimes.com/news/2018/jul/5/andrew-breitbarts-iconic-war-cry-finds-context-tru/ (describing conservatives' specific embrace of the term "war" against political adversaries after its use by Andrew Breitbart, and its rising significance under President Trump).

[6] In its prior bond filing, Ex. 13, the government alleged that "Commander" in this text referred to Rhodes, because Vallejo sent a different message to Rhodes stating, "Status report posted in Ops[,] room extended 1 day[.] Standing by awaiting orders, Sir." While Vallejo stated he was awaiting Rhodes's direction on the 7th (using his typical military speak), this "Commander" message was sent in response to a broader discussion on the group chat and was one of multiple messages by Vallejo discussing whether and when to depart in the context of orders by President Trump, whom he referred to as his "Commander in Chief." *See* Ex. 8 at 83 (discussing apparently fake video of "Our Commander in Chief…order[ing] us to go home."); Ex. 6 at 33 (stating that he would be following "POTUS directive" to "go home or to TEXAS").

The next morning, Ed set out at 6:00 a.m.—after lawfully obeying D.C.'s overnight curfew—to "probe their defense line" and conduct "recon." *Id*. at 99–100. (In plain terms, he drove downtown and looked around the Capitol to assess how to continue to "march" (*id*. at 91) and "non-violently protest" (Ex. 4 at 13)). Instead of seeing thousands of protesters, as he expected, he saw deserted streets blocked off by law enforcement and national guard members. Even at 8:00 a.m., Vallejo saw "No signs or flags supporting Trump visible anywhere…All quiet…The streets are deserted!" Ex. 8 at 101.

Around 10:00 a.m., Ed and his friend again joined the podcast of their mutual friend from Arizona. On the podcast, Ed explained his understanding of the events from the previous day, as pieced together from his hotel. As he understood it, a crowd of Trump supporters went from the Ellipse to the Capitol and "surrounded the Capitol building but weren't gonna go in, weren't going to do anything. They were just there to make sure that those inside knew they were surrounded by all these people that wanted them to do the right thing." Ex. 4 at 8. At that point, Ed believed, members of Antifa "hijacked" the scene and began "beating on…windows" and using pre-stashed instruments like bricks and propane tanks. *Id*. According to a video Ed saw, the crowd initially "jump[ed]" on these instigators, with "one guy say[ing] nobody's breaking anything here" and the crowd "stopp[ed] him from breaking in." *Id*. These suspected-Antifa members, according to Vallejo and his friend, appeared to be connected to suspected-Antifa members they had seen near (and believed had attacked) Black Lives Matter Plaza the night before.

On the podcast, Ed made clear his view of those who used violence to attack the Capitol and BLM Plaza: he called them perpetrators of "domestic terrorism." *Id*. at 10. Ed's friend likewise expressed deep frustration that the breach of the Capitol and the resulting evacuation of lawmakers had altered the course of the certification process, stating that there were senators "who were gonna

rebuke the vote and…object to the electors…[and were] committed to doing that who then said, well I was going to do this but now I'm not going to do that." *Id*.[7]

Asked what comes next, Vallejo stated that he was "never done," and was "waiting for orders from Stewart Rhodes." *Id*. at 13. (The podcaster laughed at this and said, "yeah, that's Ed." *Id*.). Ed's friend then added:

> We're here prepared in all aspects to support the Constitution and honor our oaths that we took…. The issue here then is what mechanism do we have to do that. Are there more people coming? If they do, what's gonna happen? Is it's not really plausible to non-violently protest anymore because the entire area is closed off and cordoned and curfewed [as learned by Vallejo's 6:00 a.m. "recon"]. So the question becomes when we realize that this wrong has been done, what are the next steps? I mean is this the shot heard 'round the world moment? I don't know…. I don't have…omniscient intel on what the situation is. We are here because we wanna know what develops. We're staying here to allow these things to develop so that we can…judge our position relative to what political events occur…what happens. This relies on a lot of things. How angry are people? Did they successfully manage to get this done without any real reaction from the American public? Because a few guys here who want to maintain the Constitution aren't going to do anything. America has to get mad, and if America doesn't get mad then we're utterly useless.

*Id*. Asked when they would return to Arizona, Vallejo and his friend weren't sure. Ed's friend stated, "At this point we don't know…. We don't know if there's anything left to do." *Id*. at 18. Vallejo added, "We gotta find out what happens on the 20th, 'cause if Joe Biden gets installed as President we will have gone from a nation of laws to a nation of men." *Id*. at 19.

