UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>EDWARD VALLEJO,<br>                 *Defendant*. | No. 22-cr-15 (APM) |

**REPLY IN SUPPORT MOTION FOR PRETRIAL RELEASE**

Sadly, the government's opposition presents the Court with a largely false and contradictory "just-so" story woven together with selective quotations, misrepresented time-sequences, and guilt-assuming interpretations. Its proffer is not credible, and the Court should not credit it. And even if it were, it would not constitute clear and convincing evidence that Ed Vallejo, 63, presents so dangerous a threat to life or democracy that no combination of conditions can reasonably assure the safety of the community.

    **A.**    **The Government's Thesis is Self-Contradictory and Belied by Undisputed Facts and Sworn Testimony**

Virtually every major facet of the government's case against Vallejo is contradicted by undisputed facts and sworn testimony. While it is difficult to fully rebut a guilt-assuming narrative premised on real, but out-of-context quotations, the following points are beyond reasonable dispute:

    1.   <u>There was no prior Oath Keeper plan to attack the Capitol or delay the Certification</u>

The government's opposition asserts that in "December 2020," the Oath Keepers formed a "criminal plan focused on delaying or stopping Congress's Certification of the Electoral College vote," Dkt. 105 at 4, through a "planned use of force…[to] attack…the United States Capitol on January 6, 2021," *id*. at 1. Because of the difficulty of proving a negative, Vallejo submitted to the Court virtually all the texts from the two main Signal group chats where the Oath Keepers allegedly

1

orchestrated this "planned use of force." *See* Dkt. 102-1, Exs. 8, 11. Nothing in these 100-plus pages of planning activities corroborates the government's claim of a planned Capitol attack, even though that is exactly where such a "plan" would be discussed.

In addition to these exhibits submitted by Vallejo, the government has produced over 3,900 pages from twelve other Signal group chats in discovery. Although the defense has not completely reviewed this massive database of Oath Keeper discussions, the government itself has admitted in discovery letters (presumably after reviewing them) that it has not uncovered any reference in these chats to a plan to forcibly enter the U.S. Capitol on January 6, 2021. And key word searches for "Capitol" and "QRF" return nothing in these 3,900 pages supporting the government's theory of a pre-planned, QRF-supported assault on the U.S. Capitol. On the contrary, references to QRFs—which the Oath Keepers employed as a defensive measure at numerous events in the summer, fall, and winter of 2020—repeatedly occurred in the context of discussions of anticipated violence by Antifa or other counter-protesters and concerns about "SHTF [shit hitting the fan]." Ex. 15 at 4; *see also id.* at 2 (discussing having a "QRF in the event of a worst-case scenario…such as a Benghazi style assault in the White House by communist terrorists"); *id.* at 5 (discussing putting someone on "a last ditch 'oh crap, they are killing people' QRF."); *id.* at 6 (discussing violent Antifa plans).

The government's thesis about a prior plan to attack the Capitol is also contradicted by its own reliance on messages by Stewart Rhodes regarding whether Antifa or "patriots" were behind the "spontaneous" event. *See* Dkt. 105 at 11 ("Later that evening, at around 7:30 p.m., Rhodes messaged the 'DC OP: Jan 6 21' Signal chat, 'Thousands of ticked off patriots spontaneously marched on the Capitol…. You ain't seen nothing yet.'"); *id.* at 25 ("Later, at 6:24 PM, after the Capitol had been re-secured, Rhodes declared, 'Look, I WAS THERE. I WAS RIGHT OUTSIDE. Patriots stormed in. Not Antifa. And I don't blame them. They were justifiably pissed off.'"). Obviously, if there were a pre-existing plan to attack the Capitol in order to interrupt a process

known to be occurring at precisely 1:00 p.m. on January 6, 2021, it would make no sense for the co-conspirators to be confused in real time about who was responsible for the attack, or to continue debating the issue among themselves for the rest of the afternoon.

