UNITED STATES DISTRICT COURT
THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No.: Cr. 1:22-cr-00015-APM |
| | ) | |
| STEWART RHODES, ET. AL. | ) | |

## DEFENDANT'S MOTION TO CONTINUE TRIAL

**David Moerschel,** by and through counsel, Scott Weinberg, Esq. and on behalf of all defendants, moves this Honorable Court to continue the July 11, 2022, trial date. The grounds for such sought relief are as follows:

1. The Court set forth the procedural background of the instant case in its order denying a continuance on March 29, 2022, ECF number 68. The Court pointed out the main evidence in the case is the text and signal group chat messages and the state of mind of the Defendants.
2. The government continues to make disclosures on a rolling basis as of April 26, 2022.
3. In October 2021, the Government provided "Signal Chats" from Stewart Rhodes' phone as part of their evidence disclosure. The data turned over by the government was a scoped download of the data on Mr. Rhodes' phone. This disclosure alone contained 14 signal chats with 40,000 texts equaling 3950 pages of discovery material. The "Signal Chats" produced in October were only (15-25%) of all of the relevant "Signal Chats" on Mr. Rhodes' phone, when considering the *full* raw download of Mr. Rhodes' phone.
    a. Each of these signal chats have a distinct "title" created by Mr. Rhodes in his phone.
    b. A data analysis expert retained by the defense has examined both and discovered that the phone download was not a full raw download, but rather a *limited scoped version* which did not include the bulk of the communications between the alleged co-conspirators.

    c. The 14 signal chats previously disclosed by the government in October of 2021, do not include various material signal chats that were on Mr. Rhodes' phone during the time period relevant to the indictment.
    d. Mr. Rhodes' attorney sent the rest of the relevant "Signal Chats" provided to the him last week to a privately retained data analysis expert. It will take weeks to download and sort through all of the "Signal chat" material that is a part of the *raw* data download.
    e. The raw data download totaling 80gigs has only been made to available to defense counsel last week.

4. The defense agrees that Mr. Rhodes' phone is the key to proving or disproving a conspiracy in this case. Also important is the behavior and demeanor of the Defendants throughout the day that we can now access regarding how they acted or didn't act in and around any communications they received or illicit agreements they may have struck. Where were they, what they were doing, how did they respond to events? This all bears on their state of mind. It is defense counsel's belief that their observable actions on government surveillance video and public video are incompatible with prosecution theories. The behavior of the Oath Keepers showing innocence presents a stark contrast with the now observable problematic behavior of others working in concert, collaborating, conspiring and engaging in behavior most would consider consistent with sedition and criminality. Contrast is crucial evidence to prove innocence and is a prerequisite for any effective defense, particularly where establishing state of mind is paramount. The fact that many of these subjects we have recently identified are not publicly known and for the most part have not been charged is a matter of well-founded suspicion and concern. Even the charging exceptions to this rule seem highly correlated to lenient charges, delayed charges, charging documents that lack full context and surprising authorizations of pre-trial release. To provide an effective defense counsel must be afforded a meaningful opportunity to explore and understand these issues.

5. The defense must be afforded adequate time to examine the full, raw download of Mr. Rhodes' phone in order to be prepared for trial.

6. The Defense has a good faith belief that Mr. Rhodes will be testifying in his defense during the September trial. His testimony can exculpate the defendants set for trial in July.
7. Based on logistics, there are going to be two trials, a group of 4 and a group of 5. All the attorneys are committed to have the in custody defendants ready for trial in September and the out of custody defendants ready for trial at the Courts earliest convenience in 2023.
8. On April 25, 2022, the Government provided Global Discovery Production No. 14. This disclosure includes material on Raymond Epps and numerous other reports, indexes, and files.
9. At the time of the filing of this motion, over one hundred and fifty thousand (151,174) files have been provided to the defense Relativity database.
10. Finally, the defense would cite to Delaney v. United States, 199 F.2d 107, 114 (1st Cir. 1952) as an *additional* reason to grant a continuance.
11. Detained defendants: Meggs, Watkins, and Harrelson received access to Evidence.Com and it's roughly 23,594 videos eight (8) weeks ago. Because of logistical challenges and pre-trial release conditions regarding computer access, some defendants on pre-trial release have not had an opportunity to review the information on Evidence.Com. The defense recognizes that defendants do not have a legal right to review discovery material with counsel. However, in a case where state of mind is one of the most relevant considerations for proving or disproving the charged offenses, it becomes imperative to have such opportunities in order to mount a creditable legal defense.
12. All Defendants continue to be barred from accessing the Relativity database with its 151,174 files that will soon increase substantially as we approach trial due to the previously highlighted continued rolling disclosures by the government.
13. The Government, during the last hearing, informed this Court that investigation files, that are both germane and a prerequisite to mounting any effective Defense, will not be ready for release until later this month and then only on a rolling basis of unknown duration.
14. The defense intends to file the first of three motions later this week requesting supplemental discovery that includes supplemental requests for between 50 and 100

