# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **No. 1:22-cr-00015** |
| | § | **The Hon. Amit P. Mehta** |
| **ELMER STEWART RHODES III** | § | |
| | § | |

## <u>DEFENDANT'S AMENDED MEMORANDUM IN SUPPORT OF PRE-TRIAL RELEASE</u>

COME NOW, James Lee Bright and Phillips Linder, Counsel for Elmer Stewart Rhodes, and move this Court to grant Elmer Stewart Rhodes pre-trial release from custody while his case is pending in this District. The United States Department of Justice has moved to detain Elmer Stewart Rhodes pending his trial currently scheduled for July 11, 2022.

In January of 2022, a federal grand jury returned an indictment charging Stewart Rhodes with Seditious Conspiracy and other related offenses for allegedly orchestrating a plot to oppose by force the execution of laws governing the transfer of presidential power following the 2020 United States Presidential Election, including an alleged attack on the United States Capitol on January 6, 2021. Rhodes is also charged with allegedly obstructing justice for destroying evidence related to the alleged plot.

There is a severe lack of compelling evidence of Rhodes' leadership of any alleged conspiracy. For over one year after the events of January 6, 2021, the Government knew of Rhodes' location at his residence in North Texas and yet failed to detain him at any time. During the one year between the incident and the indictment, Rhodes voluntarily met with

members of the Federal Bureau of Investigation (FBI) on multiple occasions and voluntarily surrendered his phone along with the required access codes.  Rhodes has no passport, and, due to an overwhelming amount of national publicity in which photos of him have been widely circulated, is easily identifiable.  He is also, as discussed with FBI agents Palian and Seyler, on a list that requires an interview and DHS notification before he is allowed to fly.  The Government is also fully aware, based upon Rhodes' voluntary interview with the FBI on Mar 3, 2021, that he indicated a willingness to self-surrender in Washington, D.C. if he were to be charged and/or indicted.  For all of the aforementioned reasons, Rhodes poses no flight risk.

Despite the Government being fully aware of Rhodes' presence for the year after the events of January 6, 2021, in which it neither charged or arrested Rhodes, it is now attempting to claim that the Defendant poses a threat to the public at-large and that he will "obstruct or attempt to obstruct justice, or threaten, injure or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror".

To disprove the Government's theory, Counsel argue that the Defendant has been living openly and voluntarily communicating with government agents at their request. He has watched as other members of his organization have been charged and taken into custody. None of the things that the Government claims he will do have occurred.  He has not obstructed or attempted to obstruct justice.  He has not threatened, injured, intimidated or attempted to do such to any witness or potential juror.  If he was the danger or threat that the Government is falsely attempting to cast him as, he would have been charged and taken into custody within the days and weeks after the events of January 6, 2021, as many others

were.

As to the Government's claim that "based upon Rhodes's [alleged] evidence destruction aimed at hiding his [alleged] crimes and the identities of his [alleged] co-conspirators" Defendant should be detained, it must be stated that the Government is being disingenuous to this Court. They are very well aware that the Defendant was under no legal duty to preserve the "evidence" they are referencing at the time of its alleged destruction. For all of the above-stated reasons, there is no compelling or legal reason for this Court to detain the Defendant pending trial. It is neither legally warranted nor necessary.

### I.    __Procedural Background__

Rhodes is charged with Seditious Conspiracy, in violation of 18 U.S.C. § 2384; Conspiracy to Obstruct an Official Proceeding, in violation of 18 U.S.C. § 1512(k); Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2); Conspiracy to Prevent an Officer from Discharging any Duties, in violation of 18 U.S.C. § 372; and Tampering with Documents or Proceedings, in violation of 18 U.S.C. § 1512(c)(1).

Upon return of the indictment a U.S. Magistrate Judge for the District of Columbia issued a warrant for Rhodes's arrest. Rhodes was arrested on January 13, 2022 in the Eastern District of Texas, near Dallas, Texas.  An initial appearance was held before Federal Magistrate Judge, Kimberly Priest Johnson in the Eastern District of Texas on Friday, January 14, 2022. The United States moved for Rhodes's pretrial detention pursuant to 18 U.S.C. §§ 3142(f)(1)(E) (case that involves the possession or use of a firearm, destructive device, or any other dangerous weapon), 3142(f)(2)(A) (case that

involves a serious risk of flight), and 3142(f)(2)(B) (case that involves a serious risk that the defendant will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror).

The initial detention hearing was held in the same Court in the Eastern District of Texas on Monday, January 24, 2022, and Judge Kimberly Priest Johnson ordered Mr. Rhodes be detained until the trial or upon further Order of the Court. The Motion to Reconsider is set before this Honorable Court on February 15, 2022.

## II. __Factual Background__

The Government claims Rhodes led a conspiracy to oppose by force the execution of the laws governing the transfer of presidential power in the United States. However, in reality, in November 2020, days after the presidential election, Rhodes began contacting members of the Oath Keepers, an organization mainly comprised of former military, law enforcement and EMS members to join him in traveling to Washington, D.C. to protect a rally that had been planned for November 2020. Oath Keepers then protected a Stop the Steal Rally in Atlanta in November of 2020. After that, Oath Keepers then returned to Washington, D.C. to protect a Stop the Steal Rally in December 2020. In late December, Mr. Rhodes was notified by organizers that Oath Keepers were needed to provide protection in Washington, D.C. for multiple rallies on January 5 and 6, 2021. Previous conservative rallies across the United States in the months running up to the Presidential election had been attacked by members of Antifa and Black Lives Matter. The Oath Keepers had been present for the vast majority of those rallies for the purpose of providing

defensive assistance to attendees, some of whom were injured and even hospitalized.  On January 5, 2021, protected an event by a Pro-Trump Virginia women's group in front of the United States Supreme Court. And on January 6, 2021, the Oath Keepers were tasked with providing protection for multiple events, one hosted by Ali Alexander on the Northeast corner of the Capital Grounds in "Area 8".  Oath Keepers were tasked with escorting Alexander's speakers, guests and families from President Trump's rally on the ellipse to the Capitol Grounds for that permitted event in "Area 8".  Oath Keepers also provided security on January 6, 2021 for Latinos for Trump and Virginia Freedom Keepers, which was also a permitted event, approximately two blocks North-Northeast of the Capitol next to the Senate Office Buildings. Oath Keepers also provided a PSD (Personal Security Detail) for Roger Stone who was a scheduled speaker at Ali Alexander's Capitol Grounds Area 8 event, as well as other events throughout the day.

The Government claims the purpose of their travel to Washington was "for operations aimed at stopping the transfer of power with the support of an armed 'quick reaction force,' or 'QRF.'"  The Government, whether through lack of due diligence or through obfuscation of facts and testimony, has misled this Court by painting the QRF as an offensive force whose purpose was to prevent the Presidential certification by Congress through armed action.  The QRF is meant to be a defensive force with weapons to be brought into D.C. if and only if the President of the United States invoked the Insurrection Act and called Oath Keepers into Federal service as part of the "unorganized militia" to protect the White House and the President from Antifa violence and to await further orders from the President.

It is a defensive force, called if and only if required to defend members or those with

whom they have been charged with protecting. There are an abundance of statements made through interviews and depositions which directly refute the Government's contention that the QRF is assaultive in nature. The QRFs in question were stationed in Arlington, Virginia, more than 5 miles away from the Capitol grounds. One of which was manned by co-Defendant, Edward Vallejo, a man in his late 60s, who was overweight and had a myriad of health issues from a heart condition to back and hip issues, hardly the commando force the Government is attempting to portray it as.

