Transcript of June 16, 2022 J6 Committee Hearing

House Select Committee to Investigate the January 6th Attack on the United States Capitol Holds Hearing on the January 6th Investigation

LIST OF PANEL MEMBERS, REP. BENNIE THOMPSON (D-MISS.), CHAIRMAN, REP. ZOE LOFGREN (D-CALIF.), REP. ADAM SCHIFF (D-CALIF.), REP. PETE AGUILAR (D-CALIF.), REP. STEPHANIE MURPHY (D-FLA.), REP. JAMIE RASKIN (D-MD.), REP. ELAINE LURIA (D-VA.), REP. LIZ CHENEY (R-WYO.), REP. ADAM KINZINGER (R-ILL.)

BENNIE THOMPSON:

The Select Committee to investigate the January 6th attack on the United States Capitol ill be in order. Without objection, the chair is authorized to declare the committee in recess at any point. Pursuant to House Deposition Authority Regulation 10, the chair announces the committee's approval to release the deposition material represented during today's hearing.

Good afternoon. This is — almost no idea more un-American than the notion that any one person could choose the American president, no idea more un-American. I agree with that, which is unusual because former Vice President Mike Pence and I don't agree on much.

Sponsor Message

These are his words spoken a few months ago about Donald Trump's attempt to pressure the former vice president, pressure him into going along with an unlawful and unconstitutional scheme to overturn the 2020 election and give Donald Trump a second term in office that he did not win.

Today, the Select Committee is going to reveal the details of that pressure campaign. But what does the vice president of the United States even have to do with a presidential election? The Constitution says that the vice president of the United States oversees the process of counting the Electoral College votes, the process that took place on January 6th, 2021. Donald Trump wanted Mike Pence to do something no other vice president has ever done.

The former president wanted Pence to reject the votes and either declare Trump the winner or send the votes back to the states to be counted again. Mike Pence said no. He resisted the pressure. He knew it was illegal. He knew it was wrong. We are fortunate for Mr. Pence's courage. On January 6th, our democracy came dangerously close to catastrophe.

That courage put him in tremendous danger. When Mike Pence made it clear that he wouldn't give in to Donald Trump's scheme, Donald Trump turned the mob on him, a mob that was chanting "hang Mike Pence," a mob that had built a hangman's gallows just outside the Capitol.

Thanks in part to Mike Pence, our democracy withstood Donald Trump's scheme and the violence of January 6th, but the danger hasn't receded.

Led by my colleague, Mr. Aguilar, today we'll lay out the facts for the American people. But first, I recognize my colleague from Wyoming, Ms. Cheney, for any opening statement she'd care to offer.

LIZ CHENEY:

Thank you very much, Mr. Chairman. Let me take just a few minutes today to put the topic of our hearing in broader context. In our last hearing, we heard unequivocal testimony that President Trump was told his election fraud allegations were complete nonsense. We heard this from members of the Trump campaign.

We heard this from President Trump's campaign lawyers. We heard this from President Trump's former attorney general, Bill Barr. We heard this from President Trump's former acting attorney general, Jeff Rosen. And we heard this from President Trump's former acting deputy attorney general, Richard Donoghue.

We heard from members of President Trump's White House staff as well. Today we're focusing on President Trump's relentless effort to pressure Mike Pence to refuse to count electoral votes on January 6th. Here again is how the former vice president phrased it in a speech before the Federalist Society, a group of conservative lawyers.

[Begin videotape]

MIKE PENCE:

This week that President Trump said I had the right to overturn the election. But President Trump is wrong. I had no right to overturn the election. The presidency belongs to the American people and the American people alone. And frankly, there is no idea more un-American than the notion that any one person could choose the American president.

[End videotape]

LIZ CHENEY:

What the president wanted the vice president to do was not just wrong, it was illegal and unconstitutional. We will hear many details in today's hearing, but please consider these two points. First, President Trump was told repeatedly that Mike Pence lacked the constitutional and legal authority to do what President Trump was demanding he do. This is testimony from Marc Short, the vice president's chief of staff, who served in the Trump administration in multiple positions over four years.

[Begin videotape]

UNKNOWN:

But just to pick up on that, Mr. Short, is it — was it your impression that the vice president had directly conveyed his position on these issues to the president, not just to the world through a dear colleague letter, but directly to President Trump.

MARC SHORT:

Many times.

UNKNOWN:

And he'd been consistent in conveying his position to the president?

MARC SHORT:

Very consistent.

UNKNOWN:

Ok. [End videotape]

LIZ CHENEY:

But President Trump plotted with a lawyer named John Eastman to pressure Pence to do so anyway. As the federal court has explained, "Based on the evidence, the court finds that it is more likely than not that President Trump and Dr. Eastman dishonestly conspired to obstruct the joint session of Congress on January 6th, 2021." What exactly did President Trump know?

When exactly did President Trump know that it would be illegal for Mike Pence to refuse to count electoral votes? Here is one sample of testimony given by one of the witnesses before us today, the vice president's general counsel.

[Begin videotape]

UNKNOWN:

Did John Eastman ever admit, as far as you know, in front of the president that his proposal would violate the Electoral Count Act?

GREG JACOB:

I believe he did on the 4th. [End videotape]

LIZ CHENEY:

That was January 4th, two days before the attack on Congress. A second point, please listen to testimony today about all of the ways that President Trump attempted to pressure Vice President Pence, including Donald Trump's tweet at 2:24 PM condemning Vice President Mike Pence, when President Trump already knew a violent riot was underway at the Capitol.

In future hearings, you will hear from witnesses who were present inside the White House, who were present inside the West Wing, on that day. But today we focus on the earnest efforts of Mike Pence, who was determined to abide by his oath of office. As Vice President Pence prepared a statement on January 5th and 6th, explaining that he could not illegally refuse to count electoral votes, he said this to his staff.

[Begin videotape]

GREG JACOB:

And the vice president said this may be the most important thing I ever sign, and so --

UNKNOWN:

This meaning the statement?

GREG JACOB:

The statement, and he really wanted to make sure that it was just so. [End videotape]

LIZ CHENEY:

You will hear today that President Trump's White House counsel believed that the vice president did exactly the right thing on January 6th, as did others in the White House, as did Fox News host Sean Hannity. Vice President Pence understood that his oath of office was more important than his loyalty to Donald Trump.

He did his duty. President Trump unequivocally did not. Thank you, Mr. Chairman. I yield back.

BENNIE THOMPSON:

Without objection, I recognized the gentleman from California, Mr. Aguilar, for an opening statement.

PETE AGUILAR:

Thank you, Mr. Chairman. Today we intend to show the American people that January 6th was not an isolated incident. In the weeks culminating before, it was illegal scheme and deception. We've already learned that President Trump knew he lost the 2020 election.

Shortly after, he began to look for a way to circumvent our country's most fundamental civic tradition, the peaceful transfer of power.

The president latched on to a dangerous theory and would not let go, because he was convinced it would keep him in office. We witnessed firsthand what happened when the president of the United States weaponized this theory. The Capitol was overrun, police officers lost their lives, and the vice president was taken to a secure location because his safety was in jeopardy.

Let's take a look at the effect of Donald Trump's words and actions. I want to warn our audience that the video contains explicit content. [Begin videotape]

DONALD TRUMP:

Mike Pence is going to have to come through for us. And if he doesn't, that will be a — a sad day for our country. And Mike Pence, I hope you're going to stand up for the good of our Constitution and for the good of our country. [Applause] And if you're not, I'm going to be very disappointed in you, I will tell you right now.

UNKNOWN:

I'm telling you what, I'm hearing that Pence — hearing the Pence just caved. No. Is that true? I didn't hear it. I'm hear — I'm hearing reports that Pence caved. No way. I'm telling you, if Pence caved, we're going to drag motherfuckers through the streets. You fucking politicians are going to get fucking drug through the streets.

Yes. I guess the hope is that there's such a show of force here that Pence will decide to --

Just do his job. Do the right thing, according to Trump. Bring him out. Bring out Pence.

Bring him out. Bring out Pence. Bring him out. Bring out Pence. Bring him out. Bring out

Pence. Hang Mike Pence. Hang Mike Pence.

Hang Mike Pence. Hang Mike Pence. Hang Mike Pence. [End videotape]

PETE AGUILAR:

How did we get to this point? How did we get to the point where President Trump's most radical supporters led a violent attack on the Capitol and threatened to hang President Trump's own Vice President? You'll hear from witnesses that Donald Trump pressured Mike Pence to adopt a legally and morally bankrupt idea that the Vice President could choose who the next President can be. You'll hear about how the Vice President, the White House counsel, and others told Donald Trump that the Vice President had no such authority.

But President Trump would not — listen. You'll hear how Vice President Pence withstood an onslaught of pressure from President Trump both publicly and privately, a pressure campaign

that built to a fever pitch with a heated phone call on January 6th. You'll also hear that the President knew there was a violent mob at the Capitol when he tweeted at 2:24 pm that the Vice President did not have the quote, "courage to do what needed to be done". Let me be clear, Vice President Pence did the right thing that day.

He stayed true to his oath to protect and defend the Constitution. I look forward to hearing from our witnesses this afternoon. Mr. Chairman, I yield back.

BENNIE THOMPSON:

Thank you, Mr. Aguilar. We are honored to have two distinguished witnesses who advised Vice President regarding his role on January 6th. Judge Michael Luttig is one of the leading conservative legal thinkers in the country. He served in the administrations of President Ronald Reagan and George H W Bush. He was appointed by the latter to serve on a US Court of Appeals for the Fourth Circuit where he served from 1991 to 2006. He provided critical advice for Vice President Pence regarding the role of the Vice President in a joint session of Congress shortly before that fateful moment.

He's written that the Vice President does not have the power to select the next President of the United States. He's also written that — that contrary theory espoused by one of his own former law clerks was quote, "incorrect at every turn". We are also joined today by one of the people who was with Vice President Pence on January 6th. Greg Jacob was counsel to Vice President Pence.

He conducted a thorough analysis of the role of the Vice President in a joint session of Congress under the Constitution, the Electoral Count Act, and 230 years of historical practice. But he also has firsthand information about the attack on the Capitol because he lived through it. He was with vice — the Vice President and his own life was in danger.

I'll now swear in our witnesses. The witnesses will please stand and raise their right hand.

Do you swear or affirm on the penalty of perjury that the testimony you're about to give is the truth, the whole truth, and nothing but the truth. So help you God.

UNKNOWN:

[off-mic]

BENNIE THOMPSON:

Thank you. You may be seated. Let the record reflect the witnesses answered in the affirmative. I now recognize myself for questions. In the United States, the people choose our Representatives, including the highest official in the land, the President of the United States. The American people did this on November 3rd, 2020, but President Trump did not like the outcome.

He did everything he could to change the result of the election. He tried litigation, 62 cases in fact, and that failed. He tried to pressure state legislatures to reverse the results of the election in their states, but they refused. He tried to enlist the Department of Justice in his efforts to overturn election results, but officials leading the department refused to comply.

So eventually, he latched on to a completely nonsensical and anti-democratic theory that one man, his own Vice President, could determine the outcome of the election. He wanted the Vice President to unilaterally select the President. This theory that the Vice President could unilaterally select the President runs completely contrary to our Constitution, our laws, and the entirety of our American experience.

But that didn't stop — didn't matter to President Trump. I would now like to explore how President Trump came to latch on to this ridiculous legal theory that the Vice President can select the President of the United States. Mr. Jacob, how did this theory first come to your attention?