**Vallejo's Drive Back and Peaceful Life After January 6**

Ed did not hear from Rhodes after January 6th and did not wait for him. After one more night in Virginia, Ed and his friend made their way home through Texas as they believed they had been instructed by the President, Ex. 8 at 108 ("Go home or to Texas….POTUS directive"). Believing that Rhodes may travel to Texas, and since it was already on their way, Ed and his friend

---

[7] Notably, Vallejo received a text message from Senator Ted Cruz the morning of January 6th stating: "Ted Cruz here. I'm leading the fight to reject electors from key states unless there is an emergency audit of the election results. Will you stand with me?" Ex. 6 at 26.

planned to stop there and try one last time to meet with Rhodes to discuss "next steps." Ex. 2 at 5. Before arriving, Vallejo stopped in Memphis, TN to visit Graceland, sending a selfie to several friends and family members:



Vallejo on January 10, 2021 at Graceland in Memphis, TN

Vallejo and his friend stayed in Texas for just one day before continuing home. They never heard from Rhodes (or any other Oath Keeper) while they were there or at any time before the inauguration. Ed arrived home to Arizona on the 14th and had no further role in any Oath Keeper planning or events. In the remaining days before January 20, 2021, he stayed busy and was mostly concerned with fixing the clutch on his 1996 Nissan truck, his "only running vehicle." Ex. 6 at 42.

For the next year, Ed Vallejo lived peacefully in the Phoenix area. He continued sponsoring recovering alcoholics in AA. He connected with Adam Kokesh of Homefront Battle Buddies, becoming its Program Director and attending trainings in suicide prevention. Ex. 1 at 1. He provided manual labor to develop a retreat center for veterans, despite his asthma and bad back. In short, he was a model citizen, as he tried to be his whole life. Needless to say, Ed did not launch a "guerrilla

war," or otherwise pose any danger to society. He has been cooperative with law enforcement, driving to meet with the FBI and voluntarily providing the password to his phone. *Id*. at 2. He did not even delete any pictures or messages from January 6th, as other defendants have been accused of doing, believing that he has nothing to hide.

### Vallejo's Arrest and Bond Hearing

On January 12, 2022, Vallejo was added to a superseding indictment alleging that he and members of the Oath Keepers conspired to "oppose by force the lawful transfer of presidential power." ECF 1 at 3. Specifically, he was accused of conspiring to use force to prevent, hinder, or delay the execution of the Twelfth Amendment (concerning the certification of electoral votes) and the Twentieth Amendment (specifying January 20th as the end of presidential terms). *Id*. at 8.

On January 13, 2022, over a year after he left Washington, D.C., Vallejo was arrested. The government moved for pretrial detention, arguing that no combination of conditions could reasonably assure the safety of the public if Vallejo were released. Ex. 13 at 2. The government also argued that Vallejo was a flight risk and might destroy evidence. *Id*.

To show that Vallejo posed a "Continued Threat" to the public, the government's bond memorandum cited three tweets. *Id*. at 12. Two were not even tweets from Vallejo himself, but *retweets* of the kind of standard January 6th commentary heard nightly on conservative media. Specifically, on December 30, 2021, Vallejo retweeted a message stating in part, "There was NO INSURRECTION on J6 just a peaceful protest." *Id*.  And on January 8, 2022, Vallejo retweeted a post stating, "The real insurrection happened in the wee hours of Nov. 4, 2020." *Id*. The personal tweet cited by the government, from December 2021, stated, "I HAVE NEWS FOR YOU…you

will NEVER achieve 'vaccine equality' as long as I, and others like me, are alive!....I will DIE first, and that's only when I run out of AMMUNITION!" *Id.* at 13.[8]

On January 20, 2022, Magistrate Judge John Boyle granted the government's detention request based on dangerousness but rejected the government's other bases for detention. Dkt. 9, *Vallejo*, 2:22-mj-05032-DMF (D.Ariz).