        2.    Vallejo did not "travel across the country to support this plot"

The government's brief claims that "Vallejo played a central role in the plot to oppose by force American laws governing the transfer of presidential power. He volunteered to travel across the country to support this plot…." Dkt. 105 at 4. Not so: as shown by Exhibit 1 of Vallejo's motion, Ed made the decision to go to Washington, D.C. with a couple of his friends at the request of the sitting President without even knowing if Stewart Rhodes would be there. Dkt. 102-1, Ex. 1 at 1. He was not on any of the Signal chat groups produced by the government until January 5, 2021, when he was added to one of them after he had already arrived in the D.C. area. He was not privy to any Oath Keeper discussions and simply knew that they were one of multiple groups headed to Washington, D.C. to support the President. Contrary to the government's spin, Vallejo's phone records clearly document what motivated his cross-country travel: Vallejo viewed and forwarded several podcasts and websites discussing the need for ordinary citizens to show up with individual, lawful arms as part of a peaceful demonstration of First and Second Amendment rights and to support the President should he decide to invoke the Insurrection Act—a decision these podcasts described as supported by "sober, serious" individuals in the government, including a "three-star general."[1]

---

[1] At least one of these podcasts mirrors almost word-for-word the language Vallejo expressed on the January 6–7 podcasts quoted extensively by the government, making it indisputably clear that the broader context of those statements in Vallejo's mind was the expectation that the failure of Congress to sustain objections to electoral slates would lead to the invocation of the Insurrection Act by President Trump, as called for openly by General Michael Flynn and other conservative luminaries at the time, and discussed on podcasts followed by Vallejo.

### 3. Vallejo did not "stage" or "station" himself in a "hotel full of firearms"

The government's brief repeats at least *six times* that Vallejo was "staged" or "stationed" in Arlington, Virginia with an arsenal of weapons ready to deliver to Oath Keepers attacking the Capitol.[2] Once again, the undisputed facts get in the way of the government's imagined narrative. At 1:00 p.m. on January 6, 2021—precisely when one would expect Vallejo to be "staged" at the Comfort Inn under the government's theory—Ed was in fact wandering the streets of D.C. looking for his beat up, 26 year-old pickup after forgetting where he parked the previous day. Rather than staying at the hotel to "guard[] an arsenal of firearms," as the government repeatedly alleges (Dkt. 105 at 6, 27), Ed returned to D.C. the next morning to look for his truck and attend the January 6 rallies like thousands of others. Ed did not find his truck until 1:19 p.m. Dkt. 102-1, Ex. 8 at 76 ("Eureka! Truck found :)"), by which time protesters had already breached the Capitol. If the government's narrative were accurate, Vallejo would never have gone into D.C. on the 6th, a day when D.C. was expected to be crowded with unreliable transportation. Or if he had, he would have at least made sure to leave early enough to get "staged" for the planned insurrection. He did neither, but instead wandered the streets of D.C. at 1:00 p.m., oblivious to any imminent event. The government never stops to consider what if, by happenstance, it had taken Ed even *slightly* longer to find his truck: he would have continued to innocently wander the streets of D.C. miles from any firearms, while the attack on the Capitol was happening blocks away.

---

[2] *See* Dkt. 105 at 3 ("Vallejo…implemented this plan by…staging Vallejo nearby to be prepared to assist his co-conspirators at his commander's orders."); *id*. at 4 ("Vallejo…stationed himself in a hotel full of firearms, ammunition, and equipment."); *id*. (co-conspirators…forcibly breached the Capitol while Vallejo and others staged as armed QRF teams across the Potomac River, awaiting potential deployment and empowering the co-conspirators."); *id*. at 6 ("Vallejo and his co-conspirators coordinated at least three regional QRF teams stationed at a Comfort Inn in Arlington, Virginia, to support the co-conspirators' plot and the January 6 Capitol attack."); *id*. at 8 ("Co-Conspirators Attack the Capitol with Vallejo and Others Staged Nearby"); *id*. at 27 ("Vallejo traveled across the country and staged himself near the congressional proceedings ready to transport firearms and equipment into the nation's capital.").