eyewitnesses. Some of these eyewitnesses, based on objective video reviews only now made possible, seem to actively engage in crimes to which the Oath Keepers have been falsely accused, most occurring prior to any presence of the Oath Keepers and all of such without the knowledge or participation of the Oath Keepers. The video record that the defense team is unearthing is gradually confirming this theory.

15. Undersigned counsel is under the impression that Defendants Harrelson and Watkins intend to make statements to this Court in the next hearing expressing the firm belief that they cannot receive a fair trial under these conditions and that while they believe continued detention is inappropriate and unjustified under these circumstances, they are willing to waive Speedy Trial rights indefinitely so that they may prepare an adequate defense.

16. The government has informed the undersigned that it does not oppose the ultimate relief requested in this motion—that the trial currently scheduled for July 11, 2022, be continued. The government disagrees with some of the factual representations and stated reasons for the continuance.

## LEGAL ARGUMENT
### THE DELANEY CASE, REFERENCED BELOW PROVIDES PRECEDENT FOR THIS COURT TO GRANT A CONTINUANCE OF THE JULY 11TH TRIAL.

**The Delaney case:**

The Delaney case was on appeal in front of the United States Court of Appeals for the First Circuit based on the trial court's denial of the Defendants' third motion for continuance of trial for a reasonable time until the prejudicial effect of nationwide publicity of open congressional subcommittee hearings wore off so far as to permit a trial free of hostile atmosphere and public preconception of Defendant's guilt.

Delaney was the Collector of Internal Revenue for the District of Massachusetts. He was indicted and suspended from his position in June of 1951. The indictment charged him with various criminal acts as the Collector of Internal Revenue. Delaney's suspension, removal, and indictment was met with widespread publicity in the Boston Area. At the time just prior to Delaney's trial there was a Subcommittee on Administration of the Internal Revenue Laws, known as the King

Committee. This was set up by the Committee of Ways and Means of the House of Representatives.

Counsel for Delaney requested the committee suspended its proceedings until the final disposition of the indictments. Delaney's counsel stated the committee could 'serve no other purpose than to further prejudice Mr. Delaney's right to a fair trial of accusations against him.'

On October 16, 1951, in Washington D.C., the King committee commenced public hearings focused upon derelictions of Delaney. The committee was reported on by newspapers, radio, and on television. The newspaper coverage was characterized by flamboyant, front-page headlines in large, heavy type, covering colorful feature stories emphasizing the more striking aspects of the testimony in front of the committee.

Before the King Committee were many who had testified before the grand jury that had returned indictments against Delaney and who would later testify at his trial.

**The Appellate Court's Holdings:**

The Court held, "Since the committee evidently felt that there were overriding consideration of public interest which demanded that is open hearings proceed, it must be inferred that the committee intended, as indeed it must have foreseen that is proceeding would receive the most widespread publicity" Delaney at 111.

The Court further held "The newspaper publicity was characterized by flamboyant, front-page headlines in large, heavy type, covering colorful feature stories emphasizing the more striking aspects of the testimony. This was supplemented by radio and television exploitation of the same material." Id. at 113.

"It is fair to say that, so far as the modern mass media of communication could accomplish it, the character of Delaney was pretty thoroughly blackened and discredited as the day approached for his judicial trial on narrowly specified charges. In large part, at least, this result must be attributed to the publicity which the King Committee invited and stimulated when it decided that it was its duty to hold open hearings on the Delaney case after he had been removed from office by the Executive and his indictment had been procured by the Department of Justice" Id. at 111.

"Here the United States, through its *legislative* department, by means of an open committee hearing held shortly before the trial of a pending indictment, caused and stimulated this massive pre-trial publicity, on a nationwide scale. Some of this evidence was indicative of Delaney's guilt of the offenses charged in the indictment. Some of the damaging evidence would not be admissible

in the forthcoming trial, because it related to alleged criminal derelictions and official misconduct outside the scope of the charges in the indictment. None of the testimony of witnesses heard at the committee hearing ran the gauntlet of defense cross-examination. Nor was the published evidence tempered, challenged, or minimized by evidence offered by the accused." Id. at 113