The Government, on the other hand, states that Rhodes and other members' presence in Washington, D.C. was to prevent the peaceful transfer of power. In support of this false assertion, the Government claims that Rhodes used social media and encrypted messaging to communicate with and request other members join the Oath Keepers in Washington; organized and participated in tactical military-style training; and amassed weaponry and tactical gear, organizing into regional teams to transport these items to the D.C. area. As previously stated, and easily discerned from the actual facts, all of these efforts were to prepare for the events of January 6, 2021 in a protective and defensive manner. The Oath Keepers have provided such services to conservative groups at multiple rallies all over the country, which necessitated by the aggressive and assaultive nature of violent left-wing groups such as Antifa. As the Government is fully aware from its investigation, the Oath Keepers, in previous protective and security operations, had staged QRFs in the exact same manner as they were on January 6, 2021. The Government is disingenuous in its attempts to portray the QRFs on January 6 to this Court as an invasion force when it knows of the existence of previous QRFs that were never used in that manner.

It should be stated, and also emphasized that the Government tellingly omitted, that communicating through social media and/or encrypted messaging services is not illegal. Purchasing legal weapons through legal channels by persons who are not prohibited from owing those weapons is not illegal. Coordinating with people in different parts of the country to meet at a specific time and place is not illegal. Being a member of a militia-type group and engaging in military-type training is not illegal. While the Government is attempting to paint the Defendant as a dissident attempting to overthrow the Government, the communications the Government references specifically discuss D.C. firearm laws and the prohibitions attached to them. Weapons were not illegally brought into the district, as they easily could have been if the intent was as nefarious as the Government would have the Court believe.

In December 2020, after the Electoral College cast ballots confirming Joseph Biden as the President-Elect, the Government claims Rhodes' plan focused on delaying or stopping Congress's Certification of the Electoral College vote ("Certification proceeding"). The Government further claims, "Rhodes' plan materialized on January 6, 2021, the day of the Certification proceeding, when he oversaw two military-style stacks of [alleged] co-conspirators who, along with other rioters, forcibly breached the Capitol while armed QRF teams stood by, awaiting deployment". Again, the Government is at best misconstruing and at worst fully omitting facts. The "military-style stacks", labeled such by the Government not by the Oath Keepers, were two groups of former military, law enforcement and EMS members who were completely unarmed. Several members did enter the Capitol building, but there is no evidence whatsoever that the Defendant instructed them to do so, because he did not.

According to at least one person present that day, who is not a member of the Oath Keepers, those "stacks" entered the Capitol on their own accord after receiving word that Ashli Babbitt had been shot, others were injured and there was a need for medical assistance within the building. Of course, when they entered, they were in a formation that is used in personal security details (PSDs). They had been trained to use that formation for PSDs to move through a crowd and had done so at previous Stop the Steal Rallies in Washington, D.C. in November 2020, Atlanta in November 2020 and Washington, D.C. in December 2020. They were composed of ex-military, law enforcement and EMS personnel. Their training teaches them the best ways to enter an unknown and/or hostile situation. The Government seems surprised by this, but to those who have taken the time to learn the stated goals and mission of the Oath Keepers and its members, it is quite logical. The Government has also failed to disclose to this Court that at least one of those "stacks" provided security and escort to overwhelmed Capitol police officers and assisted them in escaping that immediate threat and danger. Further, the Government has received, and should acknowledge, specific testimony as to such, which is accompanied by photographic and video evidence. These facts explicitly negate the Government's false assertions as to the actual purpose of what the FBI has labeled as "stacks," as these teams were created and implemented to provide security for various political rallies on January 6, 2021.

At least one of the "stacks" exited the building a short time later with a group of Capitol Police officers, and the two groups were interacting in a cordial and social manner, not quite the armed insurrectionists the Government has continually attempted to paint

them as.  It is unclear if this is the "stack" that assisted and protected Capitol police officers while inside the Capitol.  As well, neither "stack" was an armed QRF, which the Government insists on mischaracterizing as an offensive force and seems obsessed with, even though they played no role in the events of January 6, 2021 in any way whatsoever.

The "stacks" that entered the Capitol did so on their own accord, though the Government would like to cast the blame on Rhodes. In fact, when Rhodes was alerted after-the-fact that some members had entered the Capitol, his response to those around him was to tell those members to leave the Capitol grounds and move towards the Supreme Court.  As the myriad of videos of that day show, the breaches to the Capitol were committed by protestors that had amassed outside, not at the behest or order of anyone, including Rhodes.  This has been corroborated by FBI Agent Palian's sworn testimony at Rhodes' initial detention hearing on January 24, 2022.

While the Government is correct that the breach by the massive mob succeeded in delaying the Certification proceeding for several hours, its assertion that "Rhodes and [alleged] co-conspirators then fled from the Washington area when they learned the FBI had begun arresting individuals involved in the attack" is wholly inaccurate. As the Capitol was cleared and the crowds began to dissipate, Rhodes and other members met at the Northeast corner of the Capitol grounds and then moved to the street in front of the Supreme Court, with Rhodes ultimately returning to Virginia and going to dinner at Olive Garden with other members of the Oath Keepers but not the Florida team that entered the Capitol, lead by Kelly Meggs.  In what reality can the Government honestly paint this as people fleeing and concerned with arrest?  This was not some hasty retreat in fear of

being detained.  Rhodes had no reason to flee or to fear arrest. He had committed no crime.

The Government states that "in the weeks that followed, Rhodes and his [alleged] co-conspirators continued to make plans to stop the presidential power transfer, amass additional weaponry and tactical gear, and prepare themselves to deploy their arms, if necessary, to stop the inauguration of a new president".  Again, the Government omits vital information that it is aware of but, for reasons unknown to Defendant and his Counsel, is not presenting such to the Court.

First, it has been documented through interviews and depositions with Rhodes and others that there was a belief that President Donald Trump would invoke the Insurrection Act, necessitating a need for militias and other groups to defend that declaration. When that invocation did not come, Rhodes took no action, before or after, that could be considered seditious by any rational observer.

Second, when that invocation did not come by January 20, 2021, the Defendant ceased all preparation and communication for it.  Rhodes is a decorated former member of the United States military.  He has taken his vow to defend the United States and obey the orders of the President as a lifelong commitment.  In fact, this is the very basis of the Oath Keepers foundation.  When he believed that the President would issue an order invoking the Insurrection Act, he was prepared to follow it.  When that invocation did not come, he did precisely nothing.  The Government would like this Court to believe that is sedition, when in fact, it is the opposite.  It is loyalty to an oath taken in defense of the Country.  If the Defendant had intended to instigate and coordinate an attack against the United States

Government, he would have done so.  He did not, and the Government's attempts to twist the facts to say that he did are easily disproven.

### A. The Oath Keepers

The Government is correct in one aspect with regard to the group called the Oath Keepers.  The Oath Keepers are a non-partisan association of current and formerly serving military, police, and first responders who pledge to fulfill the oath all military and police take to defend the Constitution against all enemies, foreign and domestic.  The Group was founded by Elmer Stewart Rhodes in 2009.  Rhodes is United States Army veteran, a Yale Law School graduate, and a former member of United States Congressman Ron Paul's staff.

As is common in today's society, there is a portion of the population that seeks to label certain political groups with nonsensical pejoratives simply because they have policy differences.  The group has been falsely maligned by the mainstream media, left-wing organizations and even members of the Federal Government as white supremacists, racists, and sexists.