GREG JACOB:

The first time that I had a conversation with the Vice President about the 12th Amendment and the Electoral Count Act was in early December, around December 7th. The Vice President called me over to his West Wing office and told me that he had been seeing and reading things that suggested that he had a significant role to play on January 6th in announcing the outcome of the election.

He told me that he had been first elected to Congress in 2000 and that one of his earliest memories as a Congressman was sitting in on the 2001 certification and he recalled that Al Gore had gaveled down a number of objections that had been raised to Florida. And he asked me, mechanically how does this work at the joint session?

What are the rules? And I told the Vice President that in fact I had a fairly good idea of how things work that actually there aren't rules that govern the joint session. But what there is, is a provision in the Constitution that's just one sentence long and then an electoral count act that had been passed in 1887. And I told the Vice President that I could put a memo together for him overnight that would explain the applicable rules.

BENNIE THOMPSON:

So Mr. Jacob, when you looked at this theory, what did you conclude?

GREG JACOB:

So we concluded that what you have is a sentence in the Constitution that is inartfully [ph] drafted. But the Vice President's — first instinct when he heard this theory was that there was no way that our framers, who [abhorred] concentrated power, who had broken away from the tyranny of George III, would ever have put one person, particularly not a person who had a direct interest in the outcome because they were on the ticket for the election, in a role to have decisive impact on the outcome of the election.

And our review of text, history, and frankly just common sense all confirmed the Vice President's first instinct on that point. There is no justifiable basis to conclude that the Vice President has that kind of authority.

BENNIE THOMPSON:

Thank you, Mr. Jacobs. We will hear more today about how, despite this conclusion by you and other top legal advisers, the former President used this discredited theory in his campaign to pressure the Vice President to decide the outcome of the Presidential election.

I now recognize the gentlewoman from Wyoming, Liz Cheney, for questions.

LIZ CHENEY:

Thank you very much, Mr. Chairman. Judge Luttig, thank you as well for being here with us today. You issued a very important statement earlier today, which I urge all Americans to read. And I'd like to ask you, Judge, about one of the sentences in your statement and ask if you could explain to us the significance of it. You say, had the Vice President of the United States obeyed the President of the United States America would immediately have been plunged into what would have been tantamount to a revolution within a paralyzing constitutional crisis.

Could you elaborate on that for us, Judge?

J. MICHAEL LUTTIG:

Thank you, Madam Vice Chairman. That — that passage in my statement this morning referenced the — the most foundational concept in America, which is the rule of law. Thus, as I interpret your question, you are asking about that foundational truth of these United

States, which we call America. The foundational truth is the rule of law.

That foundational truth is, for the United States of America, the profound truth, but it's not merely the profound truth for the United States, it's also the simple truth, the simple foundational truth of the American republic. Thus, in my view, the hearings being conducted by this select committee are examining that profound truth, namely the rule of law, in the United States of America.

The specific question of course before you and before the nation, not before me, is whether that foundational rule of law was supremely violated on January 6, 2021. Now, to the question specifically that you asked, Madam Vice Chair, I believe that had Vice President Pence obeyed the orders from his President and the President of the United States of America during the joint session of the Congress of the United States on January 6, 2021 and declared Donald Trump the next President of the United States, notwithstanding that then President Trump had lost the Electoral College vote as well as the popular vote in the 2020 Presidential election, that declaration of Donald Trump as the next President would have plunged America into what I believe would have been tantamount to a revolution within a constitutional crisis in America,

which in my view, and I'm only one man, would have been the first constitutional crisis since the founding of the republic.

LIZ CHENEY:

Thank you very much, Judge, for your solemn attention to these issues and — and for your appearance here today. We're going to describe and discuss in detail what happened.

LIZ CHENEY:

And as we do, I'm going to describe a few of the details now of some of the actions taken by a gentleman named Kenneth Chesebro after the electoral college met and cast their votes on December 14th. Actually the day before they met, Kenneth Chesebro sent a memo to Rudy Giuliani, the President's lead outside counsel. Mr. Chesebro wrote to Mayor Giuliani that the Vice President is charged with quote, "Making judgments about what to do if there are conflicting votes," close quote.

Mr. Chesebro wrote that when the joint session of Congress got to Arizona in the alphabetical list of states, the Vice President should not count the Biden votes, quote, "Because there are two slates of votes." His justification which we will learn more about in our next hearing was that a group of Trump supporters in Arizona and other swing states decided to proclaim themselves the true electors for the state, creating two sets of electors: the official electors selected by the state and a group of fake electors.

This document was ordered to be produced to the select committee by a federal district court judge. As you will see on the screen shortly, Judge David Carter wrote, quote, "The draft memo pushed a strategy that knowingly violated the Electoral Count Act." The judge concluded that quote, "The memo is both intimately related to and clearly advanced the plan to obstruct the joint session of Congress on January 6th, 2021." A few days later, Professor John Eastman took up this cause.

Eastman was at the time a law professor at Chapman University Law School. He prepared a memo outlining the nonsensical theory that the Vice President could decide the outcome of the election at the joint session of Congress on January 6th. You will see portions of this memo on the screen. In the first line he wrote, quote, "Seven states have transmitted dual slates of electors to the President of the Senate." But Dr. Eastman goes on to rely on those so-called dual slates of electors to say that Vice President Pence could simply declare President Trump the winner of the 2020 election.

Mr. Jacob, were there in fact dual slates of electors from seven states?

GREG JACOB:

No, there were not.

LIZ CHENEY:

And just a few days after that, Dr. Eastman wrote another memo.

This one quote, "Wargaming out several scenarios." He knew the outcome he wanted and he saw a way to go forward if he simply pretended that fake electors were real. You will see that memo up on the screen now. Here Dr. Eastman says the Vice President can reject the Biden electors from the states that he calls quote, "Disputed." Under several of the scenarios, the Vice President could ultimately just declare Donald Trump the winner regardless of the vote totals that had already been certified by the states.

However, this was false and Dr. Eastman knew it was false. In other words, it was a lie. In fact, on December 19th, 2020, just four days before Dr. Eastman sent this memo, Dr. Eastman himself admitted in an email that the fake electors had no legal weight, referring to the fake electors as quote, "Dead on arrival in Congress," end quote, because they did not have a certification from their states.

Judge Luttig, did the Trump electors in those seven states who were not certified by any state authority have any legal significance?

J. MICHAEL LUTTIG:

Congresswoman, there — there was no support whatsoever and either the Constitution of the United States nor the laws of the United States for the Vice President frankly ever to count alternative electoral slates from the states that had not been officially certified by the designated state official in the Electoral Count Act of 1887. I did notice in the passage from Mr. Eastman's memorandum and I took a note on it, and correct me if I'm wrong, but he said in that passage that there was both legal authority as well as historical precedent.

I do know what Mr. Eastman was referring to when he said that there was historical precedent for doing so. He was incorrect. There was no historical precedent from the beginning of the founding in 1789 that even as mere historical precedent as distinguished from legal precedent would support the possibility of the Vice President of the United States quote, "Counting alternative electoral slates that had not been officially certified to the Congress pursuant to the Electoral Count Act of 1887." I would be glad to explain that historical precedent if the committee wanted, but it — it would be a digression.

LIZ CHENEY:

Thank you very much, Judge. I know my colleagues will be pursuing that issue in more depth. And now I'd like to yield back, Mr. Chairman.

BENNIE THOMPSON:

Thank you very much. Pursuant to Section 5(c)(8) of House Resolution 503, the Chair recognizes the gentleman from California, Mr. Aguilar, and staff counsel, Mr. John Wood for questioning.

PETE AGUILAR:

Thank you, Mr. Chairman. We're fortunate to have a bipartisan staff. Senior investigative counsel John Wood previously served as United States Attorney in Missouri under President George W. Bush. He and I will share today's lines of questioning. Mr. Wood.

JOHN WOOD:

Thank you. Mr. Aguilar. Judge Luttig, I had the incredible honor of serving as one of your law clerks. Another person who did was John Eastman. And you've written that Dr. Eastman's theory that the Vice President could determine who the next President of the United States is is in your words incorrect at every turn.

Could you please explain briefly your analysis?

J. MICHAEL LUTTIG:

It was my honor, Mr. Wood, to have you serve as my law clerk. I — I could answer that question perfectly if I had at my disposal either Mr. Eastman's tweet or my own analytical tweet of September 21st. But I don't. But that said, let me try to remember the analysis of — of Mr. Eastman's analysis.

JOHN WOOD:

And — and Judge, I can read to you and to the audience I think what was a really key passage from your very insightful analysis when you wrote, "I believed that Professor Eastman was incorrect at every turn of the analysis in his January 2nd memorandum beginning with his claim that there were legitimate competing slate of electors presented from seven states."

You've already addressed that issue. But your next sentence said, "Continuing to his conclusion that the Vice President could unilaterally decide not to count the votes from the seven states from which competing slates were allegedly presented." So what was your basis for concluding that Dr. Eastman was incorrect in his conclusion that the Vice President could unilaterally decide not to count the votes from these disputed states?

J. MICHAEL LUTTIG:

I understand. As I previously stated in response to Congresswoman Cheney, the — there was no basis in the Constitution or laws of the United States at all for the theory espoused by Mr. Eastman at all. None. With all respect to my co-panelist, he said I believe in partial response to one of the select committee questions that the single sentence in the 12th Amendment was he thought [unartfully] written.

That single sentence is not [unartfully] written. It was pristine clear that the President of the Senate on January 6th, the incumbent Vice President of the United States, had little substantive constitutional authority if any at all. The 12th Amendment, the single sentence that Mr. Jacob

refers to, says in substance that following the transmission of the certificates to the Congress of the United States and under the Electoral Count Act of 1887, the archivist of the United States that the presiding officer shall open the certificates in the presence of the Congress of the United States in joint session.

It then says unmistakably not even that the Vice President himself shall count the electoral votes. It clearly says merely that the electoral count votes shall then be counted. It was the Electoral Count Act of — of 1887 that — that filled in, if you will, the simple words of — of the 12th Amendment in order to construct for the country a process for the counting of the — the — the sacred process for the counting of the electoral votes from the states that neither our original Constitution nor even the 12th Amendment had done.

The irony, if you will, is that, from its founding until 1887 in — when Congress passed the Electoral Count Act, the nation had been in considerable turmoil during at least five of its presidential elections, beginning as soon thereafter from the founding as 1800. So, it wasn't for — almost 100 years later until the Electoral Count Act was passed.

So, that's why, in my view, that piece of legislation is not only a work in progress for the country, but at this moment in history an important work in progress that needs to take place. That was long winded. I understand.

JOHN WOOD:

Well, Judge Luttig, at the risk of oversimplifying for the non-lawyers who are watching, is it fair to say that the 12th Amendment basically says two things happen, the vice president opens the — the certificates and the electoral votes are counted. Is it that straightforward?

J. MICHAEL LUTTIG:

I would not want that to be my testimony before the Congress of the United States. The language of the 12th Amendment is that simple.

JOHN WOOD:

Thank you, Judge. Mr. Jacob, I have a question for you. I believe during your deposition before this committee, you said something to the effect of you'd read every word written about the 12th Amendment, the Electoral Count Act, and historical practice. I know in response to the chairman's earlier question you gave your bottom line conclusion.

But can you tell us a little bit about the process that you and your colleagues went through of researching this issue and what conclusion you came to after your thorough research?

GREG JACOB:

So, you — you — as a lawyer who's analyzing a constitutional provision, you start with the constitutional text. You go to structure. You go to history. So, we started with the text. We do

not think that the text was quite as unambiguous as Judge Luttig indicated. In part, we had a constitutional crisis in 1876 because in that year multiple slates of electors were certified by multiple slates.