**LEGAL STANDARDS**

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). Pretrial detention is appropriate only when the government demonstrates that "no condition or combination of conditions" will reasonably assure the defendant's appearance and the safety of the community. *United States v. Hanson*, 613 F.Supp. 2d 85, 88 (D.D.C. 2009) (citing 18 U.S.C. § 3142(e)). In making this determination, the Court must consider four factors: (1) the nature and circumstances of the offense charged, including whether, for example, the offense is a crime of violence; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. § 3142(g). A finding of dangerousness must be supported by clear and convincing evidence. § 3142(f). The burden of persuasion rests at all times with the government. *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010)

---

[8] The government cited this tweet as evidence that he "continues to endorse violence against authorities when he disagrees with actions those authorities take." Ex. 13 at 13. However, the tweet opposed the forcible injection of Vallejo *himself*—a policy that has never been proposed, would violate Vallejo's bodily integrity, and would be unconstitutional in most circumstances—and simply expressed Vallejo's intention to use self-defense (using common Second Amendment rhetoric) against such a hypothetical forced injection.

## ARGUMENT

## I.    The § 3142(g) Factors Weigh Strongly in Favor of Pretrial Release

### A.    Vallejo's history and characteristics strongly favor pretrial release

Although the government's prior bond memorandum focused exclusively on Vallejo's alleged offense conduct, the language of § 3142(g)(3) is much broader, instructing the Court to consider twelve specific aspects of "the history and characteristics of the person, including the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release…." Here, every single one of these statutory factors supports the conclusion that Ed Vallejo is not a danger to the community and will succeed in pretrial supervision.

Vallejo is by all accounts a person of excellent character. He is described as a "kind and generous" man who is "highly motivated by his principles." Ex. 1 at 1. He is a veteran who has poured himself into helping other veterans. He has been involved in his community for years and is well-respected in Arizona political circles. He is a loyal husband who helped raise his wife's four children from a prior marriage. He is "ferociously" generous and scrupulously honest, willing to devote an entire day to make sure a stranger gets back his wallet. *Id*. at 3. Even with regard to the charged offense, Ed only traveled to Washington, D.C. because he naively trusted the claims of a sitting President of the United States and wanted to make a difference in what he believed (and had been told by the President) was a principled fight for electoral integrity. He made this plan with four friends, not in concert with Rhodes or as an Oath Keeper. Ex. 2 at 1. He was not present at the Capitol, never personally took part in any violence or trespassing, and openly condemned as

"domestic terrorism" the breaking of windows and assaulting officers. Ex. 4 at 10. Ed's character strongly favors pretrial release.

Vallejo's physical and mental condition also weighs in favor of release. Vallejo is 63 years old with lifelong asthma and a partially disabled back. Pretrial incarceration is extremely difficult for him physically, subjecting him to hard, thin beds and humid, high-pollinated air that make moving and breathing painful tasks.

Ed's family ties, employment, financial resources, length of residence in the community, and community ties further support pretrial release. Ed is a loving husband of 35 years and a father, stepfather, and grandfather. He was employed at the time of his arrest, working as the Program Director for HBB, where he assisted veterans struggling with PTSD and suicidal ideation. Neither he nor his wife have significant financial resources. Ed has resided in the Phoenix area for 50 of his 63 years, developing deep community ties through family, friendships, work, and politics, reflected in his representing Arizona as an alternate delegate to a national political convention.

Finally, Vallejo's past conduct, history relating to drug or alcohol abuse, and criminal history strongly favor pretrial release. Before traveling to Washington at the request of a sitting President, Ed had no criminal history other than a marijuana arrest over forty years ago. He joined AA shortly thereafter and has been sober for 39 years, sponsoring many other alcoholics in recovery along the way. Ed was not on probation, parole, or pretrial release at the time of the current offense. And when contacted by the FBI, he voluntarily drove to meet them and provided his phone password.

### B.    The nature and circumstances of the offense support pretrial release

Section 3142(g)(1) instructs the Court to consider both the "nature" and the "circumstances" of the charged offense, including whether they are violent in nature. § 3142(g)(1). "The distinction between 'nature' and 'circumstances' clarifies that the former refers to the generic offense while

21

the latter encompasses the manner in which the defendant committed it." *United States v. Singleton*, 182 F.3d 7, 11–12 (D.C. Cir. 1999). In other words, the Court should look past the form of the indictment when determining bail to the actual conduct by the defendant.

Vallejo is charged with conspiring to "oppose by force the lawful transfer of presidential power." ECF 1 at 3. Specifically, he is accused of conspiring to use force to prevent, hinder, or delay the execution of the Twelfth Amendment (concerning the certification of electoral votes) and the Twentieth Amendment (specifying January 20th as the end of presidential terms). *Id*. at 8. Nominally, the allegations in the Indictment are serious, accusing Vallejo of heading a QRF team ready and willing to bring arms into the U.S. Capitol as part of a plan to forcibly halt the electoral certification on January 6, 2021, and forcibly resist the transfer of power on January 20, 2021.