4.  Vallejo did not offer to bring weapons to the Capitol

After finding his truck, Ed meandered back to his hotel and began seeing the same tense images we all saw on January 6, 2021, along with reports on the Signal group chat of "shots fired," "tear gas," "overwhelmed" officers, and Oath Keepers urgently looking for each other. *Id.* at 77. In *this* context, at 2:24 p.m., Ed messaged the group: "Vallejo back at hotel and outfitted. Have 2 trucks available. Let me know how I can assist." *Id.* And at 2:38 p.m., he messaged again, "QRF standing by at hotel. Just say the word…" *Id.* at 78.

The government fancifully describes these two offers of help during a chaotic riot—the feared "SHTF [shit hitting the fan]," Ex. 15 at 4—as evidence that "Vallejo stood ready to arm his co-conspirators" and was "[e]ager to bring weapons into Washington, D.C." Dkt. 105 at 10. As explained in Vallejo's motion, however, that interpretation is *impossible*: credible eyewitness testimony establishes that Vallejo "never, ever touched any of the firearms" in his hotel room, Dkt. 102-1, Ex. 7 at 21; and there is no hotel video of Vallejo moving firearms between 1:19 p.m. (when he found his unarmed truck downtown) and 2:24 p.m. (when he stated he was "outfitted" and offered to assist with two trucks).

The government's opposition never addresses the lack of any hotel footage of Vallejo "outfitting" his truck. As for the eyewitness testimony, the government submitted two FBI 302s from "PERSON 13" and calls his statements "consistently incredible." Ex. 105 at 24. There is just one problem for the government: "PERSON 13" is not the source of eyewitness testimony cited by Vallejo. Rather, Vallejo quoted the sworn grand jury testimony of the *other* individual traveling from Arizona, whom the government has never alleged did anything wrong and who was willing to and did testify under oath to the grand jury, at the government's request. *See* Dkt. 102-1, Ex. 7. The government has no answer for this credible, sworn, eyewitness testimony that Vallejo never touched any firearms, much less outfitted his truck with an arsenal of them.

5

The government also ignores the inconvenient fact that Vallejo continued to offer his truck to evacuate people *the rest of the afternoon*, using more express language than in his first two texts. At 4:49 p.m., for example, Vallejo sent an almost identical message explicitly offering to "exfil" (evacuate) people: "I have 2 pickups and 1 hour 11 minutes to exfil whomever needs it." Ex. 8 at 87. And at 5:51 p.m., Vallejo referenced his experience with "36 Dust off"—a medical evacuation unit—offering to "transport anyone." *Id*. at 88. Given the government's narrative, it makes no sense for Vallejo to be offering to take people away from the Capitol precisely when they needed arms to stay at the Capitol and prevent the certification. Yet that is what he did multiple times, implicitly in his 2:21 p.m. and 2:38 p.m. texts, and explicitly in his 4:39 p.m. and 5:51 p.m. messages.[3]

Despite sworn grand jury testimony corroborated by hotel video and consistent, express offers by Vallejo to "exfil" people, the government insists that Vallejo's self-description as "outfitted" in his 2:21 p.m. text must have been an offer to deliver weapons, because (1) there is no reason that Oath Keepers who "were present and actively breaching the Capitol at the time would care what attire Vallejo was wearing," Dkt. 105 at 23; and (2) Vallejo issued a "'We are at WAR' declaration on the evening of January 6," and "[w]ars demand guns, not clothes," *id*. Once again, the facts inconveniently disprove the government's spin.

In fact, the Oath Keepers repeatedly discussed among themselves what kind of clothes to wear for January 6 and other events—down to the level of "t-shirts"—believing that it was important to project a professional, unified image in situations where law enforcement might need to distinguish Oath Keepers from bad actors.[4] And certainly, if Vallejo were offering to come into

---

[3] Oddly, the government describes Vallejo's offer at 5:51 p.m. to transport anyone who "'meets us on the perimeter, curfew be damned,'" as an example of Ed "[d]isplaying a disregard for legal orders." Dkt. 104 at 11. But he literally offered to come to the "perimeter" of D.C.—thus obeying D.C.'s curfew—to transport out anyone who still felt in danger after the curfew.