**Delaney's Applicability to the Case at Bar:**

As Defendants Thomas Caldwell and Connie Meggs argued in the Motion to Change Venue, the Court of Appeals for the First Circuit, for example, addressed the prejudicial effect of contemporaneous congressional hearings in Delaney v. United States, 199 F.2d 107 (1st Cir. 1952). (ECF 93) In Delaney, the trial judge refused to grant a lengthy defense continuance request, which was based upon ongoing congressional hearings into the "scandal" involving the defendant. Id. at 114. The Delaney Court ruled that the trial judge abused his discretion in not granting the continuance, noting that the actions of Congress in generating adverse publicity were equivalent to prosecutors doing the same:

[I]n being brought to trial in the hostile atmosphere engendered by all this pre-trial publicity, would obviously be as great, whether such publicity were generated by the prosecuting officials or by a congressional committee hearing. In either case he would be put under a heavy handicap in establishing his innocence at the impending trial. Hence, so far as our present problem is concerned, we perceive no difference between prejudicial publicity instigated by the United States through its executive arm and prejudicial publicity instigated by the United States through its legislative arm. Id. at 114.

The Court of Appeals for the District of Columbia dealt with a similar issue during Watergate. Former Nixon official Robert Ehrlichman sought a continuance of his trial date based upon the Senate Watergate hearings, which was denied by the trial judge. Upholding the trial court's ruling, the Court of Appeals distinguished Delaney on the grounds that Ehrlichman was not indicted at the time of the Senate hearings, because it was a full year in the rear-view mirror:

Similarly, a continuance in the circumstances at bar is not required by Delaney v. United States, 199 F.2d 107 (1st Cir. 1952), where legislative hearings were held concerning the criminal activity to be tried. In this case, unlike Delaney, the Senate Watergate hearings occurred almost a year before the trial commenced and the defendants were not under indictment at the time of the hearings. United States v. Ehrlichman, 546 F.2d 910, 916, n. 8 (D.C. Cir. 1976).

**In the Case at Bar:**

The January 6th committee was "created" on July 1, 2021. The committee began public hearings on July 27, 2021. By the filing of this motion the committee has interviewed nearly 700 people, held 4 people in criminal contempt, held mass televised hearing and are reveling new revelations to various press outlets as this case is currently pending.

The <u>Delaney</u> case is in many ways analogous to <u>United States v. Rhodes</u>. Here we have a group of 5 defendants going to trial in July on a multitude of charges including seditious conspiracy. While this case has been pending, the media, with the help of various state senators, congresspeople, and other government officials have kept this case up front and center in the minds of the American public. There is a news story almost every day in all varieties of publications and mediums relating to the January 6th incidents. The Oath Keepers in particular have drawn the ire of the mass media, congresspeople, and senators.

This undue prejudice due to the utterances of members of the Legislative and Judicial branches are comparatively far more prejudicial than the prejudice to the defendants in <u>Delaney</u> due to the advances in media transmission since 1951. In the early 1950s the primary way in which the masses obtained their news was in written print through newspapers and magazines. Television certainly existed but having access to a television in one's home was quite obviously far less common than it is today. Equally as obvious was the fact that no one in the 1950s had access to the internet, nor had social media or 24-hour news outlets been invented.

Fast forward to 2022, nearly every American household has a television, most have multiple televisions within the home. Far greater than half of the U.S. population owns a smart phone capable of accessing the internet. Social media is one of the largest technology-based industries in the world. 24-hour news outlets are common and are accessible in through various mediums. All of these advances irrefutably lead to the conclusion that information, unfairly prejudicial or not, travels much faster and to more people than 70 years ago.

The <u>Delaney</u> Court found that the negative publicity surrounding the case due to actions of the legislative branch was too great for the defendants to receive a fair trial. That publicity was confined largely to the Boston, Massachusetts area. That publicity was largely disseminated through print. The unfair prejudice associated with the case at bar is being disseminated nationwide and at rates that the <u>Delaney</u> Court could never have imagined. If the <u>Delaney</u> Court found that the

circumstances surrounding that trial were far too prejudicial for the defendants to receive a fair trial, how could it be anything but exponentially greater and fundamentally unfair in the case at bar?