The Oath Keepers, of course, are none of the things with which they are defamed, and there is no evidence to the contrary.  In fact, it is prominently noted on the Oath Keepers website: "Oath Keepers come in all colors, shapes, sizes, ages, and backgrounds with one common bond – the oath to defend the Constitution. If you take your oath seriously, and believe in defending the Constitution against ALL enemies, foreign and domestic, and of whatever political party (there are oath breakers galore in both major parties), and if you stand for the rights of all Americans, at all times, then you are one of

us.  Join us.  We need your help to preserve liberty for our children and grand-children, and for all Americans."

In recent years, the Oath Keepers have been present at multiple political rallies to provide security for speakers and attendees in the event agitators attempt to disrupt those rallies, as was the case January 6, 2021, per testimony that has been given to the Government by multiple witnesses under oath.  They have also been present to provide security and protection for businesses at some of the "social justice" riots that broke out across the country in 2019 and 2020.

Despite the attempts to portray the Oath Keepers as an offensive paramilitary group intent on overthrowing the American Government, the facts show that these characterizations are untrue, unfounded and almost always stem from those who simply disagree with their stated mission.  It is also important to note that the Oath Keepers have been present at many events since its inception, and until the Government decided that the Oath Keepers were the perfect scapegoat for the events of January 6, 2021, they have never been charged with a crime for the protection and security that they provided over the entirety of their existence since their founding.

## B. Rhodes Did Not Plan to Forcibly Oppose the Lawful Transfer of Presidential Power

The Government states in its Memorandum in Support of Motion for Detention that "in November 2020, days after the election, Rhodes began disseminating messages to Oath Keepers members and affiliates delegitimizing the results of the election and

encouraging members and affiliates of his organization to forcibly oppose the lawful transfer of presidential power. *See* Indictment at ¶¶ 18(a) (telling those on the 'Leadership intel sharing secured' chat (hereafter "Leadership Intel chat"), on November 5, 2020, that they 'MUST refuse to accept Biden as a legitimate winner' and warning, 'We aren't getting through this without a civil war. Too late for that. Prepare your mind, body, spirit.'); 18(b) (posting to the Oath Keepers' website a plan that included '[m]illions gather[ing] in our capital,' breaking through barricades, and storming the legislature)."

Two important facts must be stated in response to the Government's allegations. First, believing that the current political environment will lead to a civil war is protected speech under the First Amendment to the Constitution, and is far different than attempting or planning to effectuate such. On February 7, 2022, United States Representative, Adam Kinzinger, stated on CNN that he believes the country could be headed for a Civil War. While not likely in the eyes of most, that some verbalize the idea as a real possibility is hardly unique to Rhodes.

Second, questioning the legitimacy of a Presidential election is not a novel concept either. In 2000, the Democratic National Committee Chair, Terry McAuliffe, stated that the election was stolen and that SCOTUS had "tampered" with the results; on September 18, 2017, Hillary Clinton called President Trump an "illegitimate President"; in a tweet from May 2017, Rep. Nancy Pelosi wrote, "Our election was hijacked. No question"; to date, Stacey Abrams, who is currently running for Governor of Georgia, has yet to concede she lost the previous Georgia Gubernatorial race; and in June of 2018, United States Representative. Maxine Waters encouraged violence against Trump cabinet

members saying, "If you see anyone from that Cabinet in a restaurant, in a department store, at a gasoline station, you get out and create a crowd and you push back on them and you tell them they're not welcome anymore, anywhere." There are many more examples. As of the time of this filing, the Department of Justice has declined to file charges against any of these people. Bombastic language might not be popular to those who do not hold the First Amendment dear, but there is a very specific reason why freedom of speech is included and protected in the First Amendment to the Constitution. The Government is attempting to convince this Court that unpopular or bombastic language is a crime. It is not.

The Government further states that, "at Rhodes' direction, regional leaders of the Oath Keepers then began recruiting others to the [alleged] conspiracy, Indictment at ¶ 20, and preparing for operations inside Washington, D.C., Indictment at ¶ 21. Those plans included organizing armed QRF teams to support those on the ground. Indictment at ¶¶ 42-45." It should be noted that the Government is fully aware, as previously stated in this brief, that on two previous occasions QRFs were established outside of Washington, D.C. for the exact purpose as they were on January 6, 2021, defensive purposes if the President invoked the Insurrection Act.

As has been previously stated, QRF forces are defensive forces. They are not offensive forces. The QRF in question was not in D.C. proper, thus there was a conscious decision to keep the weapons in a legal area to be called upon only in the event of necessity, again, only in the event President Trump invoked the Insurrection Act. In November 2020 in an online meeting between Oath Keeper leaders, of which the

Government has a recording and transcript, there was extensive discussion regarding the District of Columbia firearm laws. The Oath Keepers were very conscious about NOT bringing firearms to the Capitol as they did not want to violate any firearm restrictions while in the District of Columbia. In fact, they were meticulous about following the law of the District of Columbia regarding the carrying of weapons. The Government would honestly attest that Mr. Rhodes specifically instructs the meetings' attendees that he will not be carrying a firearm and instructs others not to carry a firearm as well, as it would be a felony to do so. The Government has this information, but once again has refrained from providing it to the Court.

In December 2020, Rhodes and other Oath Keepers agreed to assemble in Washington, D.C. on the day of the Certification proceeding, January 6, 2021. On December 22 Rhodes described January 6 as "a hard constitutional deadline" for stopping the transfer of presidential power and warned that if President-Elect Biden were to assume the presidency, "We will have to do a bloody, massively bloody revolution against them." Indictment at ¶ 30. This goes back to the belief that President Trump would invoke the Insurrection Act, at which point there would be a need for those to assist in the enforcement of that order. And in the absence of that order, it was Rhodes' belief that the American people would not stand for the peaceful transfer of power. And to some extent he was correct, as many people did indeed breach the Capitol in an attempt to stop the peaceful transfer of power. However, Rhodes' was not one of them. He was only prepared to take action if the Commander-in-Chief, the person to whom he swore an oath, issued an order for him to do so. That order did not come. Rhodes did not act.

The Government alleges that on December 23, 2020, Rhodes published an open letter on the Oath Keepers website in which he noted that, on January 6, 2021, "tens of thousands of patriot Americans, both veterans and non-veterans, will already be in Washington D.C., and many of us will have our mission-critical gear stowed nearby just outside D.C." Indictment at ¶ 31. Rhodes warned in the open letter that he and others may have to "take to arms in defense of our God given liberty." *Id.* The optimal word here is "may". At this point, the Government is attempting criminalize preparation for an event that may occur upon the invocation of the Insurrection Act by the Commander-in-Chief.

As previously mentioned, Rhodes stated in interviews with the FBI, and other Oath Keepers and those familiar with the organization have also stated, there was a belief amongst them that President Trump was going to invoke the Insurrection Act, at which point groups like the Oath Keepers would be needed to help enforce the invocation. Rhodes was correct that tens of thousands showed up in Washington; he was incorrect that President Trump would invoke the Insurrection Act; and he was incorrect that it would be necessary to take up arms. Simply stating those beliefs are, again, protected by the First Amendment and are certainly not Seditious Conspiracy.

The Government states that Rhodes "created and administered Signal chats with titles like 'DC OP: Jan 6 21' and 'OK FL DC OP Jan 6' for coordinating their plans for January 6. Indictment at ¶¶ 38-40. On these chats, they discussed, among other topics, what weapons they would bring and plans for the QRF. *Id.* at ¶ 41-56, 58-60. They utilized encrypted messaging applications for these planning chats and stressed the need for operational security. *See, e.g.*, *id.* at ¶ 27. Rhodes offered to reimburse [alleged] co-

conspirators for expenses incurred in support of the operation for things like hotels, radios, and making/copying maps. On these chats and others, Rhodes repeatedly primed his [alleged] co-conspirators to prepare themselves to use violence to stop the "usurpers" (as he regularly referred to the incoming president and vice president) from taking control. On December 31, a week before the Capitol attack, Rhodes wrote to the Leadership Intel Chat, 'There is no standard political or legal way out of this.'"