And when it came time to count those votes, the antecedent question of which ones had to be answered. That required the appointment of an independent commission. That commission had had to resolve that question, and the purpose of the Electoral Count Act of 1887 had been to resolve those latent ambiguities.

Now, I am in complete agreement with Judge Luttig. It is unambiguous that the vice president does not have the authority to reject electors. There is no suggestion of any kind that it does. There is no mention of rejecting or objecting to electors anywhere in the 12th Amendment. And so, the notion that the vice president could do that certainly is not in the text.

But the problem that we had and that John Eastman raised in our discussions was we had all seen that, in Congress in 2000, in 2004, in 2016, there had been objections raised to various states, and those had even been debated in 2004. And so, here you have an amendment that says nothing about objecting or rejecting, and yet we did have some recent practice of that happening within the terms of the Electoral Count Act. So, we started with that text.

And I recall, in my discussion with the vice president, he said I can't wait to go to heaven and meet the framers and tell them the work that you did in putting together our Constitution is a work of genius. Thank you. It was divinely inspired. There is one sentence that I would like to talk to you a little bit about.

So, then we went to structure. And again, the vice president's first instinct here is so decisive on this question. There is just no way that the framers of the Constitution, who divided power and authority, who separated it out, who had broken away from George III and declared him to be a tyrant, there was no way that they would have put in the hands of one person the authority to determine who was going to be president of the United States.

And then we went to history. We examined every single electoral vote count that had happened in Congress since the beginning of the country. We examined the Electoral Count Act. We examined practice under the Electoral Count Act. And critically, no vice president in 230 years of history had ever claimed to have that kind of authority, hadn't claimed authority to reject electoral votes, had not claimed authority to return electoral votes back to the states.

In the entire history of the United States, not once had a joint session ever returned electoral votes back to the states to be counted. And in the crisis of 1876, Justice Bradley of the United States Supreme Court, who supplied the decisive final vote on that commission, had specifically looked at that question and said, first, the vice president clearly doesn't have authority to decide anything and, by the way, also does not have authority to conduct an investigation by sending things back out for a public look at things.

So, the history was absolutely decisive. And again, part of my discussion with Mr. Eastman was, if you were right, don't you think Al Gore might have liked to have known in 2000 that he had

authority to just declare himself president of the United States? Did you think that the Democrat lawyers just didn't think of this very obvious quirk that he could use to do that?

And of course, he acknowledged Al Gore did not and should not have had that authority at that point in time. But — so, text, structure, history, I think what we had was some ambiguous text, that common sense and structure would tell you the answer cannot possibly be that the vice president has that authority.

As the committee already played the vice president's remarks, there is almost no idea more un-American than the notion that any one person would choose the American president.

And then, unbroken historical practice for 230 years that the vice president did not have such an authority.

JOHN WOOD:

Thank you. I reserve the remainder of my time.

PETE AGUILAR:

Mr. Jacob, you weren't the only one who knew that the legal theory was wrong, though.

Here is what various advisers to the president thought about that theory.

[Begin videotape]

UNKNOWN:

You'd been clear repeatedly with Mr. Meadows about you and the vice president having a different view about his authority on January 6th.

Marc Short

I believe I had.

Did Mr. Meadows ever explicitly or tacitly agree with you, or say, yeah, that makes sense, Ok?

MARC SHORT:

I believe that that Mark did agree.

UNKNOWN:

What makes you say that?

MARC SHORT:

I believe that's what he told me. But as I mentioned, I think Mark had told so many people

so many different things that it was not something that — that I would necessarily accept as Ok, well, that means that's resolved.

UNKNOWN:

I see. Tell me more what — what he told you on this topic.

MARC SHORT:

Well, I think it was that you know the vice president doesn't have any broader role. And I think he was understanding that.

UNKNOWN:

So, despite the fact that he may have said other things to the president or others, to you he said he understands the vice president has no role.

MARC SHORT:

Yes.

UNKNOWN:

Ok. Did he say that to you several times?

MARC SHORT:

A couple of times, um-hmm.

UNKNOWN:

Before January 6th?

MARC SHORT:

Yes.

JASON MILLER:

The way it was communicated to me was that Pat Cipollone thought the idea was — was nutty, and had at one point confronted Eastman basically with the same sentiment.

MARC SHORT:

Pat expressed his admiration for the vice president's actions on the day of the 6th, and said that he concurred with the legal analysis that — that our team had — had put together to reach that point.

ERIC HERSCHMANN:

It made no sense to me that, in all the protections that were built into the Constitution for a president to get elected and steps that had to be taken, that the — or to choose the next president would be sitting at — with the vice president.

UNKNOWN:

Do you know if Mr. Clark or Mr. Morgan — is it Morgan — viewed about that — thought about that, Mr. Eastman's advice?

JASON MILLER:

Yeah, they thought he was crazy.

UNKNOWN:

Do you know if they ever expressed an opinion on whether they thought the vice president had the power that John Eastman said he did?

JASON MILLER:

I know for a fact I heard both say that his theory was crazy, that there was no validity to it in any way, shape, or form.

UNKNOWN:

And did they express that before January 6th?

JASON MILLER:

Yes.

UNKNOWN:

To whom?

JASON MILLER:

I think anyone who would listen.

UNKNOWN:

Ok. What were your prior interactions with Eastman?

ERIC HERSCHMANN:

He described for me what he thought the ambiguity was in the statute, and he was walking through it at that time. And I said hold on a second. I want to understand what you're saying. You're saying that you believe the vice president, acting as president of the Senate,

can be the sole decision maker as to, under your theory, who becomes the next president of the United States.

And he said yes. And I said are you out of your effing mind, right? And I — you know, that was pretty blunt. I said you're completely crazy. I said you're going to turn around and tell 78-plus million people in this country that your theory is this is how you're going to invalidate their votes, because you think the election was stolen?

And I said they're not going to tolerate, that, said you're going to cause riots in the streets.

And he said words to the effect of there has been violence in the history of our country,

Eric, to protect the democracy or protect the republic. [End videotape]

PETE AGUILAR:

In fact, there was a risk that the lawyers in the White House counsel's office would resign.

For example, Fox News host Sean Hannity expressed concern that the entire White House counsel's office could quit. As you can see from these texts, Mr. Hannity wrote to White House Chief of Staff Mark Meadows that, "We can't lose the entire White House counsel's office.

I do not see January 6th happening the way he is being told." A few days later on January 5th, Mr. Hannity wrote to Mr. Meadows that, "I'm very worried the next 48 hours, Pence pressure, White House counsel will leave." While Sean Hannity was apparently very concerned about the possibility that the White House counsel would resign in protest of the president's effort to force the vice president to violate the Constitution, some others close to the president were more dismissive of the White House counsel's position.

Here's what Trump's son in law and senior adviser Jared Kushner said during his deposition regarding the White House counsel, Pat Cipollone's, threats to resign.

[Begin videotape]

LIZ CHENEY:

Jared, are you aware of instances where Pat Cipollone threatened to resign?

JARED KUSHNER:

I — I kind of — like I said, my interest at that time was on trying to get as many pardons done. And I know that, you know, he was always — him in the team or always saying, oh, we're going to resign. We're not going to be here if this happens, if that happens. So, I kind

of took it up to just be whining, to be honest with you.

[End videotape]

PETE AGUILAR:

The president's own lead outside counsel, Rudy Giuliani, also seemed to concede that the vice president did not have the authority to decide the outcome of the election or send it back to the states. Here's what White House attorney Eric Hirschman said about his call with Mayor Giuliani on the morning of the 6th.

[Begin videotape]

ERIC HERSCHMANN:

The morning of January 6th, I think he called me out of the blue, right? And I was like getting dressed. And we had an intellectual discussion that — about Eastman's — East — I don't know if it's Eastman's theory per se, but the VP's role. And, you know, he was asking me my view and analysis and then the practical implications of it. And when we finished, he said, like, I believe that, you know, you're probably right.

I think he thought, when we were done, that it would be something he'd have to consider if he was sitting on the bench, but he'd probably come down in that, you know, you couldn't interpret it or sustain the argument long term.

PETE AGUILAR:

Of course, the fact that Mayor Giuliani seemed to admit that the theory was wrong did not stop him from going before the crowd just a few hours later on January 6th and saying the exact opposite. Here's Mayor Giuliani's speech at the Ellipse rally on January 6th.

[Begin videotape]

RUDY GIULIANI:

We're here just very briefly to make a — very important two points. Number one, every single thing that has been outlined as the plan for today is perfectly legal. I have Professor Eastman here with me to say a few words about that. He's one of the preeminent constitutional scholars in the United States.

RUDY GIULIANI:

It is perfectly appropriate, given the questionable constitutionality of the Election Counting Act of 1887, that the vice president can cast sit aside, and he can do what a President called Jefferson did when he was Vice President. [applause] He can decide — he can decide on the validity of these crooked ballots or he can send it back to the legislatures, give them five to 10 days to finally finish the work. [End Videotape]

PETE AGUILAR:

And here's what Dr. Eastman said in his speech at the Ellipse on January 6th.

[BeginVideotape]

JOHN EASTMAN:

And all we are demanding of Vice President Pence is this afternoon at 1:00 he let the legislatures of the state look into this so we get to the bottom of it and the American people know whether we have control of the direction of our government or not. [applause] [End Videotape]

PETE AGUILAR:

Even Dr. Eastman knew his theory didn't hold water. Mr. Jacob, you discussed and even debated this theory at length with Dr. Eastman. Did Dr. Eastman ever tell you what he thought the US Supreme Court would do if it had to decide this issue?

GREG JACOB:

Yes. We had an extended discussion, an hour and a half to two hours on January 5th. And when I pressed him on the point I said, John, if the Vice President did what you were asking him to do, we would lose nine to nothing in the Supreme Court, wouldn't we? And he initially started it, well, I think maybe he would lose only seven to two.

And after some further discussion acknowledged, well, yeah, you're right, we would lose nine nothing.

PETE AGUILAR:

I appreciate that. In our investigation, the select committee has obtained evidence suggesting that Dr. Eastman never really believed his own theory. Let me explain. On the screen, you can see a draft letter to the President from October 2020. In this letter, an idea was proposed that the Vice President could determine which electors to count at the joint session of Congress.

But the person writing in blue eviscerates that argument. The person who wrote the comments in blue wrote, quote, "The 12th Amendment only says that the President of the Senate opens the ballots in the joint session. And then in the passive voice that the votes shall then be counted".

The comments in blue further state, "nowhere does it suggest that the President of the Senate gets to make the determination on his own". Judge Luttig, does it surprise you that the author of those comments in blue was in fact John Eastman?

J. MICHAEL LUTTIG:

Yes, it does Congressman. But let me — watching this unfold, let me try to unpack what was at the root of what I have called the blueprint to overturn the 2020 election. And it is this.

And I had foreshadowed this answer in my earlier testimony to Congresswoman Cheney.

Mr. Eastman, from the beginning, said to the President that there was both legal as well as historical precedent for the Vice President to overturn the election.

And what we've heard today, I believe is — is what happened within the White House and elsewhere as all of the players, led by Mr. Eastman, got wrapped around the axle by the historical evidence claim by Mr. Eastman. Let me explain very simply, this is what I said would require a digression, that I would be glad to undertake if you wished, in short, if I had been advising the Vice President of the United States on January 6th, and even if then Vice President Jefferson, and even then Vice President John Adams, and even then Vice President Richard Nixon had done exactly what the President of the United States wanted his Vice President to do, I would have laid my body across the road before I would have let the Vice President overturn the 2020 election on the basis of that historical precedent.