However, even looking past the weakness of the evidence for this nominal story (discussed below), there is no allegation that Vallejo or Oath Keepers ever brought any weapons into D.C. to fight the defenders of the Capitol. Rather, after the initial melee and alleged bad acts by Oath Keepers, it is undisputed that some Oath Keepers actually worked with Capitol police on the scene, which Vallejo watched in real time from his hotel in Virginia. Ex. 6 at 33.[9] Oath Keepers then generally returned to their hotel rooms, checked out, and went home, with the certification process proceeding forward that night. These circumstances undermine any ultimate weight that the allegations from January 6th carry with regard to Vallejo's dangerousness.

Likewise, although the Indictment discusses beliefs, attitudes, and weapons purchases by other Oath Keepers after the certification, it contains no allegation of any particular act of violence or obstruction planned by Vallejo or the Oath Keepers after January 6th. For his part, Vallejo stayed near D.C. for one day to see what would happen before starting his road trip home (making a tourist

---

[9] This or similar videos have been provided to the defense in discovery.

stop at Graceland), then waited for an uncommunicative Rhodes for a day in Texas before continuing on to Arizona. Once home, he did not speak with Rhodes or any member of the Oath Keepers again before the inauguration. Instead, he focused on fixing his truck. There is no allegation that he bought any weapons or weapon accessories, deleted any evidence, discussed any plans to obstruct the execution of any laws in any specific ways, or otherwise planned specific operations to violently resist a lawful transfer of power. Given the vagueness of the alleged seditious conspiracy after January 6th, it cannot be said that the circumstances of Vallejo's alleged offenses weigh in favor of pretrial detention, when many protesters who *actually* stormed the Capitol have received probationary sentences or sentences shorter than the time Vallejo has already served.

Moreover, the unique timing of the alleged offenses further undermines any weight for the nature of the offense as evidence of present dangerousness. Unlike a random violent crime or drug offense—which can always be repeated—the alleged seditious conspiracy described in the Indictment was uniquely time-bound: Vallejo and others are accused of conspiring to oppose by force events occurring on two specific dates (January 6, 2021 and January 20, 2021). Since those dates have long since passed, the nature and circumstances of the charged offenses here do not provide a strong basis for detaining Vallejo as a danger to the community in 2022. At worst, Vallejo is alleged to have responded to a historic call from a sitting President at a specific point in our nation's history, which had a natural expiration date he acknowledged in messages. Ex. 8 at 93 ("After Action Reports will be dated 1/21/21"). Even taking the Indictment's allegations at face value, the nature and circumstances of the offense do not suggest any ongoing danger in 2022.[10]

---

[10] The nature and circumstances of Vallejo's offenses are, at a minimum, no *worse* than those of co-defendant Caldwell, who was released despite allegations that took part in the original planning of the QRF with other Oath Keepers, surveilled the Capitol, arranged for boat transfers of weapons, instigated others to storm the Capitol, and discussed killing politicians.

### C.    The weight of the evidence supports pretrial release[11]

When used against a defendant, the weight of the evidence has been regarded as the least

significant factor under Section 3142(g). *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir.

1985). Otherwise, pretrial detention "could become in substance a matter of punishment." *Id*.

Conversely, when the evidence is weak, that lack of weight becomes an important factor favoring

release. *United States v. Chen*, 820 F. Supp. 1205, 1207–08 (N.D. Cal. 1992).

Here, the weakness of the government's case against Vallejo is a strong factor favoring his

pretrial release. There are two relevant time periods in the Indictment in which Vallejo is accused

of conspiring to hinder or obstruct the execution of federal laws: (i) up to and before the certification

of the election on January 6, 2020; and (ii) the period between the certification and the swearing in

of a new administration on January 20, 2020. For the first period, the overwhelming evidence

establishes that the Oath Keepers had no prior plan to storm the Capitol or interrupt the certification

process. In real time, the Oath Keepers were surprised and confused by these events, wondering if

they were the work of "Antifa" or "Patriots" until Rhodes clarified for the group that "thousands of

ticked off patriots spontaneously marched on the Capitol." Ex. 8 at 91.[12]

Moreover, many explicit statements by Oath Keepers discuss their desire to see the outcome

of the certification process, including statements by Vallejo and his friend on the January 6–7

podcasts. Of particular note, Ed's friend expressed frustration that the breach of the Capitol

---

[11] Some circuits hold that this factor refers to the weight of the evidence of dangerousness rather than the weight of the evidence of guilt. *See, e.g.*, *Stone*, 608 F.3d at 948. Since the government's prior bond opposition adopted this view, Ex. 13 at 17, both issues are addressed here.