[4] *See, e.g.*, Dkt. 102-1, Ex. 11 at 1 ("Attire is no full camo….So jeans or khaki 511 combat pants etc. and an OK shirt. Same for Wednesday. Plate carriers etc. Will be on for both days."); *id*. ("If

6

a chaotic situation and evacuate a particular group of people with identifiable outfits, it would have been important in that moment to be recognizable both to those group members (most of whom had never met Vallejo) and law enforcement. In any event, Vallejo never argued that "outfitted" solely meant his clothes, but included "gear," like a helmet, that people typically mean when stating that they are "outfitted" for an activity. Dkt. 102 at 26 n.13. And the government never addressed the argument that even if being "outfitted" included weapons—an impossibility given the evidence— that would hardly be incriminating, since Vallejo was offering to enter a chaotic riot and extract unarmed Oath Keepers, and thus could be expected to need weapons for self-defense.

Likewise, the facts contradict the government's just-so story that Rhodes's 1:25 p.m. message about Vice-President Pence caused Vallejo to believe that the certification was a "forgone conclusion," Dkt. 105 at 23, leading him to prepare to bring arms to the Capitol and issue a "'WAR' declaration on the evening of January 6," *id*. In fact, Vallejo's "at WAR" comment did not occur until the next day—January 7, 2021—*after* the Certification had already been completed. Dkt. 102-1, Ex. 8 at 100.[5] Moreover, while Rhodes's message described the anger and actions of non-Oath Keeper protesters, at almost the exact same time (1:16 p.m.), Oath Keepers themselves celebrated orderly objections during the certification proceedings with nary a hint of an intent to interfere. *See* Dkt. 102-1, Ex. 11 at 11 ("The first objection of Arizona has just occurred!!!"). And for his part, awaiting these objections was demonstrably Vallejo's own personal intent. As described in his motion, Dkt. 102 at 15–16, Vallejo and his Arizona friend believed that regardless of what Vice-President Pence decided, individual senators such as Sen. Ted Cruz stood poised to object to the

---

you have camo pants probably ok if OK shirt or non camo too etc. I will be wearing multi cam pants an OK shirt"); *id*. ("Then Tuesday I'll go khaki combats and OK shirt. Sweatshirt under OK shirt probably best").

[5] It is unclear why the government repeatedly asserts that Vallejo sent this message on January 6th (Dkt. 104 at 10, 23), other than to misleadingly suggest to the Court that it occurred during the Capitol breach.

certification with anticipated evidence from President Trump, and they were frustrated that the Capitol breach itself caused these senators to reverse their position and refuse to object to the certification. Thus, even if the government were correct that "Wars demand guns, not clothes," Dkt. 105 at 23—a strange statement given that wars require uniforms—the facts show that Vallejo intended to wait on the certification process to see what happened, and did not express this "war" sentiment until the morning of January 7th, long after he offered to use his 26-year old pickup truck to help "exfil" people from the Capitol.

### B. Vallejo's "Words" Do Not Reflect a Danger to the Community

Lacking any evidence that Ed Vallejo has committed a single violent act in his 63 years on this planet, the government repeatedly insists that the Court "need not look further than his own words." Dkt. 105 at 27. *See also id.* at 23 ("take Vallejo at his words"); *id*. at 26 ("There is every reason to credit Vallejo's own words."). While Mr. Vallejo's defense against the government's narrative fiction would undoubtedly be easier if he had said fewer stupid things, one thing is clear: Ed Vallejo is uniquely someone whose words and manner of speaking cannot be taken literally.

This is demonstrated by the remarkable letter of Ed's friend of several decades, who wrote that Ed always frames his everyday speech in "military terms. A morning walk is 'recon,' breakfast is 'the chow line,' the day's activity is the 'detail.'" Dkt. 102-1, Ex. 1 at 3. This friend explains that for Ed, this "lingo" helps maintain "bonds of brotherhood" with the veterans he was working with. *Id*. What is remarkable about this letter is that this friend was simply describing what it is like to be around Ed, without any knowledge that the government intended to place enormous weight on singular words like "recon," or innocent, jargon-laden messages like "cadre requesting coordinates to Allied encampment outside DC boundaries to rendezvous."