What follows are some examples of the statements by Congressional Members, government officials and media correspondents have made in an attempt to find the defendants guilty in the court of public opinion, highly prejudicial to a fair trial;

1. **Chuck Schumer:**

    "History shows us when you ignore or paint over this kind of violent action, it will recur, often in worse form than it had originally."
    "We didn't look away after the attack on Pearl Harbor. We didn't look away after the attacks on 9/11." Both said on the first anniversary of 1/6:

    https://www.reuters.com/world/us/do-not-follow-big-lie-americans-speak-first-anniversary-us-capitol-attack-2022-01-06/

2. **Bennie Thompson, chairperson of 1/6 committee:**
    On Jeffrey Clark testifying "If he's [Clark] saying 'okay I'll come, but I'll plead the fifth' then in some instances that says you are part and parcel guilty to what occurred"

    Stated on NBC with Rachel Maddow at 5:00
    https://www.youtube.com/watch?v=aw-_lhQ2S3A

3. **Nancy Mace, Republican Rep. from S.C.:**
    January 6th rioters "were domestic terrorists"

    https://twitter.com/RepNancyMace/status/1348405796422430723?s=20&t=bB-Av99eSSyv4V3vpVpflw

4. **Alexandria Ocasio-Cortez:**
    Regarding 1/6, "This was a terrorist attack."

    https://twitter.com/AOC/status/1452459627187216388?s=20&t=n4rGGCnphrEEqKj6zGUUBw

5. **President Joe Biden:**
    Called 1/6 "The worst attack on our democracy since the Civil War." On April 28, 2021, in State of the Union Address;

    "They weren't protesters. Don't dare call them protesters. They were a riotous mob, insurrectionists, domestic terrorists." "One of the darkest days in the history of our nation." "Unprecedented assault on our democracy" — statement on January 7, 2021

6. **Speaker of the House Nancy Pelosi:**
   Told House they needed "to examine and report upon the facts, causes, and security relating to the **terrorist mob attack**" when announcing a committee for 1/6.

   https://www.msnbc.com/rachel-maddow-show/maddowblog/why-pelosi-s-call-commission-capitol-attack-matters-n1257971

7. **Vice President Kamala Harris:**
   "Certain dates echo throughout history, including dates that instantly remind all who have lived through them where they were, and what they were doing when our democracy came under assault."
   "Dates that occupy not only a place on our calendars, but a place in our collective memory: December 7, 1941, September 11, 2001, and January 6, 2021."

   Speech on January 6 anniversary from 0:03 to 1:00
   https://www.youtube.com/watch?v=DXrWGJ96B14

8. **CBS News Congressional Correspondent, Scott MacFarlane**:

   Twitter post from May 1, 2022: "Sentencing is scheduled for June 30 in the Capitol riot case of Guy Reffitt, the first defendant convicted at trial. Will be very important to see how the decision to go to trial... impacts the sentence"

   https://twitter.com/MacFarlaneNews?ref_src=twsrc%5Egoogle%7Ctwcamp%5Eserp%7Ctwgr%5Eauthor

   - This is particularly problematic as the sentencing date for Mr. Guy Reffitt is just (12) days prior to the July 11, 2022, trial date. The media coverage surrounding the sentencing will be impossible for potential jurors to ignore.

Furthermore, the Legislative body of the United States of America has gleefully presented many witnesses and evidence that was used against the above referenced defendants in order to obtain the grand jury indictments. In this situation the Legislature felt it was more important to get this "evidence" televised than to allow the defendants to have a fair trial; the exact behavior expressly condemned by the Delaney Court.

## CONCLUSION

The proceedings of the January 6th Committee and the prejudicial statements from Senators, Congressmen, the President, and other employees of the federal government have been an attempt to unfairly influence the course of these judicial proceedings and impact the jury pool.

With all the surrounding negative commentary by members of the Legislative branch it is impossible to imagine a scenario where the defendants in the case at bar would receive a fair trial by an impartial jury.

Defense counsel acknowledges the Court's previously stated desire to bring this case to trial in an expedient fashion. However, defense counsel respectfully suggests that the ends of justice would best be served if defense counsel were given additional time to review the evidence to help coordinate defense experts and witnesses and generally prepare for trial. As the <u>Delaney</u> Court explained, the incidents of January 6th are in the forefront of the minds of the members of the potential jury pool at this time. There must be an adequate period for the commentary that has been made by members of the Legislative branch to fade in the minds of the potential members of the jury before the defendants in this case can receive a fair trial as is guaranteed to them by the Sixth Amendment to the United States Constitution.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on May 3, 2022, a true and correct copy of the foregoing was furnished by using the CM/ECF system with the Clerk of the Court, which will send notice of the electronic filing to all interested parties, including the Office of the United States Attorney.

Respectfully submitted,

Brown, Suarez, Rios & Weinberg, P.A.
Attorney for Defendant
265 E Marion Ave., Ste 114
Punta Gorda, FL 33950
Telephone: (941) 575-8000
Facsimile: (941) 575-8888
E-mail: Scott@bsrlegal.com


By /s/ *Scott Weinberg*
Scott Weinberg
Fla. Bar No. 71109