There is a lot to unpack in this paragraph of the Government's brief.  First, the Government seems convinced that former military and law enforcement members using military and law enforcement lingo is somehow indicative of nefarious activity.  They are ex-military.  It is quite natural for them to use such language.  Second, the history of the events where Oath Keepers were present are littered with violent acts, not committed by the Oath Keepers, but by those groups who oppose the beliefs espoused by attendees of those events.  For example, at the November 2020 "Stop the Steal" rally in Washington, D.C., members of both Antifa and Black Lives Matter attacked attendees, sending some to the hospital.  At the riots in Ferguson, Missouri in 2014, the same groups were attacking not only random citizens but businesses as well, prompting a need for protection.  Many times, the violence these groups displayed required arms to dissuade the rioters from their assaultive and destructive actions.  It again should be stated that possession of firearms, while unpopular to some, is a Constitutional right; none of those in possession of firearms were ever legally prohibited from doing so; none of the weapons were illegal weapons; and no state or federal laws were broken by their possession.  However, to read the Government's brief, it would have you believe that the Oath Keepers were the Branch

Davidians.  This is simply false.  Finally, the Government states that Rhodes used the term "usurpers" to refer to the incoming President and Vice-President and said that they must be prepared to use violence.  As previously stated, Rhodes was referring to his belief that President Trump would invoke the Insurrection Act and that it would likely require action to defend that invocation.  The Government is fully aware that there are many members and witnesses who have corroborated this fact, but yet again, it has failed to disclose this to the Court as its narrative falls apart if this overarching reality were to be fully discussed. As to the use of "usurpers", the First Amendment allows Rhodes to refer to the President in any term he chooses.  A quick Google search will show that Presidents Obama and Trump were called much worse.

### C. The Armed QRF Force is a Well-Documented Response Force, Not an Offensive Force

As described in greater detail in the indictment, but significantly exaggerated, "Rhodes and his [alleged] co-conspirators coordinated at least three regional QRF teams to support the January 6 operation, and these teams were stationed at a Comfort Inn in Arlington, Virginia. Indictment at ¶¶ 45-49. The QRF teams guarded an arsenal of firearms and related equipment and were prepared to speed those weapons into the hands of [alleged] co-conspirators on the ground in Washington whendirected by Rhodes or other conspiracy leaders. *Id.*"

The indictment further alleges, but again exaggerates, that "on January 3, Rhodes informed an [alleged] co-conspirator on Signal, 'We WILL have a QRF.This situation calls

for it.' Indictment at ¶ 50. In the following days, [alleged] co-conspirators communicated and implemented plans to bring weapons to the Comfort Inn. *Id.* at ¶¶ 58-59, 63-65, 68-69. The day before the Capitol attack, on January 5, Meggs and his Florida team dropped off at least three luggage carts worth of gun boxes, rifle cases, and suitcases filled with ammunition with their QRF team. Members of the Arizona QRF team wheeled in bags and large bins of weapons, ammunition, and essential supplies to last 30 days. A third QRF team from North Carolina consisted of four men who kept their rifles ready to go in a vehicle parked in the hotel lot. Throughout, the QRF team leaders updated Rhodes of the extent of their weapons stock and apprised him of their readiness to support the Washington-based operation on January 6. On January 5, for example, Meggs messaged Rhodes from near the Comfort Inn, '[W]e are just outside of town unloading at QRF on our way in.' Indictment at ¶ 65." Again, while the basic facts are true, the Government fails to reveal, again, to the Court the true known purpose of the QRFs based upon testimony and evidence.

The indictment further states that "on January 6, the day of the attack, before departing from his hotel for Washington, Rhodes messaged his [alleged] co-conspirators, 'We will have several well-equipped QRFs outside DC. And there are many, many others, from other groups, who will be watching and waiting on the outside in case of worst-case scenarios.' Indictment at ¶ 70. During the attack, the QRF remained in communication with Rhodes. For example: at 2:24 p.m., co-conspirator Edward Vallejo messaged the 'DC OP: Jan 6 21' chat, 'Vallejo back at hotel and outfitted. Have 2 trucks available. Let me know how I can assist.' *Id.* at ¶¶ 86. At 2:38 p.m., Vallejo messaged the chat, 'QRF

standing by at hotel. Just say the word…' *Id.*at ¶ 96." Again, it should be noted that there was no response to Vallejo's messages. The QRFs were never called, very simply, because President Trump never invoked the Insurrection Act.

In addition, the indictment provides that "in the days leading up to January 6, Rhodes himself purchased firearms-related equipment to contribute to the operation. On January 1 and 2, while still in Texas, where Rhodes was residing at the time, he spent approximately $5,000 on firearms and related equipment, including a shotgun, scope, magazines, sights, optics, a bipod, a mount,a case of ammunition, and gun-cleaning supplies. Indictment at ¶ 47. On January 3, Rhodes departed Texas and began traveling to the Washington, D.C., metropolitan area. While traveling, Rhodes spent approximately $6,000 in Texas on an AR-platform rifle and firearms equipment, including sights, mounts, triggers, slings, and additional firearms attachments. *Id.* at ¶ 57. On January 4, while still traveling toward the Washington, D.C., metropolitan area, Rhodes spent approximately $4,500 in Mississippi on firearms equipment, including sights, mounts, an optic plate, a magazine, and various firearms parts. *Id.* at ¶¶ 61."

The Government has provided a myriad of facts regarding the QRF. It is also clear that the Government believes that the purpose of the QRF was an offensive force meant to come into D.C., guns blazing, and take over the Federal Government, though there is ample evidence and testimony to disprove the theory. The simple question in response to this allegation by the Government is why didn't they? The Government's entire theory lies in the idea that the Oath Keepers, at Rhodes' behest, conspired to overthrow the Government. If that was the Oath Keepers intent, it is hard to imagine a better scenario for

them to effectuate that plan. For the first time in two-hundred and nine years, the Capitol was breached. Hundreds of people, on their own volition, stormed the Capitol and forced their way inside. The Capitol police were in disarray. Rhodes received messages from the Edward Vallejo, one of the people who was overseeing the QRFs. The two others that were allegedly another QRF left Virginia and went into D.C. without any weapons. Rhodes had ample opportunity to order the weapons into D.C. to be distributed amongst the Oath Keepers who could have then stormed the Capitol and fomented the revolution that the Government has continually claimed they wanted. And he did precisely nothing. Why? The conditions would never be better. Yet, Rhodes and the others left the Capitol grounds and went to Olive Garden for dinner. The answer is quite simple: because stopping the certification, overthrowing the government, was not Rhodes' intent. It was not the Oath Keepers intent. The allegations the Government is levying against Rhodes are simply false. It seems impossible for the Government to believe that citizens, on their own, would be so emotionally charged that they could breach the Capitol without someone ordering them to do so, without direction, without a boogeyman. And yet, that is exactly what happened. But, instead of accepting the reality for what it is, the Government has twisted the facts to make that boogeyman out of someone who, though his ideas may not be mainstream or popular, fits the mold of who it thinks that boogeyman should be.