But what this body needs to know, and now America needs to know, is that that was the centerpiece of the plan to overturn the 2020 election. It was the historical precedent in the years — and with the Vice Presidents that I named, as Congressman Raskin understands well, and the — the effort by Mr. Eastman and others was to — to drive that historical precedent up to and under that single sentence — single pristine sentence in the 12th Amendment to the United States Constitution.

Taking advantage of, if you will, what many have said is the inartful wording of that sentence in the 12th Amendment. Scholars before 2020 would have used that historical precedent to argue, not that Vice President Pence could overturn the 2020 election by accepting non-certified state electoral votes, but they would have made arguments as to some substantive, not merely procedural, authority possessed by the Vice President of the United States on — on the statutorily prescribed day for counting the Electoral College votes.

This is — this is constitutional mischief.

PETE AGUILAR:

Judge, I think that's — I think that's a good point. And I think it kind of begs the question that if the Vice President had this power to determine the outcome of a Presidential election, why hasn't it ever been used before? Why hasn't that ever happened? Why hasn't a Vice President simply rejected the outcome of an election and declared someone else the winner?

And instead, as the Chairman mentioned in his opening, for over two centuries Vice Presidents have presided over the joint session of Congress in a purely ceremonial role.

This even includes, as Mr. Jacob mentioned, Vice President Al Gore. For those of us who are old enough to remember the 2000 election came down to one state, Florida.

There were weeks of recounts and litigation after the election and Al Gore conceded. Of course, Al Gore was Vice President at the time, but he never suggested that he could simply declare himself the winner of the 2000 election when he presided over the counting of the electoral votes. Let's hear what Vice President Gore said when he described the situation he faced in 2000.

[Begin Videotape]

AL GORE:

Importance of the United States of America in all of human history, in Lincoln's phrase, we still are the last best hope of humankind. And the choice between one's own disappointment in your personal career and upholding the — the noble traditions of America's democracy, it's a pretty easy choice when it comes down to it. [End Videotape]

PETE AGUILAR:

Mr. Jacob, did Dr. Eastman say whether he would want other Vice Presidents such as Al Gore after the 2000 election or Kamala Harris after the 2024 election to have the power to decide the outcome of the election?

GREG JACOB:

So this was one of the many points that we discussed on January 5th. He had come into that meeting trying to persuade us that there was some validity to his theory. I viewed it as my objective to persuade him to acknowledge he was just wrong. And I thought this had to be one of the most powerful arguments.

I mean, John, back in 2000, you weren't jumping up and saying Al Gore had this authority to do that. You would not want Kamala Harris to be able to exercise that kind of authority in 2024 when I hope Republicans will win the election. And I know you hope that too, John.

And he said, absolutely. Al Gore did not have a basis to do it in 2000, Kamala Harris shouldn't be able to do it in 2024, but I think you should do it today.

PETE AGUILAR:

Marc Short told the select committee that Vice President Pence consulted with one of his predecessors, Vice President Dan Quayle, regarding the role of the Vice President. Vice President Quayle confirmed Pence's view that the role was purely ceremonial. Mr. Short also told the committee that he, Mr. Short, received a call from former House Speaker Paul Ryan.

Here is Mr. Short's description of his conversation with Speaker Ryan.

[Begin Videotape]

MARC SHORT:

Speaker Ryan wanted to call and say, you know, you don't have any greater authority. And I — I said to him, Mr. Speaker you — you know, Mike, you know he doesn't — you know, he recognizes that. And we sort of laughed about it, and he said I get it. And he later spoke to the Vice President too to I think have the same conversation.

[End Videotape]

PETE AGUILAR:

Fortunately for the fate of our republic, Vice President Pence refused to go along with President Trump's demands that he determine the outcome of the Presidential election.

Mr. Jacob, what was the Vice President's reaction when you discussed with him the theory that the Vice President could decide the outcome of the election?

GREG JACOB:

Congressman, as I testified, the Vice President's first instinct was that there was no way that any one person, particularly the Vice President who is on the ticket and has a vested outcome in the election, could possibly have the authority to decide it by rejecting electors or to decisively alter the outcome by suspending the joint session for the first time in history in order to try to get a different outcome from state legislatures.

PETE AGUILAR:

Despite the fact that the Vice President had a strongly held and correct view that he could not decide the outcome of the election, President Trump launched a multi-week campaign, of both public and private pressure, to get the Vice President Mike Pence to violate the Constitution. Here are some examples of the intense pressure the Vice President faced from all sides and what his chief of staff thought of it. [Begin Videotape]

DONALD TRUMP:

And I hope Mike Pence comes through for us. I have to tell you. [applause] I hope that our great Vice President — our great Vice President comes through for us. He's a great guy. Of course, if he doesn't come through, I won't like him quite as much. [laughter]

UNKNOWN:

Was it your impression that the Vice President had directly conveyed his position on these issues to the President, not just to the world, through a dear colleague letter, but directly to President Trump?

MARC SHORT:

Many times.

UNKNOWN:

And had been consistent in conveying his position to the President?

MARC SHORT:

Very consistent.

RUDY GIULIANI:

I am — I am aware of the fact that the President was upset with the way Pence acted.

UNKNOWN:

Are we to assume that this is going to be a climactic battle?

JOHN EASTMAN:

Well, I think a lot of that depends on the courage and the spine of the individuals involved.

UNKNOWN:

That would be a nice way to say a guy named Mike — Vice President Mike Pence?

JOHN EASTMAN:

Yes.

MARC SHORT:

I think we'd been clear as to what the Vice President's role was. I think the Vice President made clear with the President. And I think I'd been clear with Mark Meadows.

JASON MILLER:

I think the Vice President is going to throw down tomorrow and do the right thing because, Lou, like I said before, this is a time for choosing. People are going to look back at this moment tomorrow and remember where every single one of their elected officials were.

Did they vote for the rule of law in getting these elections right?

Or did they give it away to the Democrats and the people who cheated and stole their way through this election? Definitely the — you know, I got back into town as talk [ph] say [ph], they like the fifth and the sixth. The President was, you know, all the attention was on what

Mike would do or what Mike wouldn't do.

MARC SHORT:

The Vice President really was not wavering in his commitment to what he — what his responsibility was. And so, yeah, was it — was it painful? Sure. [End Videotape]

PETE AGUILAR:

The President's pressure campaign started in December. For example, although the Vice President made his views clearly and unmistakably known to the President and others in the White House, on December 23rd President Trump retweeted a memo from an individual named Ivan Raiklin entitled Operation Pence card that called on the Vice President to refuse the Electoral College votes from certain states that had certified Joe Biden is the winner.

President Trump started his pressure campaign in December, but he dialed up the pressure as January 6th approached.

The testimony we have received in our investigation indicates that by the time January 4th arrived, President Trump had already engaged in a quote, "Multi-week campaign to pressure the Vice President to decide the outcome of the election." This had included private conversations between the two leaders, Trump's tweets, and at least one meeting with members of Congress.

We understand that the Vice President started his day on January 4th with a rally in Georgia for the Republican candidates in the US Senate runoff. When the Vice President returned to Washington, he was summoned to meet with the President regarding the upcoming joint session of Congress. Mr. Jacob, who attended that meeting?

GREG JACOB:

The attendees were the Vice President, the President, Marc Short, the Chief of Staff to the Vice President, myself, and John Eastman. There was about a five minute period where Mark Meadows came in on a different issue.

PETE AGUILAR:

Let's show a photo of that meeting. Mr. Jacob, during that meeting between the President and the Vice President, what theories did Dr. Eastman present regarding the role of the Vice President in counting the electoral votes?

GREG JACOB:

During the meeting on January 4th, Mr. Eastman was opining that there were two legally viable arguments as to authorities that the Vice President could exercise two days later on January 6th. One of them was that he could reject electoral votes outright. The other was that he could use his capacity as presiding officer to suspend the proceedings and declare essentially a 10 day recess during which states that he deemed to be disputed — there was a list of five to seven states that — the exact number changed from conversation to conversation.

But that the Vice President could sort of issue a demand to the state legislatures in those states to reexamine the election and declare who had won each of those states. So he said that both of those were legally viable options. He said that he did not recommend — upon questioning he did not recommend what he called the more aggressive option, which was reject outright, because he thought that that would be less politically palatable.

The imprimatur of state legislature authority would be necessary to ultimately have public acceptance of an outcome in favor of President Trump. And so he advocated that the preferred course of action would be the procedural route of suspending the joint session and sending the election back to the States.

PETE AGUILAR:

Mr. Jacob, I know you won't discuss the direct conversations between the President and the Vice President. So rather than asking you what the Vice President said in that meeting, I'll ask you a more general question.

Did the Vice President ever waver in his position that he could not unilaterally decide which electors to accept?

GREG JACOB:

The Vice President never budged from the position that I have described as his first instinct, which was that it just made no sense from everything that he knew and had studied about our Constitution that one person would have that kind of authority.

PETE AGUILAR:

Did the Vice President ever waver in his position that he could not delay certification and send it back to the states?

GREG JACOB:

No, he did not.

PETE AGUILAR:

Did Dr. Eastman admit in front of the President that his proposal would violate the Electoral Count Act?

GREG JACOB:

So during that meeting on the fourth, I think I raised the problem that both of Mr. Eastman's proposals would violate several provisions of the Electoral Count Act. Mr. Eastman acknowledged that that was the case, that even what he viewed as the more politically palatable option would violate several provisions.

But he thought that we could do so because in his view the Electoral Act was unconstitutional. And when I raised concerns that that position would likely lose in court his view was that the court simply wouldn't get involved. They would invoke the political question doctrine and therefore we could have some comfort proceeding with that path.

PETE AGUILAR:

Mr. Wood.

JOHN WOOD:

But just to reiterate, he told you — maybe this was in a later conversation, but he told you at some point that if in fact the issue ever got to the Supreme Court, his theory would lose nine zero. Correct?

GREG JACOB:

The next morning starting around 11 or 11:30 — we met for an hour and a half to two hours. And in that meeting — I've already described the text, structure, history conversation. But we started walking through all of that. And I said, you know, I said John,

basically what you have is some text that may be a little bit ambiguous, but then nothing else that would support it including the fact that nobody would ever want that to be the rule.

Wouldn't we lose nine to nothing in the Supreme Court? And again he initially started well, maybe you'd only lose seven to two, but ultimately acknowledged that, no, we would lose nine zero. No judge would support his argument.

PETE AGUILAR:

After his meeting with the Vice President, Donald Trump flew to Georgia for a rally in support of the Republican candidates in the United States Senate runoff.

Even though the Vice President was — had been steadfast in resisting the President's pressure, President Trump continued to publicly pressure Vice President Pence in his Georgia speech.

Rather than focusing exclusively on the Georgia Senate runoff Trump turned his attention to Mike Pence. Here's what the President said during that rally in Georgia.

[Begin Videotape]

DONALD TRUMP:

Pence comes through for us, I have to tell you. I hope that our great Vice President — our great Vice President comes through for us. He's a great guy. Plus if he doesn't come through, I won't like him quite as much. [Laughter] [End Videotape]

PETE AGUILAR:

So the President had been told multiple times that the Vice President could not affect the outcome of the election, but he nonetheless publicly pressured Mike Pence to do exactly that by saying quote, "If he doesn't come through, I won't like him as much."