[12] *See, e.g.*, Ex. 11 at 11 ("Over the metro Pd radio I overheard that people were trying to breach the capital building"); ECF 1 at 22 ¶ 78 ("[A group chat] participant asked, "Are they actually Patriots - not those who were going to go in disguise as Patriots and cause trouble[?]"; *id*. ("RHODES responded, "Actual Patriots. Pissed off patriots[.]….JAMES followed with, "We're coming to the Capitol ETA 30 MIN[.]'"); Ex. 8 at 93 ("("I did not wake up this morning thinking I would 'Storm the Capitol'").

hardened the mood in the Senate and caused senators who planned to object to certain electoral votes to switch their position. Ex. 4 at 10. In other words, the Capitol breach *thwarted* Vallejo's and his friend's hopes for the election certification process, rather than furthering it. (Vallejo himself had received a fundraising message from Sen. Cruz on the morning of January 6th stating: "Ted Cruz here. I'm leading the fight to reject electors from key states unless there is an emergency audit of the election results. Will you stand with me?" Ex. 6 at 26).

To be sure, some members of the Oath Keepers clearly followed the crowd into the building, allegedly against police resistance (though some videos show them later cooperating with police). But equally clear, these events unfolded quickly and chaotically and reflected decisions made by individuals in real time. *See, e.g.*, Dkt. 549-1 at 2–3, *United States v. Caldwell*, 21-cr-28 (APM) (government brief discussing evidence that Caldwell individually "formed an agreement with those around him on January 6, 2021, to 'storm' and 'take' the Capitol" while on the Capitol steps in real time); Ex. 8 at 93 ("("I did not wake up this morning thinking I would 'Storm the Capitol'").  And since there was no prior plan, it is extremely difficult to know whether a particular person entering the Capitol was motivated by a spontaneous desire to participate in a momentary, exuberant protest (meriting "parading"-type misdemeanors), or by a specific intent to corruptly interfere with the certification process (as required by 18 U.S.C. § 1512(c)). How the government will prove on which side of this line each breaching defendant fell in real time is somewhat of a mystery.

In any event, Vallejo did not even go into the building, so he cannot be charged with spontaneously deciding to obstruct a proceeding based on his own conduct on January 6. Rather, the government's evidence that he conspired to join this spontaneous assault in real time boils down to: (i) statements offering assistance (i.e., Ex. 8 at 77 ("Vallejo back at hotel and outfitted. Have 2 trucks available. Let me know how I can assist"; "QRF standing by at hotel. Just say the word...")); and  (ii) Vallejo's proclamation, after Rhodes texted that thousands of angry patriots had

spontaneously marched on the Capitol, that "We'll be back to 6am to do it again…. We got food for 30 days… We have only b[egun] to fight!" *id*. at 91, 93. Neither of these statements evinces a desire to interrupt the electoral certification through violence, however.

As explained above, Vallejo's offers of assistance were not offers to bring truckloads of weapons into D.C. to siege the Capitol; they were offers to evacuate ("exfil") Oath Keepers from a dangerous situation, in line with the purpose of QRFs discussed by credible, uncharged Oath Keeper leaders. *See* Ex. 12 at 3 ("Our QRF was to protect our civilians on our bus—to extract them if they got in trouble. Our QRF…was to get our civilians out of D.C. into Virginia if violence broke out."); *id*. at 6 ("A QRF is meant to extract people if they get in trouble.")). This meaning is made evident by Vallejo's next several messages, which were more explicit, and by the fact that no Oath Keeper member ever asked Vallejo to come: they wanted to stay, not be evacuated. Against this backdrop, the government's insistence that Vallejo (who took no part in any Oath Keeper planning) stood ready to deliver caches of arms into D.C. to support an attack on the Capitol is simply guilt-assuming speculation that ignores the presumption of innocence.[13]

Vallejo's second statement ("We'll be back at 6am to do it again…. We got food for 30 days… We have only begun to fight!") likewise cannot support the conclusion that he conspired in real time to interrupt the electoral certification on January 6th. As explained above, Vallejo