Because of this coincidence, this happenstance observation by Ed's friend carries tremendous importance. While "just-so" stories employ facts as weapons to fit pre-conceived

narratives, true truth-seeking attempts to develop a full picture *from* the facts. In that arduous task, it is priceless when independent sources of information happen to converge in this manner, helping to illuminate the meaning of words. Here, the letter of Ed's friend—intended to just convey some personal anecdotes and describe his character—carries far more weight in assessing the dangerousness of Vallejo's habitual use of words like "recon" than does the guilt-assuming narrative repeated by the government.[6]

More generally, the context of Ed's references to "guerilla war" and "war" on January 6–7, 2021, simply does not reflect the dangerousness alleged by the government. Ed's "guerilla war" comment was describing what he feared would happen if a fraudulent electoral result (in his mind) were certified, not what he wished to happen. Dkt. 102-1, Ex. 3 at 15. And his comments about personally fixing a broken electoral system through "shooting" and stating that we "are at WAR" both occurred in the well-documented context of podcasts and articles Ed consumed discussing President Trump's options under Insurrection Act to use lawful force to address a perceived fraudulent election—discussions that involved conservative officials, generals, and media personalities. Vallejo never once proposed acting wholly outside of the lawful presidential authority of his "Commander-in-Chief," Dkt. 102-1, Ex. 8 at 83, and in the end, he followed what he understood to be a "POTUS directive" to "go home," Dkt. 102-1, Ex. 6 at 33. Notably absent in the government's opposition is any reference whatsoever to actual or planned "war" or violence by Vallejo after January 20, 2021, when President Biden became the lawful commander-in-chief and assumed an office to which Vallejo felt oath-bound to support. Simply put, even accepting the

---

[6] This same form of independent confirmation is evident in the January 6–7 podcasts, in which Ed's podcasting friend laughingly responds to Ed's passion by stating, "That's Ed" and contrasts him with his more "logic and reason" friend. Dkt. 102-1, Ex. 3, 4.

9

government's desperate urging to take the blustery Vallejo at his "words," there is no evidence—much less clear and convincing evidence—that Ed poses a danger to democracy or the community.

### C. The Government Ignores its Burden of Proof and the Most Salient Facts for this Motion

Ignoring its high burden of proof to show that Vallejo is a danger to the community, the government repeatedly falls back to arguing in the negative, stating that "there is no evidence that [Vallejo] has renounced violence or that he no longer believes in the necessity of guerilla warfare after January 6." Dkt. 105 at 27; *see also id.* at 21 ("[T]he defense points to no evidence citing that the conspirators have renounced their overarching goals of overturning the 2020 election."); *id*. at 23–24 ("There is simply no evidence that Vallejo's words were overly bombastic."). It is difficult to understand this line of reasoning when the Court has access to over *a year* of evidence indicating how Vallejo responded both to the inauguration of President Biden *and* Vallejo being contacted by the FBI. After a new president was inaugurated (actually before), Vallejo demonstrably went on with his life, expressing his political frustrations in spiritual terms while throwing himself into Homefront Battle Buddies, becoming its Program Director, Vice-Chairman of the Board, and the "engine" of the organization. Contrary to the government's arguments, this well-lived post-January 6th life is "evidence" that Ed is not a danger to the community or a threat to democracy.