### D. Rhodes Did Not Attack the Capitol and There Was No Plot to Stop the Lawful Transfer of Power

As stated in the indictment, on "January 6, as a large crowd gathered on the Capitol grounds and converged on the building, an Oath Keeper affiliate on the Leadership Intel

Chat claimed that Antifa had breached the Capitol. Indictment at ¶ 77. Rhodes replied: 'Nope. I'm right here. These are Patriots.' *Id.* He elaborated on a different chat: 'Pence is doing nothing. As I predicted… All I see Trump doing is complaining. I see no intent by him to do anything. So, the patriots are taking it into their own hands. They've had enough.' *Id.* Meanwhile, on yet another encrypted, invitation-only group chat titled 'Jan 5/6 DC Op Intel team,' which included Rhodes, co-conspirator Joshua James, and others, a participant posted a link to a video titled 'live stream of patriots storming capital,' and another participant asked, 'Are they actually Patriots - not those who were going to go in disguise as Patriots and cause trouble[?]' *Id.* at 79. Rhodes responded, 'Actual Patriots. Pissed off patriots[.] Like the Sons of Liberty were pissed off patriots[.]' *Id.* James followed with, 'Were coming to Capitol ETA 30 MIN[.]' James and his group (including [alleged] co-conspirators Roberto Minuta and Brian Ulrich) then headed toward the Capitol. *Id.*'

As stated in the previous section, it is worth noting that these members left a QRF but did not bring any weapons with them. The Capitol had been breached. There would never be a better time for Rhodes to have the weapons delivered to the Capitol grounds so they could storm the Capitol, and yet the group that assembled on the Capitol grounds then left to have dinner at Olive Garden. Why? They were not there to storm the Capitol, to stop the certification, to takeover the Government. They were waiting for President Trump to invoke the Insurrection Act. He did not, so Rhodes and the others did nothing. They were there for voluntary security and protective services of which the Government is fully aware, per the evidence in its possession. This is substantial proof that the

Government's accusations against Rhodes are simply false.

The indictment also provides that "at around 2:30 p.m., Rhodes explicitly directed his [alleged] co-conspirators to go to the Capitol. Indictment at ¶¶ 88-89. Rhodes then spoke with Meggs. *Id.* at ¶ 92. Moments later, Stack One marched up the east steps of the Capitol, joined the mob that was trying to force the doors open, and breached the building. *Id.* at ¶¶ 93-95, 97-99.   Stack One tried to force past riot police to the Senate Chamber, but were rebuffed, and the other half went in search of Speaker of the House Nancy Pelosi, but did not find her.  *Id.* at ¶¶ 100-106. Meanwhile, Stack Two, led by James and Minuta, [who, this Court should note, have both been released pending trial,] arrived at the Capitol grounds shortly after 2:30 p.m. *Id.* at ¶ 111. Stack Two then penetrated the Capitol grounds, marched to the east side doors through which Stack One had entered, and breached the Capitol at approximately 3:15 p.m. *Id.* at ¶¶ 113-118.  Allegedly, members of Stack Two attempted to force their way into the Rotunda but were expelled by riot police officers who had begun clearing the building.  *Id.* at ¶¶ 119-121.  After they exited the Capitol, members of both Stack One and Stack Two met up with Rhodes and other Oath Keeper members and affiliates just outside the Capitol.  *Id.* at ¶ 124."  At that point, the group left the grounds and went to dinner at an Olive Garden Restaurant.

The preceding has been addressed as well.  The "stacks" that entered the Capitol did so on their own accord, though the Government would like to cast the blame on Rhodes. There is no evidence that Rhodes ordered anyone to enter the Capitol.  In fact, when Rhodes was alerted to the fact that some members had entered the Capitol, his response to those around him was to tell those members to leave the Capitol immediately

and congregate on the Southeast Lawn of the Capitol grounds.  This has been corroborated by FBI Agent Palian's sworn testimony at Rhodes' initial detention hearing on January 24, 2022.  It has also been corroborated that the "stacks" entered only after learning of the shooting of Ashli Babbitt and that there were people in need of medical attention within the Capitol building.

### E. After January 6, Rhodes Did Not Continue Efforts to Forcibly Oppose the Lawful Transition of Presidential Power

As stated in the indictment, "on the evening of January 6, Rhodes gathered some of his [alleged] co-conspirators at a restaurant in Vienna, Virginia, to celebrate their attack on the Capitol and discuss next steps. Indictment at ¶ 125. Rhodes also sent messages to the 'DC OP: Jan 6 21' Signal chat, including: 'Thousands of ticked off patriots spontaneously marched on the Capitol…  You ain't seen nothing yet,' and, 'Patriots entering their own Capitol to send a message to the traitors is NOTHING compared to what's coming.' *Id.* at 126."

"To celebrate their attack on the Capitol."  This is patently false.  Rhodes did not attack the Capitol, and the Government knows it.  Thousands of individuals, wholly unrelated to the Oath Keepers in any way, spontaneously engaged in the protests which developed into the breach of the Capitol.  The Government has allowed emotion to overtake reality.

The indictment further states that "in the weeks after January 6, Rhodes purchased a large volume of firearms pieces and related equipment.

- On January 10, he spent approximately $6,000 on sights, bipods, a scope, mounts, backpacks, a gun grip, a magazine pouch, and other related items.

- On January 11, he spent over $1,500 on scopes, magazines, and other items.

- On January 12, he spent nearly $7,000 on hundreds of rounds of ammunition, duffel bags, magazines, rifle scopes, a scope mount, a gun light, and other items.

- On January 13, he spent approximately $1,000 on firearms parts.

- From January 14 through January 19, he spent more than $2,000 on firearms parts, mounts, magazines, a scope leveler, targets, ammunition, a gun case, holsters, and gun-maintenance equipment, among other items.

-

Indictment at ¶ 129. In total, during the two-week period from the January 6 attack to the Inauguration, Rhodes spent more than $17,000 on firearms-related equipment."

While purchasing weapons might cause some people great consternation, the simple fact is that the Second Amendment of the United States Constitution bestows an individual right upon American citizens to own firearms. That right has been reaffirmed by the United States Supreme Court. And while some may not like the fact that it is a right, it is. What the Government has not done in its thorough recitation of the firearm purchases the Rhodes made on the dates listed above, they have not shown that those weapons have been used for any illegal activity. This appears to be nothing more than a scare tactic to illicit a prescribed response from either the Court and/or the public at-large. The fact remains, however, that the Government has not alleged any illegal activity with those weapons. Further, it is impossible to dismiss the fact that firearms are viewed differently in different parts of the country. While someone in New York City might find it odd for a person to spend thousands of dollars on firearms, in the State of Texas it is practically obligatory.

### E. Rhodes Did Not Conceal Evidence of a Conspiracy

The Government alleges Rhodes also took steps to destroy evidence of his involvement in this conspiracy, stating "when Rhodes's cellular telephone was seized and searched pursuant to a warrant in May 2021, it revealed evidence that statements by Rhodes at key times on planning/coordination Signal chats had been deleted." It should be noted that the Defendant was asked for his phone and voluntarily turned it over to investigators along with the access codes. The Government goes on to say that "messages sent by Rhodes in late January, shortly after the first [alleged] co-conspirators in this matter were arrested, show Rhodes was aware that messages from the Signal chat could be used against the [alleged] co-conspirators. For example, on January 24, Rhodes messaged Vallejo on Signal, 'Ed, keep in mind that is NOT a secure chat. Contains at least one turn-coat snitch. Keep that in mind. Please confirm you got this.' Later that day, Rhodes messaged Vallejo again, 'FBI has Jessica's [Watkins] phone. So they are no doubt now monitoring any chat she was in. Which included that DC op chat.' Additionally, in the weeks after January 6, an associate of Rhodes's, with whom Rhodes may have been living at the time, encouraged [alleged] co-conspirators to delete incriminating messages from their phones. The investigation has revealed that numerous [alleged] co-conspirators deleted evidence from their phones in the weeks after January 6."