Let's turn now to January 5th. Mr. Wood.

JOHN WOOD:

Thank you. That morning, meaning January 5th, the President issued a tweet expressly stating that the Vice President had the power to reject electors. Let's look at what the President wrote. Quote, "The Vice President has the power to reject fraudulently chosen electors." Mr. Jacob, you've already told us about your meeting with Dr. Eastman and the President on January 4th and you briefly made reference to the meeting you had with Dr. Eastman the next day, January 5th. Can you tell us a little bit more about that meeting with Dr. Eastman on January 5th? For example, where was the meeting?

Who was there?

GREG JACOB:

So at the conclusion of the meeting on the fourth, the President had asked that that our office meet with Mr. Eastman the next day to hear more about the positions he had expressed at that meeting. And the Vice President indicated that — offered me up as his counsel to fulfill that duty. So we met in Marc Short's office in the executive office building across the way from the White House.

Dr. Eastman had a court hearing by Zoom that morning, so it didn't start first thing but rather started around 11. And that meeting went for about an hour and a half, two hours.

Chief of Staff Marc Short was at that meeting most of the time. There were a few times that he left. And essentially it was an extended discussion.

What most surprised me about that meeting was that when Mr. Eastman came in he said I'm here to request that you reject the electors. So on the fourth that had been the path that he had said I'm not recommending that you do that. But on the fifth, he came in and expressly requested that. And I grabbed a notebook as I was heading into the meeting.

I didn't hear much new from him to record, but that was the first thing I recorded in my notes was request that the VP reject.

JOHN WOOD:

Just to be clear, you're saying that Dr. Eastman urged the Vice President to adopt the very same approach that Dr. Eastman appeared to abandon in the Oval Office meeting with the President the day before? Is that correct?

GREG JACOB:

He had recommended against it the evening before. And then on the fifth came in and I think it was probably his first words after introductions and as we sat down were I'm here to request that you reject the electors in the disputed states.

JOHN WOOD:

And you referenced a moment ago some handwritten notes which you've provided to the select committee. I'd now like to show you those notes. As you can see you wrote there at the top — the writing's a little bit faint in the copy. But you wrote requesting VP reject. Does that accurately reflect what Dr. Eastman asked of you in your meeting on January 5th?

GREG JACOB:

Yes.

JOHN WOOD:

And what was your reaction when Dr. Eastman said on January 5th that he was there to ask the Vice President of the United States to reject electors at the joint session of Congress?

GREG JACOB:

I was surprised because I had viewed it as sort of one of the key concessions that we had

secured the night before from Mr. Eastman that — that he was not recommending that we do that.

JOHN WOOD:

So what did you say to him?

GREG JACOB:

Well, as I indicated, to some extent it simplified my task because the — there are more procedural complexities to the send it back to the states point of view. And I actually had spent most of my evening the night before writing a memorandum to the Vice President explaining all of the specific provisions of the Electoral Count Act that that plan would violate.

So instead, since he was pushing the sort of robust unilateral power theory — I've already walked the committee through the discussions that we had. We — again, we — I started out with our points of commonality or what I thought were our points of commonality. We're conservatives, we're small government people.

We believe in originalism as the means that — by which we're going to interpret this. And so we walked through the text, we walked through the history, and at — the committee had shown footage of Mr. Eastman on the stage on the sixth claiming that Jefferson supported his position in a historical example of Jefferson.

In fact, he conceded in that meeting Jefferson did not at all support his position that in the election of 1800 there had been some small technical defect with the certificate in Georgia.

It was absolutely undisputed that Jefferson had won Georgia. Jefferson did not assert that he had any authority to reject electors.

He did not assert that he had any authority to resolve any issue during the course of that.

And so he acknowledged by the end that there was no historical practice whatsoever that supported his position. He had initially tried to — to push examples of Jefferson and Adams. He ultimately acknowledged they did not work.

As we've covered, he acknowledged it would lose nine oh in the Supreme Court. He again tried to say but I don't think the courts will get involved in this. They'll invoke the political

question doctrine. And so if the courts stay out of it, that will mean that we'll have the 10 days for the states to weigh in and resolve it. And then the — you know, they'll — they'll send back the Trump slates of electors and the people will be able to accept that.

And I expressed my vociferous disagreement with that point. I did not think that this was a political question. Among other things, if the courts did not step in to resolve this there was nobody else to resolve it. You would be in a situation where you have a standoff between the President of the United States and counter factually the Vice President of the United

States saying that we've exercised authorities that constitutionally we think we have by which we have deemed ourselves the winners of the election.

You would have an opposed House and Senate disagreeing with that. You would have state legislatures that to that point, I mean, Republican leaders across those legislatures had put

together — had put out statements, and we collected these for the Vice President as well, that the people had spoken in their states and that they had no intention of reversing the outcome of the election.

GREG JACOB:

We did received some signed letters that Mr. Eastman forwarded us by minorities of leaders in those states, but no state had any legislative house that indicated that it had any interest in it. So, you would have had just a — an unprecedented constitutional jump ball situation with that standoff. And as I expressed to him, that issue might well then have to be decided in the streets, because if we can't work it out politically, we've already seen how charged up people are about this election.

And so, it would be a — a disastrous situation to be in. So, I said I think the courts will intervene. I do not see a commitment in the Constitution of the question whether the vice president has that authority to some other actor to resolve. There's arguments about whether Congress and the vice president jointly have a constitutional commitment to generally decide electoral vote issues.

I — I don't think that they have any authority to object or reject them. I don't see it in the 12th Amendment, but nonetheless — and I concluded by saying, John, in light of everything that we've discussed, can't you — we just both agree that this is a terrible idea? And he couldn't quite bring himself to say yes to that, but he very clearly said, well, yeah, I see we're not going to be able to persuade you to do this.

And that was how the meeting concluded.

JOHN WOOD:

But you just described a terrifying scenario. Sounds like there could have been chaos under the Eastman approach, and you have described it a — potentially could be decided in the streets. And you've described several concessions that Dr. Eastman made throughout that discussion or even debate that you had with him.

At some point during that meeting on January 5th, did Dr. Eastman seemed to admit that both of the theories that he had presented to the United States a day before — so, the theory that the vice president could reject electors outright and declare Donald Trump the winner

and his less aggressive theory that the vice president could simply send it back to the states, at some point in that conversation, on the 5th, did Dr. Eastman seem to admit that both of these theories suffered from similar legal flaws?

GREG JACOB:

So, I had at least one, possibly two, other conversations with Dr. Eastman later that day. In the earlier meeting, we really were focused, because his request that he made had been reject the

electors outright, on why that theory was wrong and why we certainly would not be doing. Later that day, he pivoted back to, well, we hear you loud and clear.

You're not going to reject. But remember, last night I said that there was this more prudent course where you could just send it back to the states. Would you be willing to do that? And during the course of our discussion about his renewed request that we consider that option, he acknowledged to me — he put it both Mr. Eastman and myself are graduates of the University of Chicago Law School, and he said, look, as graduates of that august institution, you and I will mutually understand that the underlying legal theory of plenary vice presidential authority is what you have to have to get there, because this new theory, as I was pointing out to him, or the procedural theory, still violates several provisions of the

Electoral Count Act, as he acknowledged.

And the only way that you could ever be able to ignore several provisions of statutory law is if it was pretty clear that they were unconstitutional. And the only way they could be unconstitutional is if the vice president had the plenary authorities that were — formed the basis for the reject votes as well.

So, he acknowledged in those conversations that the underlying legal theory was the same, he just thought that the send it back to the states option would be more politically palatable and he hoped more palatable to the vice president for that reason.

JOHN WOOD:

And in fact, when Dr. Eastman made this concession during that meeting, according to your earlier deposition, Dr. Eastman said, just between us University of Chicago chickens, is that right?

GREG JACOB:

I don't think that the University of Chicago is going to start a Chicago Chickens fundraiser club. But yes, that is the terminology that he used. He said, you know, just between us Chicago chickens, we will understand, as — as lawyers who have studied the Constitution, that the underlying basis really is the same.

JOHN WOOD:

I reserve for the remainder of my time.

PETE AGUILAR:

Thank you, Mr. Wood. Mr. Jacob, the president and the vice president meet again on that ame topic the next day, January 5th, correct?

GREG JACOB:

Their — so, after my extended meeting with Mr. Eastman that morning, during that time the vice president had been back at his residence working on his statement to the nation that we released the next day. He got down to the White House at some point between 1:00 and 2:00 as my meeting with Mr. Eastman was wrapping up. And when we — Marc Short and I went over to meet with the vice president and — actually, we thought maybe we had good news.

We felt like we had sort of defeated Mr. Eastman. He was sort of acknowledging that there was no there there. But the vice president was then asked down to the Oval Office. And he went down to the Oval Office while Marc and I stayed back in the vice president's office.

PETE AGUILAR:

You weren't in that meeting?

GREG JACOB:

I was not.

PETE AGUILAR:

In the book Peril, journalists Bob Woodward and Robert Costa write that the president said, "If these people say you have the power, wouldn't you want to?" The vice president says, "I wouldn't want any one person to have that authority." The president responds, but wouldn't it almost be cool to have that power?

The vice president is reported to have said, no, look, I've read this and I don't see a way to do it. We've exhausted every option. I've done everything I could and then some to find a way around this. It's simply not possible. My interpretation is no, to which the president says, no, no, no, you don't understand, Mike.

You can do this. I don't want to be your friend anymore if you don't do this. We asked Marc Short about this during his deposition. [Begin videotape]

MARC SHORT:

An understanding that I would have. In other conversations with the vice president, he articulated to me that, no, he wouldn't want that power bestowed upon any one person.

[End videotape]

PETE AGUILAR:

Mr. Jacob, did you, Mr. Short, and the vice president have a call later that day again with the

president and Dr. Eastman?

GREG JACOB:

So, yes, we did.

PETE AGUILAR:

And what did Dr. Eastman request on that call?

GREG JACOB:

On that phone call, which I believe was around 5:00 that afternoon, Mr. Eastman stated that he had heard us loud and clear that morning. We were not going to be rejecting electors. But would we be open to considering the other course that we had discussed on the 4th, which would be to suspend the joint session and request that state legislatures reexamine certification of the electoral votes?

PETE AGUILAR:

That same day, January 5th, the New York Times ran a story about the disagreement between the president and the vice president about whether the vice president could determine the outcome of the election. Even though the New York Times story was indisputably correct, Donald Trump denied it. Trump issued a statement claiming that the vice president had agreed that he could determine the outcome of the election, despite the fact that the vice president had consistently rejected that position.

Let's look at what the president said in his statement. "The New York Times report regarding comments Vice President Pence supposedly made to me today is fake news. He never said that. The vice president and I are in total agreement that the vice president has the power to act." Mr. Jacob, how did the vice president's team react to this statement from the president that the vice president could take an active role in determining the winner of the presidential election?

GREG JACOB:

So, we are shocked and disappointed because whoever had written and put that statement

out, it was categorically untrue.

PETE AGUILAR:

The vice president's chief of staff, Marc Short, had an angry phone call with Trump campaign senior adviser Jason Miller about this statement. Here's what Mr. Short and Mr.

Miller told the committee about that call.

[Begin videotape]

UNKNOWN:

Ok. Tell me about the conversation you had with Jason.

MARC SHORT:

It was brief. I was irritated and expressed displeasure that a statement could have gone out that misrepresented the vice president's viewpoint without consultation.

UNKNOWN:

The statement says the vice president and I are in total agreement, that the vice president has the power to act. Is that incorrect?