---

[13] The government reads the term "outfitted" to mean "stocked with weapons" in the message, "Vallejo back at hotel and outfitted. Have 2 trucks available. Let me know how I can assist." Ex. 8 at 77. But his meaning was actually much more mundane: Vallejo referred to *himself* as "outfitted," not his trucks, meaning he had made it back to his hotel room and put on an Oath Keeper t-shirt and self-defense gear. This is corroborated by a credible eyewitness who testified that Ed "never ever touched any of the firearms," Ex. 7 at 21, and by the lack of any hotel surveillance video showing Vallejo carrying weapons into the parking lot on January 6th, making it impossible that he had "outfitted" two trucks with truckloads of weapons. Moreover, being "outfitted" with weapons would *still* not mean the weapons were meant to be used *offensively* to siege the Capitol, since the point of the QRF was to be able to extricate Oath Keepers from dangerous situations that might require weapons for legitimate self-defense. Ex. 12 at 3, 6. Thus, for multiple reasons, this text cannot bear the weight the government places on it as evidence of dangerousness.

expected (and predicted in the Signal chat) that the certification would be completed that evening. Ex. 8 at 91. Thus, his resolve to "do it again" at 6:00 a.m. the next day could not have indicated a plan to stop the certification through force. Rather, as reflected in Vallejo's texts messagse, he expected 10 million people to flood D.C. over the weekend when people got off work, Ex. 6 at 31, and he wanted to be part of a large, sustained protest movement that would convince officials to overturn what he viewed as an electoral fraud. This is further corroborated by the lament by Ed's friend on the January 7th podcast that holding a "non-violent[] protest" was no longer possible after the cordoning off of D.C., Ex. 4 at 13, which reflected new information Vallejo had learned after his "recon" trip on the morning of the 7th. Thus, at *most*, Ed's statement that they would be back to "do it again" the night before suggests a desire to continue rowdily protesting in unapproved spaces—something punishable as "parading" or illegal protesting—not an intention to interrupt Congress and delay the (already completed) certification vote for 30 days.

The government's theory is slightly more logical for the second period, January 7 to 20, 2021, only because virtually all of Vallejo's martial metaphors were in the context of the possible or actual failure of Congress to sustain objections during the certification process. *See, e.g.*, Ex. 3 at 15 ("[M]y gut feeling…is…the American people are going to be told today [January 6th] that we have liberty and justice for all or they're gonna be told fuck you…okay… and *if*, and *if* they're told fuck you, that's going to be the declaration of a guerrilla war.") (emphasis added); Ex. 8 at 100 (stating, on the morning of January 7, 2021, after the certification, "We are AT WAR"). The problem for the government is that there is no evidence that Vallejo ever agreed to do anything (much less anything illegal) about the situation.  Feeling upset and feeling "at WAR," are not crimes, however passionately those feelings are expressed.

The government makes much of Vallejo going to D.C. on the 7th to "probe their defense line" and conduct "recon," *id*. at 99, but that was just Ed's military jargon for driving downtown

and looking around the Capitol to assess the prospects of further protests. Vallejo's texts are replete with overly-jargoned expressions, which is just how he talks. *See, e.g.*, Ex. 8 at 77–78 ("exfil," "RTO," "Dust off," "Recon," "Wilco"); Ex. 1 at 3 (stating that Ed "frame[s] things in military terms" to "maintain…bonds of brotherhood" with veterans, such that a "morning walk is 'recon,' breakfast is 'the chow line,' the day's activity is the 'detail.'").[14] In any event, checking out the scene is only criminal if it is part of a seditious agreement to forcibly oppose the execution of specific federal laws. And the evidence is clear that after losing contact with Stewart Rhodes on January 6th, Vallejo was in a wait-and-see posture without any agreement or plan while he and his friend decided "if there's anything left to do." Ex. 4 at 18; *see also id*. (Ed's friend: "We're staying here to allow these things to develop so that we can…judge our position relative to what political events occur…what, what happens. This relies on a lot of things."); (Vallejo: "We gotta find out what happens on the 20th.").[15]

After a day of waiting and watching, Vallejo and his friend went home, stopping in Texas in hopes of reconnecting with an uncommunicative Rhodes and discussing "next steps." Ex. 2 at 5. Since that meeting never happened, it is impossible to know what Vallejo and his friend would have agreed to as "next steps," *id*., much less whether they would have agreed with any specific plan for

---

[14] In a humorous illustration of this tendency, Vallejo asked for the Oath Keeper meeting location using 24 jargon-laden words, "Ed Vallejo of Arizona in Tenn. With cadre requesting coordinates to Allied encampment outside DC boundaries to rendezvous. Please respond ASAP. For The Republic." Ex. 6 at 23. By contrast, an Oath Keeper member who was actually involved in the planning of operations simply asked, "We get that QRF hotel address yet?" Ex. 11 at 4.