Likewise, Vallejo's motion described how he provided his phone password to the FBI upon his first contact with them, and then voluntarily agreed to meet with them again to discuss what he knew about January 6. As it turns out, that second meeting was just a ruse by the FBI to arrest Vallejo, but the fact that he did not flee or initiate any anti-government violence after learning that he was under investigation—and was willing to drive a significant distance to meet with the FBI—is strong "evidence" that he is not a danger to the community or the administration of justice. Indeed, given that the weight of the evidence of guilt (when it is strong) is regarded as the *least*

significant factor under 18 U.S.C. § 3142(g), *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985), the government's failure to engage with Vallejo's post-January 20th life and the far-more relevant "history and characteristics of the person, including the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings," § 3142(g)(3), dooms any claim that it has demonstrated Vallejo's dangerousness by clear and convincing evidence.[7]

### D. The New Recordings Submitted by the Government Strongly Support Vallejo's Release

Finally, and ironically, the recordings of jail calls between Vallejo and his wife and friend, recently filed by the government in a supplement (Dkt. 107), strongly support Ed's release. The government filed these deeply intimate recordings because, in its view, they (i) indicate that storage bins brought by Ed to the Comfort Inn did not really contain "'200 lbs of food,'" *id*. at 3 (quoting ECF 102 at 9), and (ii) reflect "attempted concealment of evidence" by Ed, *id*. These conclusions are wildly unfounded and inconsistent with the government's own prior arguments, however.

First, the Indictment itself credits Vallejo's claim to have brought "food for 30 days," ECF 1 at 26 ¶ 126(b), and the government's opposition repeatedly emphasizes this fact in arguing that Vallejo is dangerous and a flight risk. *See* Dkt. 105 at 17 (arguing that Vallejo has the means to flee prosecution because he "demonstrated in January 2021 that he is willing and capable of preparing

---

[7] The government's bald claim to have a stronger basis now to detain Vallejo than it originally had for Defendant Caldwell, who was released despite allegations that he played a far greater role in the planning of the QRF and the breach of Capitol grounds, should not be credited. Notably missing from its vague proffer of information learned from cooperators is any claim that the QRF was intended to bring weapons into D.C. to support a prior plan to attack the Capitol, as opposed to just generally to bring weapons into D.C. "if called to do so by Stewart Rhodes." Dkt. 105 at 20. Such a general plan for a QRF to bring weapons if called upon would apply to any variant of "SHTF [shit hitting the fan]," Ex. 15 at 4, and is a fact generally undisputed for numerous Oath Keeper events.

11

and storing months' worth of food at a time"); *id*. at 22 (arguing that Vallejo is dangerous because he "was prepared for a prolonged attack with a months' worth of food"). It is unclear how the government believes Vallejo transported a month's worth of food for himself and others except with the bins he is seen unloading at the Comfort Inn.

In any event, the government's reasoning for why these calls show that the bins did not really contain food is nonsensical. It argues that "if the bins really did contain food, then there would be no need for Vallejo to direct a third party to remove objects from them the day he learned the government was aware of these bins"; and, "if the bins really did contain food, there would be no need for Vallejo to cryptically describe the contents of the bin by saying 'you'll see what I am talking about.'" Dkt. 107 at 3. This reasoning is premised on two obviously flawed assumptions. First, it assumes that Vallejo did not use the bins to store anything new at any time in the *one-year* period between his return to Arizona and his arrest in this case. But given that humans eat food, and food goes bad, it is highly unlikely that Vallejo left 200 pounds of food sitting in storage bins for a year, even if that was what was in the bins in January 2021. Second, it assumes that whatever interested Vallejo in the bins left no room for 200 pounds of food. But that is contradicted by Vallejo's description of the item of interest as a "satchel." *Id*. at 2. Even if an incriminating "satchel" were left sitting in the bins for over a year—a highly dubious proposition—it would not have taken up much room, and thus would have no bearing on whether the rest of the bins contained food.

Likewise, the government's conclusion from these calls that Vallejo was trying to conceal evidence, and thus must be physically restrained by the Court to prevent further obstruction, is wholly unfounded. Again, that conclusion depends on the assumption that Vallejo would not have reused the bins or added to them at any point in the last year, a highly doubtful proposition, especially if they contained food. It also depends on the conclusion that whatever "evidence" Ed was attempting to "conceal" would fit in a "satchel." *Id*. Other than an undiscovered phone, it is

hard to imagine anything relevant to these charges that could fit in a satchel; and it couldn't have been a phone, since Ed's messages from this period are preserved on the phone he handled over to the FBI after voluntarily providing his password.