It should be noted that the person referenced giving this advice was actually prior legal counsel.  Said counsel was of the legal opinion that the members of Oath Keepers

had no duty to preserve anything, including Rhodes, since he had not been arrested, charged or indicted for any offenses relating to the events of January 6, 2021, nor was he under investigation for events from the same.

### III.    <u>Argument</u>

Pursuant to 18 U.S.C. § 3142(a), when a defendant is arrested, the Court, in relevant part, "shall issue an order that, pending trial, the person be (1) released on personal recognizance…; (2) released on a condition or a combination of conditions…; or (4) detained under subsection (e)." Detaining a defendant under Section 3142(e) requires a hearing "pursuant to the provisions of subsection (f)." *Id.* at § 3142(e).  If taken as true, the Government would have this Court believe that the "evidence" outlined above makes it plain that Rhodes should be detained pending trial.

### A. Bases for Government's Detention Request

"According to Section 3142(f), there are limited circumstances in which the Court 'shall hold a hearing to determine whether any condition or combination of conditions… will reasonably assure the appearance of such person as required and the safety of any other person and the community.' 18 U.S.C. § 3142(f); *see also United States v. Twine*, 344 F.3d 987, 987 (9th Cir. 2003). Here, the Government alleges that three of those circumstances apply: Subsection (f)(1)(E) (case that involves the possession or use of a firearm, destructive device, or any other dangerous weapon), Subsection (f)(2)(A) (case that involves a serious risk of flight), and Subsection (f)(2)(B) (case that involves a serious risk

that the defendant will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror. The Government believes that all three bases for a detention hearing are supported by the evidence outlined above." However, they are wrong.

The Government contends that "first, this case involves the possession and use of firearms. Section 3142(f)(1)(E) mandates a detention hearing in connection with 'any felony' if the Government proves by a preponderance of the evidence that the charged felony 'involves the possession or use of a firearm or destructive device[.]' In determining whether the charged felony 'involves the possession or use of a firearm,' 'we may consider the actual conduct at issue in the specific case,' and not just whether the elements of the charged offenses required the possession or use of a firearm. *United States v. Watkins*, 940 F.3d 152, 166 (2d Cir. 2019). Here, the Government alleges a conspiracy involved the planning and coordination of QRF teams armed with an arsenal of firearms that would be brought to [alleged] co-conspirators on the ground at the direction of Rhodes or other leaders of the conspiracy. Accordingly, the Government wants this Court to believe that this case involves the possession and use of firearms, and, therefore, Section 3142(f)(1)(E) is an appropriate basis for a detention hearing."

Second, "the Government suggests this case also involves a serious risk of flight as defined in 18 U.S.C. § 3142(f)(2)(A). The defendant is facing potential conviction on numerous felony offenses that each carry statutory maximum penalties of up to twenty years of incarceration. He is [alleged] to have organized a conspiracy to oppose the lawful transfer of presidential power by force, and thus his willingness to comply with conditions

of release set by this government is in doubt. Additionally, the defendant lacks a permanent address. He is estranged from his legal wife and moved out of his permanent residence in Montana at some point in mid-2020. While he has resided primarily with the associate discussed above since the attack on the Capitol, there have been many periods where he has left that residence for several days or several weeks at a time to stay with other associates. The defendant has his bank statements and similar mail sent to P.O. boxes. Finally, the defendant has associates located throughout the United States, and he is known to possess many firearms and related equipment. These factors all combine to give Rhodes the incentive and means to flee and attempt to evade prosecution."

Finally, "the Government attempts to claim this case also involves a risk of tampering with witnesses and evidence. As described above, Rhodes stands charged with one count of tampering with documents or proceedings, in violation of 18 U.S.C. § 1512(c)(1), for deleting Signal messages on key chats at key times from his cellular telephone. Additionally, shortly after the attack on the Capitol, Rhodes's associate discussed above, with whom Rhodes is very close and with whom Rhodes may have been living at the time, messaged [alleged] co-conspirators on the Leadership Intel Chat and told them to delete incriminating messages from their phones. The Government suggests there is a significant risk that Rhodes would seek to tamper with key witnesses or evidence as these are identified for him through the discovery process."

The Government claims that "under any of the above-referenced bases—firearms, flight, and tampering - a detention hearing is warranted. And together, those three features illustrate the need to detain Rhodes pending trial to protect the community, ensure his

return to court, and safeguard the integrity of evidence and the proceedings."

## B. United States v. Byrd, 969 F.2d 106 (5th Cir. 1992)

Section 3142(f) provides that upon motion of the attorney for the Government, in a

case that involves (A) a crime of violence; (B) an offense for which the maximum sentence

is life imprisonment or death; (C) an offense for which a maximum term of imprisonment

of ten years or more is prescribed in the Controlled Substances Act, the Controlled

Substances Import and Export Act, or the Maritime Drug Enforcement Act; or any felony if

the person has been convicted of two or more offenses described in subparagraphs (A)

through (C) of this paragraph, or two or more State or local offenses that would have been

defenses described in subparagraphs (A) through (C) of this paragraph if a circumstance

giving rise to Federal Jurisdiction had existed, or a combination of such offenses; or  (2)

Upon motion of the attorney for the Government (A) a serious risk that the person will flee;

or (B) a serious risk that the person will obstruct or attempt to obstruct justice, or threaten,

injure, or intimidate, or attempt to threaten, inure, or intimidate, a prospective witness or

juror.  In other words, § 3142(f) does not authorize a detention hearing whenever the

government thinks detention would be desirable, but rather limits such hearings to the [six

circumstances listed in (f)(1)(A), (f)(1)(B), (f)(1)(C), (f)(1)(D), (f)(2)(A) and (f)(2)(b) ].

*Byrd* at 109.

Further, A hearing can be held only if one of the six circumstances listed in (f)(1)

and (2) is present; detention can be ordered only after a hearing is held pursuant to §

3142(f). Detention can be ordered, therefore, only "in a case that involves" one of the six

circumstances listed in (f), and in which the judicial officer finds, after a hearing, that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community. The First and the Third Circuits have both interpreted the Act to limit detention to cases that involve one of the six circumstances listed in (f). *See Ploof,* 851 F.2d at 11; *United States v. Himler,* 797 F.2d 156, 160 (3rd Cir.1986). Both Circuits held that a person's threat to the safety of any other person or the community, in the absence of one of the six specified circumstances, could not justify detention under the Act. There can be no doubt that this Act clearly favors nondetention. *Id.*

Finally, the Fifth Circuit agreed with both the First and Third Circuits that even after a hearing, detention can be ordered only in certain designated and limited circumstances, irrespective of whether the defendant's release may jeopardize public safety. Nevertheless, we find ourselves in agreement with the First and Third Circuits: a defendant's threat to the safety of other persons or to the community, standing alone, will not justify pre-trial detention. *Byrd* at 110.  A defendant who clearly may pose a danger to society cannot be detained on that basis alone. In such instances, the Act requires that society's interest be safeguarded only by a set of conditions imposed on his release. *Id.*

## C. Analysis

In actuality, the Court must consider four factors to determine whether pretrial detention is warranted and necessary: (1) the nature and circumstances of the offense charged, including whether, for example, the offense is a crime of violence; (2) the weight

of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g). The persuasion burden rests with the government. *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010). A judicial officer's finding of dangerousness must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f); *Stone*, 608 F.3d at 945. When "risk of flight" is the basis for detention, however, the government must only satisfy a preponderance of the evidence standard. *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996); *United States v. Chimurenga*, 760 F.2d 400, 405-06 (2d Cir. 1985); *United States v. Fortna*, 769 F.2d 243, 250 (5th Cir.