MARC SHORT:

I think the record shows that that's incorrect.

UNKNOWN:

Yeah.

MARC SHORT:

I mean, we've — we've been through many documents that clarify that this is not where the vice president was.

UNKNOWN:

Right. So, essentially, the president is sending out a baldly false statement about being in

alignment, purported alignment, with the vice president despite all of the predicate that you indicated had gone before about their respective positions. Is that effectively what happened?

MARC SHORT:

I interpret the statement is false. I'll let you figure out who sent it out.

UNKNOWN:

When Marc Short contacted you, he — he was upset. Is that what you said?

JASON MILLER:

He clearly was not pleased.

UNKNOWN:

Tell us what he said?

JASON MILLER:

What's the process for putting out a statement for a meeting where only two people were in the room?

UNKNOWN:

Did he ask you to retract the statement?

JASON MILLER:

No, he just — I think it went right to what's the process for putting out a statement for a meeting when only two people were in the room.

UNKNOWN:

And he clearly disagreed with the substance though, right, because he said that — he said the vice president doesn't agree with this.

JASON MILLER:

I'm trying to think what exactly he said. I mean, the — the tone was very clearly that he'd — that he'd used some language to strongly infer that the vice president disagree with — with that take, but I don't remember what that language was.

UNKNOWN:

Did he dictate this statement?

JASON MILLER:

We — he dictated — he dictated most of it. I mean, typically on these — typically on these, I might have a couple of wording suggestions, or maybe I'd, you know, have a — a sense or a rough framework or something of that. But I — I know with — specifically on this one that it was me and him on the phone talking through it, and ultimately the way this came out was

the way that he wanted to. [End videotape]

PETE AGUILAR:

The dispute between the president and the vice president had grown to the point where the vice president's chief of staff, Marc Short, was concerned that the president could, in Mr. Short's

words, "lash out at the vice president on January 6th." In fact, Mr. Short was so concerned about it that he talked with the head of the vice president's Secret Service detail on January 5th. Here is Mr. Short.

[Begin videotape]

MARC SHORT:

Concern was for the vice president's security, and so I wanted to make sure the head of the vice president's Secret Service was aware that — that likely, as these disagreements became ore public, that the president would lash out in some way. [End videotape]

PETE AGUILAR:

After the recess, we will hear that Marc Short's concerns were justified. The vice president was in danger. Mr. Chairman, I reserve.

BENNIE THOMPSON:

Pursuant to the order of the committee of today, the chair declares the committee in recess for a period of approximately 10 minutes. [Recess] Committee will be in order. Gentleman from California, Mr. Aguilar, is recognized.

PETE AGUILAR:

I'd now like to turn to the events of January 6, 2021, which turned out to be a fateful day in our nation's history. Despite the fact that the Vice President consistently told the President that he did not have and would not want the power to decide the outcome of the Presidential election, Donald Trump continued to pressure the Vice President both publicly and privately.

As you will hear, things reached a boiling point on January 6th and the consequences were disastrous. In the middle of the night on January 5th, into the morning of the sixth, around 1:00 am, President Trump tweeted at the Vice President. Meaning that the comments in response to the President's tweet would also show up on the Vice President's Twitter feed.

The tweet stated that the Vice President could quote, "come through for us", and send it back to the states. Then around 8:00 am on January 6th, President Trump again tweeted.

This time to say that the Vice President could send it back to the states and quote, "we win". And that, this is the time for extreme courage.

Mr. Short told us during his deposition that the Vice President started a meeting on January 6th in prayer. Here is what Mr. Short said. [Begin Videotape]

UNKNOWN:

You arrived at the Vice President's residence?

MARC SHORT:

As would often be the case. I recall that knowing it would be an important day, we gathered in prayer and often that would be something the staff member would — would lead. So it would have just been at that time, I believe, the Vice President, myself, Greg, and Chris.

And we would have just asked for guidance and wisdom knowing that the day was going to be a challenging one.

[End Videotape]

PETE AGUILAR:

Mr. Jacob, did you go to the Vice President's residences on the morning of January 6th?

GREG JACOB:

Yes.

PETE AGUILAR:

Who else was with you?

GREG JACOB:

Marc Short, Devin O'Malley, our communications director, and Chris Hodgson, our legislative affairs director.

PETE AGUILAR:

And did the Vice President have a call with the President that morning?

GREG JACOB:

He did.

PETE AGUILAR:

Were you with the Vice President during the call?

GREG JACOB:

So we had been putting the — the Vice President had finalized his statement overnight. We were in the process of proofing it so that we could get that out. And we were told that a call had come

in from the President. The Vice President stepped out of the room to take that call and no staff went with him.

PETE AGUILAR:

The President had several family members with him in the Oval that morning for that call.

I'd like to show you what they and others told the Select Committee about that call along with never before seen photographs of the President on that call from the National Archives.

[Begin Videotape]

ERIC HERSCHMANN:

When I got in, somebody called me and said that the family and others were in the oval.

And do I want to come up. So I — I went upstairs.

UNKNOWN:

And who do you recall being in the Oval Office?

ERIC HERSCHMANN:

Don Jr, Eric, Laura, Kimberly, I believe Meadows was there. At some point Ivanka came in.

IVANKA TRUMP:

It wasn't a specific formal discussion. It was very sort of loose and casual.

UNKNOWN:

So then you said at some point there's a telephone conversation between the President and the Vice President. Is that correct?

ERIC HERSCHMANN:

Yes.

IVANKA TRUMP:

When I entered the office the second time he was on the telephone with who I later found out to be was the — the Vice President.

UNKNOWN:

Could you hear the Vice President or only hear the President's end?

ERIC HERSCHMANN:

Only hear the President's end. And at some point it started off as a calmer tone, everything, and then it became heated.

IVANKA TRUMP:

The conversation was — was pretty heated.

ERIC HERSCHMANN:

I think till it became somewhat, you know, louder tone, I don't think anyway was paying attention to it initially.

UNKNOWN:

Did you hear any part of the phone call, even if just this — the end that the President was speaking from?

NICHOLAS LUNA:

I did. Yes.

UNKNOWN:

Alright. And what did you hear?

NICHOLAS LUNA:

So as I was dropping off the note, I — my memory — I remember hearing the word wimp.

Either he called him a wimp — I don't remember if he said you are a wimp, you'll be a

wimp. Wimp is the word I remember.

UNKNOWN:

It's also been reported that the President said to the Vice President that — something to the

effect of you don't have the courage to make a hard decision.

KEITH KELLOGG:

Worse. I remember exactly it was something like that. Yeah.

UNKNOWN:

Do you --

KEITH KELLOGG:

-- Being — you're — you're not tough enough to make the call.

IVANKA TRUMP:

It was a different tone than I'd heard him take with the Vice President before.

UNKNOWN:

Did Ms. Trump share with you any more details about what had happened or any details about what had happened in the Oval Office that morning?

JULIE RADFORD:

That her dad had just had an upsetting conversation with the Vice President.

UNKNOWN:

Do you recall anything about her demeanor either during the meeting or when you encountered her in Dan Scavino's office?

ERIC HERSCHMANN:

I don't remember specifically. I mean, I think she was uncomfortable over the fact that there was obviously that type of interaction between the two of them.

UNKNOWN:

Something to the effect this is — the wording is wrong. I made the wrong decision four or five years ago. And the — the word that she related to you that the President called the Vice President, I apologize for being impolite, but do you remember what she said her father called him?

JULIE RADFORD:

The P word. [End Videotape]

PETE AGUILAR:

Mr. Jacob, how would you describe the demeanor of the Vice President following the call — following that call with the President?

GREG JACOB:

When he came back into the room, I'd say that he was steely, determined, grim.

PETE AGUILAR:

Of course, the most dangerous part of what Donald Trump did on January 6th was what he did himself. As will be discussed in detail in a future hearing, our investigation found that early drafts of the January 6th Ellipse speech prepared for the President included no mention of the Vice President. But the President revised it to include criticism of the Vice

President and then further ad-libbed.

Here is what the President said on January 6th after his call with Vice President Pence.

[Begin Videotape]

DONALD TRUMP:

I hope Mike is going to do the right thing. I hope so. I hope so. Because if Mike Pence does the right thing, we win the election. All Vice President Pence has to do is send it back to the states to recertify and we become President. And you are the happiest people. And I actually — I just spoke to Mike.

I said Mike that doesn't take courage. What takes courage is to do nothing. That takes courage. And then we're stuck with a President who lost the election by a lot and we have to live with that for four more years. We're just not going to let that happen. And Mike Pence is going to have to come through for us. And if he doesn't, that will be a — a sad day for our country.

And they want to recertify their votes. They want to recertify. But the only way that can happen is if Mike Pence agrees to send it back. So I hope Mike has the courage to do what he has to do. And I hope he doesn't listen to the RINOs and the stupid people that he's listening to. [End Videotape]

PETE AGUILAR:

Of course, we all know what happened next. The President's words had an effect. President Trump's supporters became angry. When the Vice President issued his public letter, the crowd at the Capitol erupted in anger. The rioters who had erected makeshift gallows began chanting hang Mike Pence. Testimony in our investigation has made clear what the target of the rioters' ire was: Vice President Mike Pence.

The rioters breached the Capitol at 2:13 p.m.. [Begin Videotape]

UNKNOWN:

Go. Go. Go. Go. [End Videotape]

PETE AGUILAR:

Now let's take a look at what was going on at the White House at this time. We received testimony that the President's Chief of Staff Mark Meadows was notified of the violence at the Capitol by two p.m. and likely earlier. The testimony further establishes that Mr. Meadows quickly informed the President and that he did so before the President issued his 2:24 p.m. tweet criticizing Vice President Pence for not having quote, "Courage to do what needed to be done." Here is what the President wrote in his 2:24 p.m. tweet while the violence at the Capitol was going on. And here is what the rioters thought.

[Begin Videotape]

UNKNOWN:

-- Nothing but a traitor, and he deserves to burn with the rest of em. So this — so this all escalated after Pence — what — what happened? Did Pence — — Pence, yeah. Pence didn't do what we wanted. Pence voted against Trump. Ok. And that's when all this started? Yup.

That's when we marched on the Capitol.

We've been shot at with rubber bullets, tear gas. We just heard that Mike Pence is not going to reject any fraudulent electoral votes. Boo. You're a traitor. That's right. You've heard it here first. Mike Pence has betrayed the United States of America. Fuck you, Mike Pence.

Mike Pence has betrayed this President and he has betrayed the people of the United States and we will never, ever forget.

[Cheers] It's real simple. Pence betrayed us, which apparently everybody knew he was going to and the President mentioned it like five times when he talked. You can go back and watch the President's video. This is our Capitol. Let's be respectful to it. There's four million people coming in. So there's a lot of control [Inaudible]. It's only a matter of time.

Justice is coming. [End Videotape]

PETE AGUILAR:

Although the President's Chief of Staff Mark Meadows has refused to testify before this committee, Mr. Meadows' aide Ben Williamson and White House Deputy Press Secretary Sarah Matthews testified that Mr. Meadows went to the dining room near the Oval Office to tell the President about the violence at the Capitol before the President's 2:24 p.m. tweet.

In future hearings you'll hear more about exactly what was happening in the White House at that time. But here is what some White House staff told the select committee.

[Begin Videotape]

UNKNOWN:

Do you know where he went?

BEN WILLIAMSON:

Yes, I followed him down the hallway and I followed him into the outer oval corridor, which is the hallway between the Oval Office hallway and the outer oval section of the Oval Office.