[15] Notably, waiting on President Trump was also the posture of other Oath Keepers who stuck around D.C. and attended the Olive Garden dinner, even while it appeared that he would not act as they wanted. *See* Ex. 8 at 100 ("Sadly he isn't willing to fight. So now it's up to us. And Patriots are standing up in their state capitols all over. Just like Ms. Kellye was talking about at dinner….The fight's in our states. And like Stewart said, *if* Trump won't do insurrection act, *then* we walk the same path as founders of defiance, nullification, raising militia and mutual defense.") (emphasis added). Significantly, Vallejo wished that Oath Keeper well, but stated that he would not be leaving or acting outside of the presidential authority, stating, "I'll depart when cleared by my Commander Sir"—a clear reference to President Trump. *Id*.

violence outside the contours of lawful authority exercised by President Trump under the Insurrection Act. *See* Ex. 4 at 13. (Ed's friend stating that he and Vallejo were reserving judgment regarding next steps based on "our position relative to what political events occur"). What is clear is that when they left Washington, D.C., there is no evidence Vallejo or his friend had committed to any specific post-January 6 seditionary plan, but were waiting to see how President Trump and the American people responded, feeling that without Presidential action or mass reaction from the public, further resistance would be, in their words, "utterly useless." *Id.*

In sum, there is little substantive evidence that Vallejo agreed to any plan to disrupt the certification process on January 6 or to seditiously interfere with the execution of any specific laws afterwards. But while the evidence of Vallejo's guilt is extremely weak, the weight of the evidence of his dangerousness, *Stone*, 608 F.3d at 948, is even weaker. At 63, Vallejo has zero history of violence in six decades, has a long history of community involvement, has devoted his life to service through AA, HBB, and other organizations, and is described by those in his community as a "kind and generous" man who is "highly motivated by principles." Ex. 1 at 1.

The main argument for Vallejo's dangerousness is the government's overblown assertions about a unified "QRF" under Vallejo's command ready to deliver a cache of weapons to Oath Keepers actively storming the Capitol. That narrative is utter fiction, however. It is undisputed that Vallejo never discussed any "QRF" plan (or any other Oath Keeper plan) with anyone prior to showing up in D.C. and being added to the Oath Keeper Signal chat group on January 5th. The notion that he would thus be placed in charge of an Oath Keeper arsenal is laughable. It is also contradicted by the lack of any hotel video of Ed moving weapons on January 6th and by a credible, uncharged eyewitness who stated unequivocally that Ed "never, ever touched any of the firearms." Ex. 7 at 21. That statement alone undermines the government's evidence of dangerousness. Moreover, statements by credible, uncharged Oath Keepers establish that each group brought their

own weapons that they kept to themselves for defensive purposes to extract their members, so Vallejo's "QRF" reference could at most have only meant an offer to extract people using himself, his friend, and their two rickety trucks. *See* Ex. 12 (Thayer, *supra* Note 3) at 3, 6. And there is no evidence Vallejo purchased or brought multiple weapons to D.C., discussed violent plans with Oath Keepers while there, or purchased multiple weapons systems after the 6th to prepare for war, as others are accused of doing.

With no direct evidence of dangerousness, the government's prior bond memorandum attempts to paint Vallejo as dangerous based on the worst behavior of his alleged conspirators, noting that Rhodes purchased forty thousand dollars' worth of weapons and accessories (mostly accessories), called the Biden administration an "occupying enemy force," and encouraged the destruction of evidence. Ex. 13 at 11–12, 18. But Vallejo did none of those things. In fact, he voluntarily gave investigators the password to his phone, knowing that he did nothing wrong. While Vallejo said some hotheaded things on a podcast with a longtime friend —things not dissimilar to contemporaneous statements circulating on the air from talk show hosts and the then-sitting President of the United States—those statements were not matched with actions after January 6th. Instead of fomenting a revolution, Vallejo left D.C., went to Graceland, went home, fixed his truck, and moved on with his life. This is not strong evidence of dangerousness.