More fundamentally, this unfounded conclusion contradicts the patently clear meaning of Ed's words and the context in which he made the request. On the call with his wife, Ed was discussing his expectation that if he were released, he would be subject to conditions such as having no contact with alcohol or drugs. *Id*. And in words that were omitted in the government's filing, he discussed a fellow inmate having his probation revoked due to drinking a beer. In this context of discussing conditions of release and revocations involving drugs and alcohol, Ed asked his wife to look through "all my stuff…everything" to make sure there was no "contraband" that might "jeopardize" his ability to be (and stay) released. *Id*. Notably, after this request, Ed's wife asks him, "Did they drug test you?"

Given this context, it is easy to guess examples of "contraband" that an older gentlemen with a history of back pain and a distrust of the medical establishment might have stashed away, and why he would "cryptically describe" such remedies. Important here, Vallejo asked his wife to scour his belongings—not just the black bins—to ensure that any such contraband was eliminated and wouldn't violate any conditions or "jeopardize" his release. Such an effort to ensure complete compliance is to Ed Vallejo's credit, not evidence of obstruction. That the government cannot see this is yet another example of it becoming stuck in its own guilt-assuming reasoning.

While the new recordings utterly fail to support the government's conclusions that the bins did not contain food a year ago and that that Ed was attempting to conceal evidence, they provide a powerful window into Ed Vallejo's heart and show palpably why this Court should feel comfortable ordering his release. On these calls, the parties discuss: (i) Ed's efforts to obtain a Bible and connect with a chaplain; (ii) the confidence of Ed's prior attorney and her advice that the

13

government's case had serious holes; (iii) the fact that the probation office in Arizona determined that Ed was not a danger and recommended his release; (iv) the determination by his jail that he was not a danger and his placement at the lowest level of classification (the same level as the beer-drinking probationer); (v) the back pain Ed was experiencing in jail; (vi) Ed's confidence that he will be cleared and half-joking hope that he might get a book deal; (vii) Ed's passing the time reading old books and his generous desire, after clearing his name, to donate new books to his institution to give inmates better options for reading; (viii) Ed's willingness to abide by any restraints, including ankle bracelets and internet monitoring; and (ix) the willingness of Ed's wife to "jump through any hoop" to support his release, including submitting her own electronics to government monitoring. All of these themes, discussed genuinely in intimate conversations, support the conclusion that Ed is someone with a kind and generous heart who has no desire or incentive to flee from or obstruct these proceedings.

Most poignantly, Ed's conversation with Debbie Vallejo, his wife of 35 years, reflects a tenderness and attachment that should give the Court great assurance that he would succeed in pretrial supervision. On the call, Debbie reminds Ed of her concerns about some of Ed's political circles over the years, and Ed expresses remorse that his stupidity has placed her in this position. Through tears, Ed states that getting the job that brought him to Debbie was the best thing that ever happened to him, and he now wants nothing more than to hug her again and spend the rest of his days with her. It is a remarkable and touching exchange, and a far cry from the politically-obsessed Ed of January 2021, much less the false depiction of Ed as an unrepentant, violent obstructionist in the government's briefs. If the Court listens to these recordings in their entirety, it will hear the passionate heart of a man who loves his wife of 35 years, wants to make the world a better place, believes in his innocence and in the strength of his case, and is willing to abide by any conditions the Court imposes.

## CONCLUSION

The government cannot meet its heavy burden of showing by clear and convincing evidence that no combination of conditions can reasonably assure the safety of the community if Ed Vallejo were released.

April 29, 2022									Respectfully submitted,

/s/ Matthew J. Peed
Matthew J. Peed (D.C. Bar No. 503328)
CLINTON & PEED
1775 I St. NW, Suite 1150
Washington, D.C. 20006
(202) 919-9491 (tel)
(202) 587-5610 (fax)

*Counsel for Defendant Edward Vallejo*