1985); *United States v. Orta*, 760 F.2d 887, 891 (8th Cir. 1985); *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). An analysis of these four factors weighs heavily in favor of Rhodes's release given the clear and convincing evidence that his release presents no danger to the community as well as the preponderance of evidence that he poses no serious risk of flight and of obstructing justice.

Considering *Byrd,* however, even if this Court were to agree with the Government's position that Rhodes presents a danger to the community, that alone is not enough to justify pre-trial detention. The Government has failed to show that any condition or set of conditions would prevent Rhodes from appearing in Court.

The Government claims that he is a flight risk but offers no concrete evidence in support thereof. Counsel would argue the contrary; he offers no risk of flight. The contention that he knows people across the country as proof that he would flee is

bordering on ridiculous.  He has maintained a residence in the same location for two years, the last fifty-three weeks of which postdate the events of January 6, 2021, with no effort to flee or hide.  He has met with FBI agents on multiple occasions, knowing that they were investigating him in relation to the events of January 6, 2021, with no effort to flee.  He has no passport, so he has no ability to leave the country.  Photos of him have been rampant across all forms of media since his arrest making him easily recognizable.  He is also, as discussed with FBI agents Palian and Seyler, on a list that requires an interview and DHS notification before he is allowed to fly.  To suggest he would flee at this point strains rational thought.  He is currently one of the most recognizable individuals in America and would be fundamentally impossible to go unnoticed in society.

Again, considering *Byrd* and contrary to Government claims, there is no rational basis to believe that Rhodes represents a serious risk to obstruct or attempt to obstruct justice, or threaten, injure or intimidate, or attempt to threaten, injure or intimidate a prospective witness or juror.  Rhodes has been living freely for over a year since the events of January 6, 2021.  He has seen others arrested for crimes related to January 6, some of whom could indeed serve as witnesses in his own trial.  There is absolutely no evidence that he has threatened, injured or intimidated them, nor is there any rational basis to believe that he would do so in the future.  The Government has attempted to claim Rhodes has obstructed justice by destroying evidence in the form of electronic messages, even charging him with that offense, despite the fact that they are well aware he was under no duty to preserve those specific communications as he had not been

charged with an offense that would trigger the preservation of that information. The FBI is in possession of his phone, which he voluntarily surrendered to them along with the pass codes, and he has met with the FBI at their request. Those are not the actions of someone attempting to obstruct justice. There is also substantial evidence that the Government is aware of regarding prior dealings and amicable relations that Rhodes had with federal authorities.

Thus, the issue of dangerousness, a wholly subjective analysis, is the only one for this Court to consider, and as *Byrd* states, the issue of dangerousness on its own is insufficient to justify pre-trial detention. Therefore, Rhodes should be released with a condition or set of conditions to be determined by this Court.

## I. Rhodes' Involvement was Not Criminal, Not Extreme and Not Serious

A grand jury found probable cause to charge Rhodes with initiating and leading a conspiracy to forcibly oppose the lawful transfer of Presidential power in the United States. The Government provides in their brief that "it is difficult to imagine conduct that poses a graver risk to our society than one targeted at undermining the laws and procedures at the heart of our democratic process - and doing so with force. *See United States v. Munchel*, 991 F.3d 1273, 1283 (D.C. Cir. 2021) ('[T]o order a defendant preventatively detained, a court must identify an articulable threat posed by the defendant to an individual or the community. The threat need not be of physical violence and may extend to 'non-physical harms such as corrupting a union.')(citing *United States v. King*, 849 F.2d 485, 487 n.2 (11th Cir. 1988))." As stated by Counsel to Mr. Rhodes, it is

disingenuous on the part of the Government to make such a bold claim when it waited thirteen months to arrest him, and only then to claim that he is the greatest of risks to our nation and society.  As described in greater detail above and in the indictment, "Rhodes [allegedly] put forth the plan for a conspiracy; he [allegedly] recruited others to that conspiracy; he [allegedly] organized and administered planning meetings and chats on encrypted messaging applications; he [allegedly] offered to reimburse alleged co-conspirators for expenses they incurred in participating in operations in furtherance of the conspiracy; and he [allegedly] contributed thousands of dollars of his own firearms and related equipment to the cause." The Government would have this Court believe that these assertions are facts, and therefore argue that because Rhodes was the central leader and coordinator of this alleged conspiracy, these factors point in favor of detention. Nothing could be further from the truth.

### ii. The Weight of Evidence Against Rhodes is Weak

The Government claims "the weight of the evidence of Rhodes's dangerousness is immense and claim his dangerousness is chronicled in his written and recorded communications; corroborated by his conduct before, during, and after January 6; buttressed by his obstruction efforts; and reinforced by the indisputable success of his planning, most alarmingly the gathering of dozens of Oath Keepers in the Washington area on January 6 to participate in an attack on the Capitol featuring two military-style stacks and a QRF, which forced a delay of the Certification proceeding."  This is tacitly false. The Government is wholly aware of the intended security and protective services that the

Oath Keepers were voluntarily providing to several permitted and legal events that day and that the QRFs and "stacks" had nothing to do with the delay of the certification process.

The Government would like this Court to believe that Rhodes' "electronic communications show a leader who persistently and methodically readied his [alleged] co-conspirators to use force and violence to stop the lawful transfer of presidential power. Casting the struggle for control of the White House in existential terms - from November 2020 through January 2021, Rhodes regularly used the terms 'civil war' and 'revolution' to describe the necessary path forward – Rhodes repeatedly emphasized to his [alleged] co-conspirators that there was no choice but to take up arms to stop the transfer of presidential power."

During this time period, the Government claims that Rhodes "engaged in recruitment, planning, and coordination to ensure the largest possible presence of Oath Keeper members and affiliates in Washington, D.C., for the critical moments when he believed his group would be in a position to implement their plan to forcibly oppose the presidential transfer, and he ensured that these ground forces would be supported by well-armed QRF teams who could supply them with firepower when needed." The Government also claims "Rhodes offered to reimburse [alleged] co-conspirators for travel and other expenses related to participating in these operations and that Rhodes personally spent over $22,000 on purchases of firearms and firearms-related equipment in the week leading up to January 6, with many of these purchases being made on his drive from Texas to the Washington, D.C., area."

The Government would have this Court believe that "Rhodes' 'plotting' culminated

in his [alleged] co-conspirators' attack on the Capitol on January 6 - but that he and his [alleged] co-conspirators did not stop there. They continued to plan for and amass weapons to forcibly oppose the lawful transfer of presidential power. Rhodes supposedly made an additional $17,000 in firearms and firearms-related purchases in the weeks after the attack on the Capitol, and he called fellow leaders of this [alleged] conspiracy, like James, to his side in Texas. As January 20 approached, it is [alleged] Rhodes messaged others to organize local militias to prepare to forcibly oppose the new administration."

The Government claims that "there is overwhelming evidence that Rhodes organized a plot to oppose by force the execution of the laws of the United States and that he possesses the willingness and capacity to continue to engage in criminal conduct." If the Government's allegations were true, only pretrial detention can protect the community from the danger Rhodes poses. However, few of the Government's allegations are true, and those that have some semblance of truth are greatly exaggerated and misinterpreted.