I followed him into that little corridor hallway. I saw him walk into outer oval. I maybe took a step into outer oval and then left.

And I don't know where he went outside of that, but it looked like he was headed in the direction of the Oval Office.

SARAH MATTHEWS:

You know, we had all talked about — at that point about how it was bad and the, you know, situation was getting out of hand. And I — I know Ben Williamson and I were conferring and we thought that the President needed to tweet something and tweet something immediately. And I think when Kayleigh gave us that order of don't say anything to the media I told her that I thought the President needed to tweet something.

And then I remember — then I remember getting a notification on my phone. And I was sitting in a room with Roma and Ben and we all got a notification. So we knew it was a tweet from the President, and we looked down and it was a — a — a tweet about Mike Pence.

BEN WILLIAMSON:

I believe I had sent him a text saying that we may want to put out some sort of statement because the situation was — was getting a little hairy over at the Capitol. And then it was common for after I would text him I would just go down and — and see him in person.

UNKNOWN:

You went down to speak with Mark Meadows after this. What was that conversation?

BEN WILLIAMSON:

Very brief. I went down and told him the same thing I have in the text that I can recall. And I — I don't remember anything that was said between us other than I told him that and to my recollection he immediately got up and — and left his office. [End Videotape]

PETE AGUILAR:

Our investigation found that immediately after the President's 2:24 p.m. tweet, the crowds both outside the Capitol and inside the Capitol surged. The crowds inside the Capitol were able to overwhelm the law enforcement presence, and the Vice President was quickly evacuated from his ceremonial Senate office to a secure location within the Capitol complex.

[Begin Videotape]

UNKNOWN:

By 2:24 p.m., the Secret Service had moved Vice President Pence from the Senate chamber to his office across the hall.

CHRIS HODGSON:

The noise from the rioters became audible, at which point we recognized that maybe they had gotten into the building.

UNKNOWN:

Then President Trump tweeted Mike Pence didn't have the courage to do what should have been done to protect our country and our Constitution, giving states a chance to certify a corrected set of facts, not the fraudulent or inaccurate ones which they were asked to previously certify. USA demands the truth.

Bring out Pence. Bring out Pence.

SARAH MATTHEWS:

It was clear that it was escalating and escalating quickly.

UNKNOWN:

Hang Mike Pence. Hang Mike Pence. Hang Mike Pence.

SARAH MATTHEWS:

So then when that tweet — the Mike Pence tweet was sent out I remember us saying that that was the last thing that needed to be tweeted at that moment. The situation was already bad, and so it felt like he was pouring gasoline on the fire by tweeting that.

UNKNOWN:

30 seconds later, rioters already inside the Capitol opened the East Rotunda door just down the hall. And just 30 seconds after that rioters breached the crypt one floor below the Vice President. The Secret Service couldn't control the situation and do their job of keeping him safe. At 2:26 p.m., Secret Service rushed Vice President Pence down the stairs.

GREG JACOB:

I think they had been trying to figure out whether they had a clear route to get us to where there — it was that they wanted to move us to.

UNKNOWN:

We moved pretty quickly down the stairs and through various hallways and tunnels to the secure location. Upon arriving there, there was further discussion as to whether or not we were going to leave the Capitol complex or stay where we were. Vice President Pence and his team ultimately were led to a secure location where they stayed for the next four and a half hours, barely missing rioters a few feet away. [End Videotape]

PETE AGUILAR:

Approximately 40 feet. That's all there was. 40 feet between the Vice President and the mob. Mr. Jacob, you were there. Seeing that for the first time.

Does it surprise you to see how close the mob was to the evacuation route that you took?

The — 40 feet is the distance from me to you roughly.

GREG JACOBS:

I could hear the din of the rioters in the building while we moved, but I don't think I was aware that they were as close as that.

PETE AGUILAR:

Make no mistake about the fact that the Vice President's life was in danger. A recent court filing by the Department of Justice explains that a confidential informant from the Proud Boys told the FBI that the Proud Boys would have killed Mike Pence if given a chance. This witness, whom the FBI affidavit refers to as W1, stated that other members of the group talked about things they did that day and they said that anyone they got their hands on they would have killed including Nancy Pelosi.

W-1 further stated that members of the Proud Boys said that they would have killed Mike Pence if given a chance. We understand that Congressional leaders and others were evacuated from the Capitol complex during the attack. We'd like to show you what happened after the Vice President was evacuated from the Senate.

[Begin Videotape]

UNKNOWN:

Select Committee has obtained never before seen photos from the National Archives that show Vice President Pence sheltering in a secure underground location as rioters overwhelmed the Capitol. At 4:19 pm, Vice President Pence is seen looking at a tweet the President had just sent, a tweet asking the rioters to leave the Capitol.

After four and a half hours spent on working to restore order, the Vice President returned to the Senate floor to continue the certification of electors. [End Videotape]

PETE AGUILAR:

So Vice President Pence was the focus of the violent attack. Mr. Jacob, did the Vice President leave the capital complex during the attack?

GREG JACOB:

He did not.

PETE AGUILAR:

Can you please explain why the Vice President refused to leave the Capitol complex?

GREG JACOB:

When we got down to the secure location, Secret Service directed us to get into the cars, which I did. And then I noticed that the Vice President had not. So I got out of the car that I had gotten in — gotten into and I understood that the Vice President had refused to get into the car. The head of his Secret Service detail, Tim, had said, I assure you we're not going to drive out of the building without your permission.

And the Vice President had said something to the effect of, Tim, I know you, I trust you, but you're not the one behind the wheel. And the Vice President did not want to take any chance that the world would see the Vice President of the United States Fleeing the United States Capitol. He was determined that we would complete the work that we had set out to do that day, that it was his constitutional duty to see through.

And the rioters who had breached the Capitol would not have the satisfaction of disrupting the proceedings beyond the day on which they were supposed to be completed.

PETE AGUILAR:

Let me see if I understand this right. You were told to get in the cars. And how many of the

Vice President's staff got into cars while he did not?

GREG JACOB:

Most of us.

PETE AGUILAR:

During our investigation, we received testimony that while the Vice President was in a secure location within the Capitol complex, he continued the business of government. We understand that the Vice President reached out to Congressional leaders, like the acting Secretary of Defense and others, to check on their safety and to address the growing crisis.

In addition, the Vice President's chief of staff, Marc Short, made several calls to senior government officials. Here's Mr. Short's testimony regarding his call with Representative

Kevin McCarthy. [Begin Videotape]

MARC SHORT:

He indicated that he had had some conversation. I don't recall whether it was with the

President or somebody at the White House, but I think he expressed frustration that I'm not taking the circumstances seriously as they should that moment.

UNKNOWN:

So Mr. McCarthy indicated he'd been in touch with someone at the White House and he conveyed to you that they weren't taking this as seriously as they should? You have to answer. Yes or no.

MARC SHORT:

Yes, yes.

UNKNOWN:

Ok. [End Videotape]

PETE AGUILAR:

While the Vice President made several calls to check on the safety of others, it was his own life that was in great danger. Mr. Jacob, did Donald Trump ever call the Vice President to check on his safety?

GREG JACOB:

He did not.

PETE AGUILAR:

Mr. Jacob, how did Vice President Pence and Mrs. Pence react to that?

GREG JACOB:

With frustration.

JOHN WOOD:

Mr. Jacob, immediately before you and the Vice President were evacuated to a secure location within the Capitol, you hit send on an email to John Eastman explaining why his legal theory about the Vice President's role was wrong. You entered [ph] your email by stating that, quote, "thanks to your bullshit, we are now under siege". We'll take a look at that email.

And Dr. Eastman replied, and this is hard to believe, but his reply back to you was, the siege is because you and your boss, presumably referring to the Vice President of the United States, did not do what was necessary to allow this to be aired in a public way so the

American people can see for themselves what happened.

Mr. Jacob, later that day you wrote again to Dr. Eastman. Let's show that email on the screen. In that email you wrote, and I quote, "did you advise the President that in your professional judgment, the Vice President does not have the power to decide things unilaterally?" And you ended that email saying, it does not appear that the President ever got the memo.

Dr. Eastman then replied, he's been so advised. And he ends his email with quote, "but you know him. Once he gets something in his head, it's hard to get him to change course".

Close quote. Mr. Jacob, when Dr. Eastman wrote, once he gets something in his head, it's hard to get him to change course. Did you understand the he, in that email, to refer to the

President of the United States?

GREG JACOB:

I did.

JOHN WOOD:

And Mr. Jacob, did you hear from Dr. Eastman further after the riot had been quelled? And if so, what did he ask?

GREG JACOB:

Late that evening, after the joint session had been reconvened, the Vice President had given a statement to the nation saying that violence was not going to win, freedom wins and that the people were going to get back to doing their work. Later that evening, Mr. Eastman emailed me

to point out, that in his view, the Vice President's speech to the nation violated the Electoral Count Act — that the Electoral Count Act had been violated because the debate on Arizona had not been completed in two hours.

Of course, it couldn't be since there was an intervening riot of several hours. And that the speeches that the majority and minority leaders had been allowed to make also violated the Electoral Count Act because they hadn't been counted against the debate time. And then he implored me, now that we have established that the Electoral Count Act isn't so sacrosanct as you have made it out to be, I implore you one last time, can the Vice President please do what we have been asking him to do these last two days?

Suspend the joint session, send it back to the states.

JOHN WOOD:

And we'll show you the text of that email, which Dr. Eastman wrote at 11:44 pm on January 6th. So after the attack on the Capitol and after law enforcement had secured the Capitol, he still wrote, as you described, quote, "So now that the precedent has been set that the Electoral Count Act is not quite so sacrosanct as was previously claimed, I implore you to consider one more relatively minor violation and adjourn for ten days to allow the legislatures to finish their investigations". So even after the attack on the Capitol been quelled, Dr. Eastman requested, in writing no less, that the Vice President violate the law by delaying the certification and sending the question back to the states.

Is that correct, Mr. Jacob?

GREG JACOB:

It is.

JOHN WOOD:

Did you eventually share Dr. Eastman's proposal with Vice President Pence?

GREG JACOB:

Not right at that time because the Vice President was completing the work that it was his duty to do, but a day or two later back at the White House, I did show him that that final email from Mr. Eastman.

JOHN WOOD:

And what was Vice President Pence's reaction when you showed him the email where Dr. Eastman, after the attack on the Capitol, still asked that the Vice President delay certification and send it back to the states.

GREG JACOB:

He said that's rubber room stuff.

PETE AGUILAR:

I'm — I'm sorry, Mr. Jacob, he said it's rubber room stuff?

GREG JACOB:

Yes, Congressman.

PETE AGUILAR:

What did you interpret that to mean?

GREG JACOB:

I understood it to mean that after having seen play out what happens when you convince people that there is a decision to be made in the Capitol legitimately about who is to be the President and the consequences of that he was still pushing us to do what he had been asking us to do for the previous two days, that that was certifiably crazy.

PETE AGUILAR:

We know that the Vice President did not do what Dr. Eastman requested because he presided over the completion of the counting of electoral votes late in that evening.

[Begin Videotape]

MIKE PENCE:

The number of electors appointed to vote for President of the United States is 538. Within that whole number, a majority is 270. The votes for President of the United States are as follows. Joseph Biden, Jr of the State of Delaware has received 306 votes. Donald J Trump of the state of Florida has received 232 votes.

The whole number of electors appointed to vote for Vice President of the United States is 538. Within that whole number a majority is 270. The votes for Vice President of the United States are as follows. Kamala D Harris of the state of California has received 306 votes. Michael R Pence of the state of Indiana has received 232 votes.