Nevertheless, the government sees it as extremely significant that Vallejo was awaiting orders from Rhodes on January 7, and then waited for him in Texas (for a day) to discuss "next steps." Ex. 2 at 5. But as was made clear on the January 7 podcast, Vallejo and his friend were in a wait-and-see mindset after the certification, waiting to see if there were a groundswell movement that could influence the Congress or President to act. Without such a movement, they viewed themselves as "utterly useless." Ex. 4 at 13. This language of awaiting orders and asking about "next steps" while President Trump was still Commander-in-Chief is not the language of a meeting

of the minds in a seditious conspiracy. And indeed, as the next twelve months showed, Vallejo was not in any seditious conspiracy. The weight of the evidence of dangerousness is weak, supporting pretrial release.[16]

### D.    The lack of danger Mr. Vallejo poses to the community supports release

If released, the Court can be reasonably certain that Mr. Vallejo would live peaceably with his wife and continue his noble work of sponsoring individuals battling addition and counseling veterans struggling with PTSD and suicidal ideation. As Mr. Osgood stated, Ed "will continue this activity until he passes from this Earth." Ex. 1 at 4. And Mr. Kokesh aptly stated, "[t]he world, our country, and the veterans community needs more men like Ed, not less." *Id.* at 1. Indeed, the community is less safe with Vallejo incarcerated before trial, losing someone actively and passionately dedicated to helping others struggling with mental health and addiction.

Moreover, the very nature of these charges and of Ed's alleged role in them undermines any alleged danger posed in 2022. At *worst*, the government could argue that *in theory*, Vallejo was prepared to take violent action between January 6–20, 2021, *if* commanded to do so by President Trump or Stewart Rhodes. But Donald Trump is no longer the legitimate president authorized to invoke the Insurrection Act; and the Court has ordered Rhodes to be detained. And whatever the

---

[16] The Court has previously expressed reluctance to rely on peaceful conduct by alleged conspirators in the year-long aftermath of public arrests of co-conspirators as evidence against dangerousness, because arrested defendants do not have access to such arguments, and because the desire not to be arrested might have influenced the conduct of the later-arrested defendants. But the fact that initially-arrested defendants lacked the opportunity to live peacefully in the community should not prevent the Court from using helpful information at its disposal about the conduct of those who had that chance. To use an analogy, medications that are tested and proven safe should be approved for release even if there are untested medications that might also be safe, but which did not get chosen for clinical trials. Here, Vallejo has been "tested" and proven safe in the community for the last year, and nothing indicates that this will change merely because he has been charged. That is especially true since he voluntarily met with the FBI and provided the password to his phone despite knowing that he was under suspicion for these charges—strong evidence that he will not flee or pose a danger.

Court thinks of Vallejo's preparedness to use violence on January 6, 2022, his own words and those of his close Arizona companion show that after the certification, Vallejo intended to wait and see what happened on the 20th, feeling that without broad public support, any further resistance would be "utterly useless." Ex. 4 at 13. Since that support never materialized, there is no danger whatsoever that Vallejo—a longtime political activist well-liked in the Arizona community—would try to commit "utterly useless" acts of violence while awaiting his day in court.

The government's reliance on an anti-forced-vaccination tweet and two banal retweets in its prior bond memorandum (Ex. 13 at 12–13) underscores the weakness of the alleged danger posed by Ed Vallejo. Prosecutors did not come to the prior court with pictures of illegal (or even legal) weapons or a history of criminal activity—the standard fare when arguing that a court must override the strong norm of pretrial liberty. It came with three tweets expressing controversial (but hardly uncommon) opinions by a man working every day on the frontlines of a mental health crisis afflicting veterans. In a case with unprecedented investigatory resources, that is decidedly weak sauce. Because the government can cite no actual danger to the public if Mr. Vallejo were released, this factor weighs strongly in his favor.[17]

## CONCLUSION

The government cannot meet its heavy burden of showing by clear and convincing evidence that no combination of conditions can reasonably assure the safety of the community. Mr. Vallejo respectfully requests that the court release him into the custody of his wife, Debra Vallejo, with appropriate conditions.

---

[17] Again, any danger posed by Vallejo is certainly no worse than that posed by co-defendant Caldwell, who is alleged to have played a far greater role in the planning of the QRF and the breach of Capitol grounds (with similar health issues as Vallejo), yet was released.

April 18, 2022                           Respectfully submitted,

                                         /s/ Matthew J. Peed
                                         Matthew J. Peed (D.C. Bar No. 503328)
                                         CLINTON & PEED
                                         1775 I St. NW, Suite 1150
                                         Washington, D.C. 20006
                                         (202) 919-9491 (tel)
                                         (202) 587-5610 (fax)

                                         *Counsel for Defendant Edward Vallejo*