### iii. History and Characteristics of Rhodes

The Government would have this Court believe that Rhodes' "history and characteristics animate the conclusions drawn from the facts above. He has no known criminal convictions. He is a graduate of Yale Law School and has previously served in the military. They suggest that those experiences highlight that Rhodes should have and did know better; they support that his words were deliberate, that his deeds were calculated, and that his intent was criminal. Rhodes used his legal and military training to lead an attack on our core democratic traditions. Additionally, they suggest his post-January 6

statements and conduct suggest he would continue to encourage and coordinate violence, and that on the night of January 6, Rhodes warned his [alleged] co-conspirators, 'Patriots entering their own Capitol to send a message to the traitors is NOTHING compared to what's coming.'" What is intriguing is the fact that none of that has happened in the year since the events of January 6, 2021.

The Government also suggests that "in the year that has followed, Rhodes has bolstered his arsenal of weapons and continued to encourage his followers to forcibly oppose the current presidential administration. The Government claims that there is every reason to credit Rhodes's own words and deeds and fear that he has or will plan additional violence if not detained." The Government has utterly failed to detail any specific facts or evidence that Rhodes presents any future danger. The Government is merely attempting to create the specter of future danger by the manner in which it is framing bombastic language and otherwise legal activities. If there is any truth to the Government's current position, why did they not detain him in January 2021 when others were detained? FBI Agent Palian testified under oath at Mr. Rhodes initial detention hearing that all of the "dangerous" allegations in regard to Mr. Rhodes were fully known in January 2021 and that nothing new has developed, and yet the Government took no action to charge Mr. Rhodes with any offenses or take him into custody. It is apparent that Rhodes does not present the danger that the Government claims him to be, otherwise he would have been taken into custody long before present. It also could be suggested there are ulterior motives for the Government's current position.

### iv. Danger to the Community and Risk of Flight are Non-Existent

Finally, the Government claims that "Rhodes is a danger to the community because he [allegedly] organized a conspiracy to opposeby force the lawful transfer of presidential power and an attack on the United States Capitol in furtherance of this plot. Moreover, the Government claims Rhodes [allegedly] set in motion his [alleged] co-conspirators' attack on the Capitol knowing that an armed QRF stood ready at a moment's notice to ferry an arsenal of firearms into the hands of their [alleged] co-conspirators on the ground." The Government claims that "while the [alleged] co-conspirators did not need to activate the QRF that day, the danger posed by this plot shows an extreme disregard for the safety of the community and the laws of the United States."  Counsel for Mr. Rhodes strongly disagrees.  Mr. Rhodes possesses no passport, so leaving the country is not an option.  He is on a no-fly related list that requires DHS notification and an interview before he is allowed to fly. In the thirteen months since the events of January 6, 2021, Rhodes has posed no threat to anyone.  The Government has repeatedly claimed that Rhodes is somehow a great danger to the public at-large.  Yet, he has caused harmed to no one.  The Government is in need of a focal point for the events of January 6, 2021, someone they can point to and say, "It's his fault.  He is the reason January 6, 2021 occurred", instead of realizing that the events from that day were an organic product of thousands of people who made their own decisions and acted accordingly.  The Government cannot show that Rhodes ordered anyone to act in any particular way, and it knows he does not pose the threat they claim he is.  If he was, he would have been charged and arrested in the days and weeks after the events of January 6, 2021 as so many others were.  In fact, there is an

absolute lack of any specific directions or orders from Rhodes to engage in the activities witnessed by our nation on January 6, 2021.

## IV.  Conclusion

The Government states that "a grand jury found probable cause to believe that Rhodes hatched and led a plot to oppose by force the execution of the laws governing the transfer of presidential power in the United States - including an attack on the Congress while it reviewed the election results", however the Grand Jury made this decision without access to all the evidence that is now available.  In addition, if the Government's Motion in Support of Detention is any indication of what was presented to the Grand Jury, significant facts were not presented, and interpretation of other facts stretch the bounds of believability.

The Government claims "Rhodes destroyed evidence of his role in these [alleged] crimes, and in so doing, showed contempt for the laws and Constitution of this country that make it impossible to trust he would comply with any conditions fashioned by this Court for his release.  For these reasons, the Government insists Rhodes must be detained pending trial to protect the safety of the community, ensure his return to court, and safeguard the integrity of evidence and the proceedings."  Nothing could be further from the truth.

The Government has no evidence of Rhodes ordering anyone into the Capitol on January 6, 2021.  They have willfully omitted or distorted facts to insist that Rhodes and the Oath Keepers intended to stop the certification process and/or overthrow the Government, despite interviews and depositions with the FBI, DOJ and January 6th

Committee, from Rhodes, other Oath Keepers and even those who are not members of that group, that frankly state that the belief was that President Trump would invoke the Insurrection Act.  It would only be at that time that the Oath Keepers would ever consider taking any action whatsoever, and that action would be at the direction of President Trump and thus a lawful activity per the Insurrection Act.  When that did not happen, Rhodes and others took no action.  They left the Capitol grounds and went to dinner.

If their intent had been as nefarious as the Government is falsely claiming, then they would have acted when the Capitol was breached, the Capitol police were in disarray, and the ability to take action would have never been more opportune.  However, that did not occur.  The weapons the Government claims were intended for an offensive strike against the Government never moved.  Rhodes did not ask for them to be brought into the Capitol, despite the fact that at least one person was messaging him with such a request.  When he was alerted to the fact that members of the Oath Keepers were inside the Capitol, his response was for them to leave.  These actions nullify the Government's entire argument that it was Rhodes' intent and the intent of the Oath Keepers to stop the certification and/or "overthrow" the Government, and the Government knows it.

Since the January 6, 2021, the Government has been looking to find the poster child for the events of that day, the one person it can point to and blame for the actions of thousands of people who decided to commit some horrendous acts.  The problem is that the Government has chosen the wrong person.  Elmer Stewart Rhodes is not guilty of the charges that have been levied against him; he did not take part in a conspiracy to stop the election certification and/or overthrow the Government; and he did not conspire with

others to do so.  He did not then, and does not now, present any kind of danger to the Government, to witnesses, or to the public at-large.  He has never previously been charged with a crime, and there is no rational basis for believing that will in the future.  In short, there is no compelling or legal basis for detention or to believe that no condition or set of conditions will not reasonably assure the appearance of Rhodes as required.  The facts and the testimony of Rhodes and others proves this, and the Government knows it.

RESPECTFULLY SUBMITTED,

*Phillip A. Linder*
_____
PHILLIP A. LINDER

3300 OAK LAWN AVENUE, SUITE 700
DALLAS, TEXAS 75219
TEL: (214) 252- 9900 OFFICE
FAX: (214) 252-9902 FAX
PHILLIP@THELINDERFIRM.COM
TBN: 12363560

ATTORNEY FOR ELMER STEWART RHODES
STEWART RHODES

*James Lee Bright*
_____
JAMES LEE BRIGHT

3300 OAK LAWN AVENUE, SUITE 700
DALLAS, TEXAS 75219
TEL: (214) 720-7777 OFFICE
FAX: (214) 720-7778 FAX
JLBRIGHTLAW@GMAIL.COM
TBN: 24001786

ATTORNEY FOR ELMER

## <u>CERTIFICATE OF CONFERENCE</u>

On April 22, 2022, Phillip Linder, counsel for Defendant Elmer Stewart Rhodes conferred with Assistant United States Attorney, Kathryn Rakoczy, to inform her that Defendant's attorneys would be making this filing to the Court, as a supplement to the original, on behalf of our client and received her assurances that the Government does not oppose this filing.


*Phillip A. Linder*
Phillip Linder
ATTORNEY FOR DEFENDANT