The announcement of the state of the vote by the President of the Senate shall be deemed a sufficient declaration of the persons elected President and Vice President of the United States, each for the term beginning on the 20th day of January 2021 and shall be entered together with the list of the votes on the journals of the Senate and the House of

Representatives.

[End Videotape]

PETE AGUILAR:

Mr. Jacob, we heard earlier that you and the Vice President and the team started January 6th with a prayer. You faced a lot of danger that day. And this is a personal question, but how did your faith guide you on January 6th?

GREG JACOB:

My faith really sustained me through it. I, down in the secure location, pulled out my Bible, read through it, and just took great comfort. Daniel 6 was where I went, and in Daniel 6, Daniel has become the second in command of Babylon, a pagan nation that he completely faithfully serves. He refuses an order from the king that he cannot follow and he does his duty in — consistent with his oath to God. And I felt that that's what had played out that

day.

PETE AGUILAR:

It spoke to you?

GREG JACOB:

Yes.

PETE AGUILAR:

At the end of the day, Marc Short sent the Vice President a text message with a Bible verse.

Here's what he told the select committee. [Begin Videotape]

MARC SHORT:

At 3:50 in the morning, when we finally adjourned and headed our ways, I remember texting the Vice President a passage from Second Timothy chapter four verse seven about, I fought the good fight. I finished the race. I have kept the faith. [End Videotape]

PETE AGUILAR:

He started his day with a prayer and ended his day with a Bible verse. I've fought the good fight. I finished the race. I've kept the faith. White House attorney, Eric Herschmann, testified that the next day January 7th he received a call from Dr. Eastman. Here is Mr.

Herschmann's account of that call. [Begin Videotape]

ERIC HERSCHMANN:

The day after, Eastman I remember why — he called me — or he texted me or called me, wanted to talk with me, and he said he couldn't reach others. And he started to ask me about something dealing with Georgia and preserving something potentially for appeal.

And I said to him, are you out of your f-ing mind?

I said — I said I only want to hear two words coming out of your mouth for now on, orderly transition. [inaudible] don't want to hear any other f-ing words coming out of your mouth no matter what other than orderly transition. Repeat those words to me. [inaudible]

Eventually he said, orderly transition.

I said, good, John. Now I'm going to give you the best free legal advice you're ever getting in your life. Get a great f-ing criminal defense lawyer. You're going to need it. And then I hung up on him. [End Videotape]

PETE AGUILAR:

In fact, just a few days later, Dr. Eastman emailed Rudy Giuliani and requested that he be included on a list of potential recipients of a Presidential pardon. Dr. Eastman's email stated quote, "I've decided that I should be on the pardon list if that is still in the works".

Dr. Eastman did not receive his Presidential pardon.

PETE AGUILAR:

So, let's see what Dr. Eastman did as a result when he was deposed by this committee.

[Begin videotape]

JOHN EASTMAN:

I assert my Fifth Amendment right against being compelled to be a witness against myself.

UNKNOWN:

Did the Trump legal team ask you to prepare a memorandum regarding the vice president's role in the counting of electoral votes at the Joint Session of Congress on January 6th, 2021?

JOHN EASTMAN:

Fifth.

UNKNOWN:

Dr. Eastman, did you advise the president of the United States that the vice president could

reject electors from seven states and declare that the president had been reelected?

JOHN EASTMAN:

Fifth.

UNKNOWN:

Dr. Eastman, the first sentence of the memo starts off by saying seven states have transmitted
dual slates electors to the president of the Senate. Is that statement in this

memo true?

JOHN EASTMAN:

Fifth.

UNKNOWN:

Has President Trump authorized you to discuss publicly your January 4th, 2021

conversation with him?

JOHN EASTMAN:

Fifth.

UNKNOWN:

Are — so, is it your position that you can discuss in the media direct conversations you had with
the president of the United States, but you will not discuss those same conversations with this
committee?

JOHN EASTMAN:

Fifth. [End videotape]

PETE AGUILAR:

Dr. Eastman plead the fifth a hundred times. Finally, let's hear from a federal court judge, the
only one to date who has opined on whether the president was involved in criminal activity. Page
36 of Judge Carter's ruling says, "Based on the evidence the court finds it more likely than not

that the president — that President Trump corruptly attempted to obstruct the joint session of Congress on January 6th, 2021." Page 40 of the ruling says,

"Based on the evidence, the court finds that it is more likely than not that President Trump and Dr. Eastman dishonestly conspired to obstruct the joint session of Congress on January 6th, 2021." And Page 44, Dr. Eastman and President Trump launched a campaign

to overturn a democratic election, an action unprecedented in American history.

Their campaign was not confined to the ivory tower. It was a coup in search of a legal theory. Mr. Jacob, what would have happened to our democracy if Vice President Pence had gone along with this plan and certified Donald Trump is the winner of the 2020 election?

GREG JACOB:

So, there would have been short term and long term effects. The short term I previously described a constitutional jump ball situation, political chaos in Washington, lawsuits, and who knows what happening in the streets, and you would have had the vice president of the United States having declared that the outcomes of these state elections were incorrect.

So, for all of those reasons, there would have been significant short term consequences.

But in the long term, we would have established a situation where a vice president would have asserted that one person could have the authority to determine the outcome of an election, which is antithetical to everything in our democracy.

It's antithetical to the rule of law. And so, it would have been significant impacts both in the short and the long term.

PETE AGUILAR:

Judge Luttig, in the statement you released earlier today, you wrote that the efforts by President Trump to overturn the 2020 election were, "The most reckless, insidious, and calamitous failures in both legal and political judgment in American history." What did you mean by that?

J. MICHAEL LUTTIG:

Exactly what I said, Congressman.

PETE AGUILAR:

Thank you, Judge. Thank you, Mr. Jacob. Mr. Chairman, I yield back.

BENNIE THOMPSON:

Gentleman --

PETE AGUILAR:

I'm sorry. I'm sorry, Mr. Chairman. I want that back. Mr. Chairman, this was an informative hearing, a powerful hearing. I'm grateful for your leadership and the leadership of the distinguished vice chair. Donald Trump knew he lost the 2020 election, but he could not bring himself to participate in the peaceful transfer of power so he latched on to a scheme that, once again, he knew was illegal.

And when the vice president refused to go along with it, he unleashed a violent mob against him. When we began, I asked how we got to this place, and I think the answer to that question starts with the fact that people in positions of power put their political party before their country. That cannot be allowed to continue.

I'll yield back now, Mr. Chairman.

BENNIE THOMPSON:

Thank you very much. Without objection, the chair recognizes that gentlewoman from

Wyoming, Ms. Cheney, for a closing statement.

LIZ CHENEY:

Thank you very much, Mr. Chairman. Thank you to my colleague, Representative Aguilar,

and thank you very much to our witnesses today, Mr. Jacob and Judge Luttig. Thank you for — for being here with us. We have seen so far in — in our hearings that President Trump knew that his claims of a stolen election were false.

You have seen that he knew that Mike Pence could not legally refuse to count electoral votes. And you have seen what Mike — what President Trump did to pressure Mike Pence into taking illegal action. Over the course of our next hearings, you will see information about President Trump's efforts, John Eastman efforts, the Trump legal team's efforts to apply pressure to Republican state legislatures, state officials, and others.

Judge Carter has recently written, "Dr. Eastman's actions in these few weeks indicate that his and President Trump's pressure campaign to stop the electoral count did not end with Vice President Pence. It targeted every tier of federal and state elected officials." We will examine all of those threats, and we will examine the Trump team's determination to transmit materially false electoral slates from multiple states to officials of the executive and legislative branches of our government.

We will examine the pressures put on state legislatures to convene to reverse lawful election results. An honorable man, receiving the information and advice that Mr. Trump received from his campaign experts and his staff, a man who loved his country more than himself would have conceded this election. Indeed, we know that a number of President

Trump's closest aides urged him to do so. This committee will address all of these issues in greater detail in the coming weeks.

Mr. Chairman, I yield back.

BENNIE THOMPSON:

The gentlelady yields back. Judge Luttig and Mr. Jacob, our nation owes you a great debt for your knowledge, integrity, and your loyalty to our Constitution. You and Vice President Pence are exactly the people our nation needed at a critical time. You had the courage to do what was right. In the weeks leading up to January 6th, many people failed this test when they had to choose between their oath to the country or the demands of Donald Trump.

But there were others who, like you, stood tall in the face of intimidation and put our democracy first. They include the judges who rejected the bogus claims of election fraud, the senior Justice Department officials who stood up to Donald Trump, and the state officials whom we will hear from at our next hearing.

We're deeply grateful to your courage and devotion to our country. There are some who think the danger has passed, that even though there was violence and a corrupt attempt to overturn the presidential election, the system worked. I look at it another way. Our system nearly failed and our democratic foundation destroyed but for people like you.

Judge Luttig, I want to give you an opportunity to share your thoughts on the ongoing threat. You've written the clear and present danger to our democracy now is that former President Donald Trump and other political allies appear prepared to seize the presidency in 2024 if Mr. Trump or one of his anointed candidates is not elected by the American people.

What do you mean by this?

J. MICHAEL LUTTIG:

Mr. Chairman, I'm honored beyond words by your words. I was honored on January 6th, 2021, and also honored beyond words to have been able to come to the aid of Vice

President Mike Pence. I prayed that day just like the vice president prayed that day. I believe we may have prayed the — the same prayer to the same God. I prayed that same prayer with my wife this morning before I came into these hearings.

I have written, as you said, Chairman Thompson, that today, almost two years after that fateful day in January 2021, that still Donald Trump and his allies and supporters are a clear and present danger to American democracy. That's not because of what happened on January 6th. It's because, to this very day, the former president, his allies, and supporters pledge that, in the presidential election of 2024, if the former president or his anointed successor as the Republican Party presidential candidate were to lose that election, that they would attempt to overturn that

2024 election in the same way that they attempted to overturn the 2020 election, but succeed in 2024 where they failed in 2020. I don't speak those words lightly.

I would have never spoken those words ever in my life, except that that's what the former president and his allies are telling us. As I said in that New York Times op-ed, wherein I was speaking about the Electoral Count Act of 1887, the former president and his allies are executing that blueprint for 2024 in open, in plain view of the American public.

I repeat, I would have never uttered one single one of those words unless the former president and his allies were candidly and proudly speaking those exact words to America. Chairman, thank you for the opportunity to appear here today for these proceedings.

BENNIE THOMPSON:

Thank you again, Judge Luttig. As a part of the Select Committee's charge to make recommendations that are informed by other investigative findings, we will be reviewing the views shared by Judge Luttig and other experts on potential improvements to the Electoral Count Act, among a range of other initiatives.

I know the information we presented over the last week is shocking, the idea that a president of the United States would orchestrate a key — a scheme to stay in power after

the people have voted him out of office. We are able to present this information because so many witnesses have cooperated with our probe.

But the fact is there are more people with direct knowledge, with evidence germane to our investigation. I ask those who might be on the fence about cooperating to reach out to us.

The committee's website address is being displayed behind me, January6th.house.gov.

There you can view the evidence we presented in our hearings and find a tip line to submit any information you might think would be helpful for our investigation.

And despite how you might not think it's important, send us what you think. And I thank those who've sent us evidence for their bravery and patriotism. Without objections, members will be permitted ten business days to submit statements for the record, including opening remarks and additional questions for the witnesses.

The chair requests those in the hearing room remain seated until the Capitol Police have escorted members from the room. Without objection, the committee stands adjourned.